# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

RECEIVED
COURT OF CRIMINAL APPEALS
ABEL ACOSTA, CLERK

EX PARTE § TEXAS COURT OF CRIMINAL APPEALS
§ NO. WR 78,113-01
HUMBERTO GARZA, §
§ IN THE 370th JUDICIAL DISTRICT
APPLICANT § COURT OF HIDALGO COUNTY, TEXAS
§ NO. CR-3175-04-G(1)

---

## APPLICANT'S OBJECTIONS TO, AND MOTION FOR WITHDRAWAL OF, THE CONVICTING COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW AND RECOMMENDATION OF DENIAL OF RELIEF

---

HILARY SHEARD
Texas Bar # 50511187
7301 Burnet Road, # 102-328
Austin, TX 78757
Phone: (512) 524 1371
Fax: (512) 646 7067
HilarySheard@Hotmail.com

*Counsel for Applicant.*

**APPLICANT'S OBJECTIONS TO THE CONVICTING COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND ITS RECOMMENDATION THAT RELIEF BE DENIED**

Applicant Humberto Garza, by and through counsel, respectfully requests

that this Honorable Court withdraw its Order of February 12, 2015, entering

Findings of Fact and Conclusions of Law (hereafter "Findings and Conclusions)

and containing a recommendation denying habeas corpus relief, and, taking into

account the following objections, withdraw the Order of February 12, 2015, recuse

itself and request the assignment of a different judge to preside over renewed

proceedings or, in the alternative, enter revised Findings of Fact and Conclusions

of Law and recommend relief.

As Applicant in his Renewed Objections Concerning Procedures and

Rulings in this Tex. Code. Crim. Proc. Art. 11.071, filed simultaneously with his

proposed Findings and Conclusions, has previously stated, these proceedings were

rendered unfair because of the Court's refusal to recuse itself, its refusal to admit

the reports of Applicant's expert witnesses and its denial of prompt and adequate

funding with which Applicant could develop his case. The fact-finding

procedures and rulings of the Convicting Court repeatedly impaired Applicant's

ability to adequately prepare and develop his case and to have his Grounds for

Relief fairly considered in these TEX. CODE CRIM. PROC. Art. 11.071 capital

habeas corpus proceedings. In addition to his previously stated objections, which Applicant now renews, he makes further objection to the Order of February 12, 2015, which adopted almost in their entirety the State's proposed Findings and Conclusions.

While state habeas courts are given discretion over the methods of developing and receiving evidence to resolve contested factual claims, *see, e.g.,* TEX. CODE CRIM. PROC. Art. 11.071, § 9(a), such discretion is circumscribed by the necessity that the fact-finding procedures be adequate for reaching reasonably correct results. *Ex parte Davila,* 530 S.W.2d 543, 545 (Tex. Crim. App. 1975) (citing *Townsend v. Sain,* 372 U.S. 293, 316 (1963)). Since the fact-finding procedures here were not adequate, and the Convicting Court has largely adopted the State's Findings and Conclusions despite the fact that they are flawed in many ways, this Court should reconsider its rulings.

This Court is asked to remedy several fundamental errors in this case, namely:

1)      The Convicting Court Should Have Recused Itself from Presiding over These Art. 11.071 Proceedings;[1]

---

[1]As discussed in Applicant's Petition for Writ of Mandamus of July 9, 2014 at 32-38, of which a copy is attached and which is incorporated herein by reference, the avenues by which to raise for review the denial of a Motion to Recuse filed during Art. 11.071 proceedings are unclear. Without mandamus relief, such proceedings continue to be presided over, as they have here, by a judge who should have been recused, and whose findings of fact and conclusions of

2) The Convicting Court Adopted the State's Proposed Findings of Fact and Conclusions of Law and Recommendations almost in their entirety and with virtually no amendment, thereby abdicating from its proper role of "neutral arbiter" of the proceedings;

3) The Convicting Court Denied Applicant an Adequate Opportunity to Develop the Factual Basis for His Grounds for Relief Because of the Court's Consistent Failure to Provide Timely and Adequate Funding with Which Applicant Could Develop His Case.

4) The Convicting Court Rendered the Proceedings Unfair by Refusing to Admit the Reports of Expert Witnesses Who Were Unable to Testify Solely Because of The Timing Limitations Imposed upon this Case.

.

---

law must be revisited. The issue of recusal is urged again in these objections, which are being filed simultaneously in the Court of Criminal Appeals, in order to ensure that Applicant's objection to the conduct of these proceedings before a judge who should have been recused is preserved.

.

## 1) The Convicting Court Should Have Recused Itself from Presiding over These Art. 11.071 Proceedings.

On May 27, 2014, Applicant's Counsel filed a Motion for the Court to Recuse Itself, which was denied. The case was therefore assigned to the Hon. J.R. "Bobby" Flores of the 139th District Court of Hidalgo County, for a hearing on the motion to recuse. The hearing was conducted on June 16, 2014. On July 3, 2014, Judge Flores entered an order denying the motion to recuse. Judge Flores denied the Motion to Recuse on July 3, 2014, without stating reasons for his decision, and Applicant subsequently, on July 8, 2014, sought leave to file a motion for writ of mandamus against Judge Flores, and commanding him to vacate his "Order Denying Applicant's Motion to Recuse 370th District Court Judge Noe Gonzalez" and to enter an Order recusing the Court. The Court of Criminal Appeals denied leave to file the motion for writ of mandamus on July 18, 2014.

The Court of Criminal Appeals did not deny the Petition for Writ of Mandamus on its merits, and Applicant continues to maintain that this Convicting Court should have recused itself.

The grounds for the recusal motion were that the Court's impartiality might reasonably be questioned, and that it had personal knowledge of disputed evidentiary facts. The gist of the factual allegations were that the Court and its bailiff, Alicia "Licha" Salinas, engaged in prejudicial off-the-record

communications with the jury during the trial, in the jury room, and outside the presence of counsel or the defendant.

The subject matter of the communications included the concern of jury members about their personal safety in this gang-related case in which the jury was required to answer the "future dangerousness" special issue, TEX. CODE CRIM. PROC. Art. 37.071. The actions of the Court and bailiff formed part of the subject matter of Applicant's Grounds for Relief Four, Five and Six, which included allegations of "jury misconduct, including the exposure of the jury to outside influences." Because of the Convicting Court's failure to provide funding (discussed further below) few of the jurors could be interviewed while the Application was being prepared, and such interviews as were conducted were done by volunteer law students. Some subsequent investigation of the case revealed that former jurors would indeed testify that both the Court and its bailiff engaged in off-the-record communications with the jury during the trial, in the jury room, and outside the presence of counsel or the defendant. Those communications concerned, among other things, the Court stating that gangs may threaten and follow jurors, and the bailiff telling the jurors, in response to their security concerns, that the Court carried a gun.

Since both the Court and its bailiff's actions were an integral part of the

pleaded grounds for relief, the basis for the motion to recuse was that, in the circumstances the Court's ability to adjudicate impartially a ground for relief concerning its own and its bailiff's conduct "might reasonably be questioned," and also that "the judge has personal knowledge of disputed evidentiary facts concerning the proceeding", TEX. R. CIV. P. 18b (b)(1) and (3). Applicant objects both to the Court's initial and continuing failure to recuse itself and to Judge Flores' subsequent denial of the Motion to Recuse, and urges that the question of recusal be reconsidered and reviewed.

Moreover, the Court's handling of the underlying issues during the pendency of the case and in the subsequent Findings and Conclusions further demonstrates that the Court's impartiality might reasonably be questioned: In addition to refusing to recuse itself, Court refused even to be interviewed by counsel concerning the allegations concerning outside influences on the jury and would only answer a few questions from counsel about what it stated its general courtroom practices to be. *See* Letters from undersigned counsel to the Court dated July 29, 2014, and August 3, 2014, filed on August 5, 2014. Thus, counsel was prevented from discovering relevant facts, and could not, of course, call the Court as a witness in the proceedings, because of the absence of prior discovery, and because of TEX. R. EVID. 605, which prohibits a sitting judge from appearing a

witness.

Furthermore, some of the very few amendments made by the Court to the State's proposed Findings and Conclusions included truncating the factual narrative of Ms. Palacios and Ms. Guerrero's accounts of what had happened as set out by the State in its proposed Findings and Conclusions: Compare State's proposed Findings and Conclusions at 528-539, with the Court's Findings and Conclusions at 528-530, which eliminate paras. 562-90 of the State's drafting, among other material.[2] The Court then simply dismissed the former jurors' testimony as not supporting "a finding that the jury was exposed to improper comment from this Court or its staff," and added that it "agrees with Judge Flores' implicit findings on credibility." Findings and Conclusions at para. 566, p. 529. The Court also added that "The evidence at the recusal hearing does not support a recusal," *id.*, thereby volunteering an opinion in its own favor on a legal question it was not called upon to answer. However, precisely because the Court's own integrity and that of its staff member were being called into question, these findings cannot be relied on as being impartially made. The jury-related claims

---

[2]The Court also inserted some facts concerning the recusal proceedings, see, e.g., Court's Findings and Conclusions at 528. Applicant does not suggest that he agrees with the State drafted material that was redacted, but emphasizes that the Court's concern to edit this discrete part of the State's voluminous pleading demonstrates why the Court's impartiality may properly be questioned.

are discussed again at pp. 600-604, and the Court again redacted some of the State-drafted material. Paragraph 66 in the Court's version removes even the explicit mention of material supporting both the recusal motion and Applicant's jury-related grounds for relief.[3]

Moreover, Applicant notes that Ms. Salinas was called by the State at the hearing on the motion to recuse and her testimony might properly have been considered by Judge Flores with regard to the recusal issue. However, Ms. Salinas was neither called by the State in person at the August 2014 evidentiary hearing, nor was the transcript of her recusal hearing testimony offered into evidence by the State for the purpose of these underlying Art. 11.071 proceedings, which are governed by the "Texas Rules of Criminal (sic) Evidence," see Art. 11.071§ 10. Applicant, on the other hand, had the transcripts of the recusal hearing testimony of jurors Palacios/Vera and Guerrero correctly admitted into

---

[3]Despite discussing the case law at length, neither the State nor the Court address the fact that the communications with the jury by the Court and bailiff in this case were ones which constituted an "outside influence" on the jury, evidence as to which would be admissible under TEX. R. EVID. 606(b)(1). Nor is any attempt made to objectively analyze the prejudice to Applicant from those communications, as required by *McQuarrie v. State*, 380 S.W.3d 145, 153-4 (Tex. Crim. App. 2012) (reversing and remanding for further proceedings where outside influence had potentially had negative impact on jury's verdict). *Colyer v. State*, 428 S.W.3d 117, 129-30 (Tex. Crim. App. 2014)(affirming objective "reasonable person" test as measure of impact of outside influence on hypothetical average jurors). Rather para. 71, p. 603, seems to directly contradict those authorities. The findings and conclusions concerning this ground for relief therefore cannot stand, and are objected to.

evidence. *See* Order on Motion to Deem Stipulated Evidence Formally Admitted of August 29, 2014. The Court in these habeas proceedings properly only had before it the affidavits, declarations and testimony of various former jurors, uncontradicted by anything to which Ms. Salinas testified. In this situation, whatever factors underlay Judge Flores' decision, this Court - or rather, a different judge presiding over this matter subsequent to this Court's recusal - should have arrived at its own estimation of the credibility of the former jurors rather than simply adopting the supposed "implicit" findings contained in Judge Flores simple statement that recusal was denied, and contained no findings of fact or conclusions of law. Indeed, Judge Flores' ruling may not have rested on credibility at all, or on any other matter relevant to these habeas proceedings.

For these reasons, Applicant objects to the Court's Findings and Conclusions, which must be revisited.

2) **The Convicting Court Adopted the State's Proposed Findings of Fact and Conclusions of Law and Recommendations Almost in Their Entirety and With Virtually No Amendment, Thereby Abdicating from its Proper Role of "Neutral Arbiter" of the Proceedings.**

The Court adopted the State's proposed Findings and Conclusions virtually without emendation or correction except, as noted above, with regard to information concerning issues that Applicant contends should have led to the

Court's recusal and to the grant of relief on his allegations concerning outside influences on the jury. Those parts of the State's proposed Findings and Conclusions that the Court did adopt overlook copious evidence that undermines the State's findings, and the many logical flaws in the State's submissions. A prime example is the finding concerning trial counsel's preparation of the case, at p. 511:

> 523. This Court was not privy to information concerning the steps which not privy to information concerning the steps which (sic - repetition in original) Applicant's trial attorneys, Ralph R. Martinez and Libra do "Keno" Vasquez took to investigate the underlying criminal case, including any conversations they may have had with Applicant, members of his family, or other potential witnesses, and thus must rely on Mr. Martinez' and Mr. Vasquez' credible testimony concerning this topic.

This "finding" overlooks the fact that in no case is a trial judge ever likely to be privy to the details of defense case preparation, and that if such knowledge were a prerequisite to the grant of habeas relief, relief would probably never be granted. Moreover, the Court overlooks the many affidavits from potential mitigation witnesses either overlooked by trial counsel or from whom trial counsel failed to elicit pertinent facts, as well as court and other records concerning Applicant's background and that of his family. *See, e.g.,* Applicant's Exhibits 4, 5, 10-29, 37-50, 54-73, and Applicant's Hearing Exhibits 2-3. The only reason

that the Convicting Court stated it "must" rely on counsel's testimony is, logically, that is the testimony that supported the State's position. This ignores the wealth of information undermining the State-drafted Findings and Conclusions. In addition to the affidavits from family members, the information before the Court included psychological reports created during Applicant's adolescence, Applicant's Exhibits 18 and 19, and the affidavit of Applicant's former TYC (Texas Youth Commission, now Texas Juvenile Justice Department) caseworker, which indicated that Applicant had serious psychological problems and came from a family background that contributed to those problems. Applicant's Exhibit 70, Affidavit of Jeanette Brothers.

There is no indication that the Court actually considered the content of Applicant's mitigation evidence developed in these habeas proceedings as exposing trial counsel's flawed and cursory case preparation or the prejudice caused to Applicant by trial counsel's performance: Although those four volumes of exhibits are listed and described at pp. 78-282, they are barely mentioned or discussed in the actual Findings and Conclusions. The Findings and Conclusions signed by the Court do not therefore amount to the work of an impartial court affording a full and fair proceeding and fairly supporting its findings by reference to the actual record of the case. A post-conviction court must actually consider

mitigation evidence brought before it, and may not unreasonably discount the impact of such evidence by assuming that because, for example, it might be in some way imperfect, it should be disregarded entirely. *Porter v. McCollum*, 558 U.S. 30, 37, 42-43 (2009) (perceived problems with cognitive testing and with evidence of alcohol abuse and abusive childhood did not justify "discount[ing] entirely the effect that testimony might have had on the jury.").

The Court of Criminal Appeals in *Ex parte Reed*, 271 S.W.3d 698, 729 (Tex. Crim. App. 2008) warned that a convicting court that does not act as a neutral arbiter and carefully scrutinize the State's proposed findings to ensure that they accurately reflect the record of a case can unnecessarily complicate that Court's independent review. *Reed*, 271 S.W.3d at 729; *See also Ex parte Simpson*, 136 S.W.3d 660, 668 (Tex. Crim. App. 2004)(emphasizing importance of convicting court's role in habeas proceedings). The United States Supreme Court has also criticized courts for "their verbatim adoption of findings of fact prepared by prevailing parties," *Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985), and has recently remanded such a case for further review of the procedures by which such a decision was made. *Jefferson v. Upton*, 560 U.S. 284, 294(2010)(remanding for determination whether state court factual findings warranted presumption of correctness).

The practice of convicting courts simply adopting the State's proposed Findings and Conclusions completely, or almost completely, is not unique to the 370th District Court of Hidalgo County, but is prevalent across this State: *See Ex parte Christopher Chubasco Wilkins*, Tarrant County, WR-75,229-01 (findings signed on December 22, 2010); *Ex parte Steven Anthony Butler*, Harris County, WR-41,121-02 (findings signed on February 28, 2012); *Ex parte Cortne Robinson*, Harrison County, WR-81,583-01 (findings signed on Aug. 25, 2014); *Ex parte Mark Soliz*, Johnson County, WR-82,429-01 (findings signed on Nov. 6, 2014); *Ex parte Garland Harper*, Harris County, WR-81,576-01 (findings signed on Dec. 11, 2014) and *Ex parte Gary Green*, Dallas County, WR-81,575-01 (findings signed on Dec. 31, 2014).

This practice undermines the principle that the Texas courts should provide an impartial and independent system for review of convictions and sentences. It also defies the statutory instruction that "Every provision relating to the writ of habeas corpus shall be most favorably construed in order to give effect to the remedy, and protect the rights of the person seeking relief under it." TEX. CODE. CRIM. PROC. Art. 11.04. Furthermore, it results in a denial of due course of law under Art. 1, s. 19 of the Texas Constitution, especially given that the Texas habeas statute specifically mandates protection of "the rights of the person seeking

relief," and also denies due process under the United States Constitution.

Moreover, the relevant Findings and Conclusions signed by the Court do not suggest that they have been the subject of careful scrutiny. In fact the content of its 637 pages is sometimes jumbled, with for example, a brief discussion of the law pertaining to Ground for Relief 14 inserted between a 16-page narrative concerning the Court of Criminal Appeals' recent case law on TEX. R. EVID. 606(b), at pp. 511-527, and discussion of Grounds for Relief 4-6 concerning outside influences on the jury, to which TEX. R. EVID. 606(b) is pertinent, at pp. 528-530. Between pages 332 and 584 there are 252 pages of text discussing multiple grounds for relief, unrelieved by a single subheading, and frequently discussing either the facts or the law without even explaining to the reader which ground for relief is being dealt with.

Some examples of the many respects in which these largely State-drafted findings did not merit the Court's signature are given below, specifically in regard to Applicant's allegation that counsel rendered ineffective assistance at the sentencing phase of his trial:

a)     Unwarranted Reliance on Trial Counsel's "Credibility".

The Findings and Conclusions rely throughout on the rote recitation of the word "credible" to describe trial counsel's testimony and on their attribution of

strategic reasons for their actions and inactions. They fail, however, to address whether counsel's explanation of their "strategies" and actions in fact demonstrated "reasonable professional assistance," given contradictory facts in the record. *Strickland v. Washington,* 466 U.S. 668, 689-690 (1984). Even if counsel were "credible" in the sense that the Court believed them to be sincere, and even if their explanations, taken in isolation, sounded facially plausible, it is imperative that any court reviewing a claim of ineffective assistance should come to a determination based on the totality of the facts of the individual case. *Id.*

As discussed further in the sections below, there are irreconcilable discrepancies between counsel's - particularly lead counsel's - assertions and actions at Applicant's trial, assertions during the evidentiary hearing and the other facts and evidence available to counsel. For example, the Findings and Conclusions state that trial counsel did not want to introduce psychological reports created during Applicant's adolescence because he wanted to avoid the jury hearing of "Applicant's anti-social behavior and his gang involvement." Para. 407 at 463-64; para. 26, 29 at 590-91; para. 48 at 596-97. However, lead counsel himself at trial referred to Applicant as "enforc[ing] things that maybe - that definitely were anti-social," 35 RR 9, and the jury heard copious evidence of Applicant's gang involvement during the guilt phase of trial, rendering counsel's

subsequent explanation illogical.

b)    <u>Failure to Investigate and Present  Evidence in Mitigation of Sentence.</u>

The Findings and Conclusions  are contradictory in that they quote, for example, the American Bar Association Guidelines for the Performance of Counsel in Death Penalty Cases (Rev. Ed. 2003), 31 HOFSTRA L. REV. 913 (2003) advocating that counsel should retain an investigator, a mitigation specialist and other professional expertise and conduct a "comprehensive pretrial investigation." Findings and Conclusions at pp. 402-03, but then endorse counsel's failure to retain a mitigation specialist, p. 461, and to simply conduct an investigation himself in the short time available before the trial commenced.  The Findings and Conclusions in fact assert that trial counsel were fully prepared for Applicant's capital murder trial and sentencing, para. 11, p. 586, despite counsel's preparation having consisted almost entirely of reading the State's file, speaking to Applicant and some family members, and performing legal research.  Para. 12, p. 587.  This flies in the face of many of the authorities set out in the Findings and Conclusions at, *e.g.*,  pp. 402-420 and 491-510, including the ABA guidelines and *Strickland v. Washington*, 466 U.S. 668, 706 (1986)("[C]ounsel's general duty to investigate ... takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of

death"); *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)(counsel ineffective for failing to investigate and present mitigating evidence of petitioner's life history); *Williams v. Taylor*, 529 U.S. 362 (2000), *Rompilla v. Beard*, 545 U.S. 374, 382 (2005) and *Ex parte Gonzalez*, 204 S.W.3d 391, 393-400 (Tex. Crim. App. 2006)(Cochran, J., concurring), which demonstrate the importance of an independent, thorough and extensive investigation in a capital case.[4]

The Findings and Conclusions claim that trial counsel had "valid reasons" for not obtaining the services of a mitigation specialist including lead counsel's belief that he could do his own mitigation investigation, his assertion that there was not that much mitigation evidence available and that he had spoken to Applicant, Applicant's family and "church people," and that Applicant had denied having problems with his father other than neglect. They also describe as "valid" counsel's choice to simply tell the family members they interviewed that they needed to know about "problems," "mental issues" or any other types of issues. Para. 16, 17, 46 and, p. 587-88, 596. This ignores the copious mitigation evidence that was in fact readily available and was presented in these Art. 11.071

---

[4]Given that the Court sat on the committee that oversaw the creation of the State Bar of Texas Guidelines and Standards for Texas Capital Counsel, Texas Bar Journal 966-982 (November 2006) which largely mirror the ABA guidelines, the Findings and Conclusions' endorsement of trial counsel's minimalist investigation as "thorough" provides additional ground to conclude that these statements are not the product of a neutral arbiter carefully scrutinizing a proposed order to ensure an accurate reflection of the record and application of legal principles.

proceedings. It again ignores the very case law and guidelines cited by the State itself in these Findings and Conclusions, which undermine the Findings and Conclusions' description of counsel's investigation as "thorough." Para. 17 at p. 588.

The discrepancies between the assertions of lead counsel that Applicant's family had failed to tell him significant information, or had given him different information from that contained in their later affidavits, p. 462, should have been given little weight: Lead counsel testified that he had asked Applicant's mother and family only indirectly about "problems" affecting applicant, and acknowledged that people are sometimes embarrassed or slow to disclose embarrassing things in their background, and that people with alcohol problems may not necessarily recognize them as such. 2 EHRR 125-130. His cocounsel, Keno Vasquez recalled that counsel had met the family in a group, with counsel sometimes taking an individual family member aside. 3 EHRR 59. He recalled lead counsel asking the family to talk about Applicant's childhood, but did not recall any specific questioning about sexual abuse, substance abuse, or about Applicant being suicidal, neglected by his mother or exposed to trauma other than the murder he had witnessed. 3 EHRR 28-29. While Keno Vasquez' affidavit of February 8, 2013 indicates, "Discussed everything with Defendant and family," in

response to a question about whether these and other specific topics were investigated, Affidavit at p. 15, his hearing testimony clarified that these specific topics were in fact not discussed. Indeed, Mr. Vasquez, who made it clear in both his hearing testimony and his affidavit that Mr. Martinez had had primary responsibility for the case, stated that had he been lead counsel, he would have looked closer into everything possible and explored issues such as Applicant being left alone by his mother. 3 EHRR 30-32.

Lead counsel claimed during the hearing that Applicant's family had conveyed to him that Applicant had a "nice, warm happy home," 2 EHRR 118, and that Applicant's mother, who counsel relied on as their primary source of mitigation information, was "a great mom," 2 EHRR 242, who calmly handled the pressure of having a son facing the death penalty. 2 EHRR 122. Those assertions are belied by Applicant's psychological reports and TYC records, by the multiple affidavits of family members and others describing Applicant's mother's poor parenting, and by counsel's own statement to the jury that Lydia Garza was a "deficient" and neglectful mother. 35 RR 8. Moreover, an ordained minister, Salomon Avila, describes Applicant's mother as "in a bad way" and "extremely stressed and fearful," prior to her son's trial. Exhibit 42 at 3-4. The Findings and Conclusions then condone as reasonable counsel's unquestioning acceptance of

statements made by Applicant's family members about his having had a good and happy upbringing, and denial or silence concerning familial alcohol related problems and Applicant's suicide attempts Para. 20-21, p. 589. That this reliance was unreasonable is demonstrated by the copious evidence that would have been available to counsel had they used a qualified and competent mitigation specialist to review records and thoroughly interview an appropriate range of witnesses extending beyond Applicant's immediate maternal family.

Applicant and his family may have failed to volunteer information, or not have been perfectly accurate or consistent in what they told counsel, but that does not automatically excuse counsel's failings. Counsel had no mental health training and no capital mitigation investigation experience and failed to hire anyone who could supplement those deficiencies. Preparation time was severely limited, but counsel did not move for sufficient additional time, and did not have conducted the kind of repeated, in-depth one-on-one interviews, informed by training and prior records review, that might have been more fruitful. *See, e.g., State v. Herring,* ____ N.E.3d ___, 2014 Ohio 5228, 2014 Ohio LEXIS 3074 * 51-52 (Ohio December 3, 2014)(defendant's failure to be forthcoming did not excuse trial counsel from conducting a mitigation investigation).

The conclusions, para. 34-36, p. 593, attribute strategic validity to the

supposed decisions by counsel not to present evidence that Applicant's mother neglected him in favor of her boyfriend, or that she had taken into her home a violent adult male criminal who was later shot in front of Applicant. The justification for these decisions is asserted as being that Applicant's mother had denied exposing her son to negative influences, had claimed to be a good mother, which was what counsel wanted the jury to hear and that she had failed to mention the shooting. This "strategic" explanation is undermined by the fact that counsel themselves described Applicant's mother as "deficient" and as having both "spoiled" and "neglected him because of her relationships," 35 RR 7-8, but failed to substantiate those assertions. Moreover, presenting Applicant as being the child of a good mother would logically fail to explain the negative and criminal trajectory of his life as being the product of his upbringing rather than simply the result of his own voluntary choices. As the affidavits provided in support of the writ application demonstrate, Applicant's mother did consistently give priority to her husband and boyfriends rather than her child, failed to protect him, exposed him to a wide range of criminal behavior and left him to his own devices for days or weeks at a time when he was as young as ten or eleven. *See, e.g.*, Applicant's Exhibits 4, 13 and 15, Affidavits of Lydia Garza at 6, Jennifer Cavazos at 4, Juanita Matthews at 2. The mere fact that, in conversation with counsel,

Applicant's mother might have had told them she had not left Applicant alone and was a "good mother," 2 EHRR 126, cannot excuse their failure to investigate further.

Moreover, counsel's claim that Applicant's mother did not tell them about the shooting is not credible: She and the widow of the deceased were friends, 35 RR 91, there was no reason Applicant's mother would have withheld the information, which she states that she did give to counsel - See Affidavit of Lydia Garza, Exhibit 4 at para. 81, and counsel elsewhere admitted that Applicant's mother had identified for them which witnesses they should call. 2 EHRR 274.

That the Findings and Conclusions's characterization of counsel's decision-making as based on valid strategy and a thorough mitigation investigation is illogical is further demonstrated by their treatment of Applicant's report of concerns, as a teenager, of "being pushed into sex." Para. 23, p. 590. The State's Findings and Conclusions claim that counsel was right not to present evidence on that issue because of damaging facts contained in the same report in which that concern was mentioned. *See* Applicant's Exhibit 18, Report of Dr. L.R. Fricke, p. 2. This ignores two facts: (1) that counsel never even asked their own client to explain what he had meant when he spoke of being "pushed into sex," 2 EHRR 132-34, and (2) that information in such reports can simply provide a basis for

other investigation without actually being introduced into evidence. Given that counsel did not give Applicant's statement even enough thought to simply ask him what he had been talking about, which might have allowed them to discover, e.g. the sexual abuse Applicant had experienced during his childhood - *see, e.g.,* Applicant's Exhibit 10, Affidavit of Edna Wilma Garza - their decision not to pursue that investigative avenue, or present a more expansive mitigation case, should not be dignified as the pursuit of a valid strategy.

c)    Mental Health Evidence and Use of Experts.

The Findings and Conclusions purport to validate trial counsel's failure to have Applicant evaluated by a mental health professional because Applicant and his family supposedly said he had no mental health issues and because counsel - who had no training in the field of mental health - recognized no indication of such problems. Para. 18, 20, 25, 27, p. 588-91. The conclusions state that counsel were reasonable to rely on their personal belief that Applicant was intelligent and their lack of perception that he had any problems. Para. 19, 27 p. 588-89, 591. Psychological reports, which had been disclosed by the State, put counsel on actual notice that Applicant's mental health had caused prior evaluators serious concern, not least because of the consequences of his witnessing the murder of a family friend - a fact that counsel themselves identified as sufficiently

important to Applicant's development to have presented evidence of it at sentencing. *See* Applicant's Exhibit 18 (TYC Psychological Evaluations); 35 RR 80-95, Testimony of Blanca Cortez.

Paras. 27, 28, 47, p. 591, 596, of the Findings and Conclusions state that counsel were reasonable to rely on what was said by Applicant and his family members, in deciding that Application had no mental health issues and that his mother was a "great mother," and a constant and supportive presence in his life with no alcohol-related issues, because they had no reason not to believe what they were told. Again, this assertion is obviously illogical when Applicant's psychological reports and TYC records are actually taken into account: they demonstrate a troubled upbringing by a neglectful mother and recommendations that Applicant receive further testing and treatment for problems that were already evident. *See* Applicant's Exhibit 18. Counsel had no reason to disbelieve the reports and records but did not investigate or follow up on this independent source material in any way. Rather, counsel claimed to have accepted what they were told by family members at face value even when what they were told was contradicted by the earlier reports, prepared by mental health professionals, and by the records compiled by TYC case workers.

In a notable contradiction of the conclusions in paras. 28 and 47, discussed

above, the conclusion at para. 52, p. 598, states that counsel "properly relied" on information received from Applicant and his family that Applicant's mother had not wanted him, had tried to terminate her pregnancy with him, and had left him to fend for himself as a child, that there was severe substance abuse within the family, and that Applicant had attempted suicide by cutting his wrist, and had emotional problems and depression and abused drugs. There is no indication in the trial record whatsoever reflecting that counsel relied on this information in any way, and the inherent contradictions among the various paragraphs of the State-drafted Findings and Conclusions are irreconcilable.

The Findings and Conclusions describe as a "valid strategic decision" counsel's decision not to utilize any experts "for fear that doing so would open the door to the prosecution's use of hypothetical situations that would emphasize Applicant's gang involvement and [admitted] extraneous offenses." Para. 19, 29, p. 588, 591. The characterization as "valid" and "strategic" is absurd: Counsel did not explain what the feared "hypotheticals" might consist of other than references to guns or gangs, 2 EHRR 167-68, factors of which the jury would have been aware from the guilt phase evidence. Nor did they explain how the State could further emphasize Applicant's gang involvement and extraneous offenses which formed a large part of the guilt phase evidence. This conclusion also

ignores the fact that it is possible to use experts to assist in case preparation without necessarily choosing to call them to testify, and that such consultation has been deemed a *sine qua non* of capital representation:   *See* Commentary to ABA Guidelines, The Defense Team and Supporting Services:  Guideline 4.1 which states that "mental health experts are *essential* to defending capital cases ... creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time consuming and expensive process. Counsel must compile extensive historical data, as well as obtaining a thorough physical and neurological examination."

Similarly, the Findings and Conclusions excuse as a valid strategy counsel's failure to present evidence of Applicant's post-traumatic stress disorder and depression because the reports from which counsel would have known of those mental disorders contained material about Applicant carrying a gun and having engaged in "anti-social behavior."  Paras. 25-26, 48, pp. 590-591, pp.596-97. Leaving aside that the reports themselves need not necessarily have been introduced into evidence, the jury in fact became aware, at and before sentencing, of just such negative information about Applicant.  What trial counsel failed to provide to the jury was any coherent explanation of *why* Applicant had developed as he had.  Failing to provide such an explanation because of what counsel

declared was a concern about introducing damaging material was an inadequate response to the State's case which was already laden with negative information.[5] Indeed, Applicant's undesirable practice of carrying a gun could have been readily explained had the jury been informed about his troubled background, not least that it was the father for whom Applicant "yearned," according to trial counsel, 35 RR 7, who had constantly exposed Applicant as a child to firearms, drug-trafficking and many other undesirable influences and activities. *See* Applicant's Exhibits 39, 40, 41, 43 Affidavits of George Morales, Eddie Garza, David Garza, Raul Herrera, Jr.

d) Gang Evidence and Applicant's Statements.

The Findings and Conclusions assert that "Trial counsel also made a valid stregic (sic) decision to keep evidence of Applicant's alleged gang involvement and drug involvement out of Applicant's case." Para. 15, p. 587. This overlooks the State's guilt phase presentation of comprehensive evidence of those very facts, *see, e.g.*, 30 RR 154-65, 31 RR 1-2, 31 RR 53-67, 31 RR 70-91; 31 RR 209-17, 31 RR 200-25, 32 RR 1-20, and that defense counsel themselves established, during

---

[5]As the Tennessee Supreme Court recently remarked, in a case reversed for ineffective assistance in a capital sentencing: "Counsel held in their hands compelling evidence that [the Applicant] has a broken brain and a tragic past ... [t]he evidence from [Applicant's] mental health records held little to demean him further in the jury's eyes. However, it had great potential to explain the invisible mental machinations that made him behave this way." *Davidson v. State*, ___ S.W.3d ___, 2014 Tenn. LEXIS 918 * 42-44 (Tenn. Nov. 17, 2014).

the guilt phase, that the Texas Syndicate is a gang, 31 RR 129, and that Applicant's imprisoned father, was a founder member of the Texas Syndicate, 31 RR 213, which information counsel had the same witness repeat on cross-examination, 32 RR 34. Counsel then referred to the same facts in his punishment phase opening. 35 RR 7.

The conclusion that counsel were reasonable to bring out that Applicant's father was a negative influence but without actually investigating or "emphasizing said matters," para. 30-31, 33 p. 592, for fear of bringing out information about the father's previous convictions and gang activities, is another lapse in logic that should not be upheld. Given that counsel did not know in advance what Applicant's father's criminal record consisted of, or what was in his records, their "know-nothing" approach of not even investigating that background information cannot be deemed "strategic." Moreover, as explained above, the jury was made aware that Applicant's father was a founder of the Texas Syndicate gang, and the evidence of Applicant's own gang involvement was comprehensively presented to the jury during the trial on the merits. Counsel otherwise described Applicant's father to the jury as " a violent man, extensive involvement," 35 RR 7, but without further explanation or evidence. Further explanation of the early influences at play in Applicant's life would have helped to demonstrate that

Applicant's criminal activities were attributable in large part to the absence of any positive role model or other support in his early life.

This Court should also reject the conclusion that trial counsel made a valid strategic decision not to introduce evidence about Applicant's father because "they had not wanted any gang evidence in this case and had instead wanted to limit this case to the statement which Applicant had made and to argue that there was not enough to prove the case," Para. 33, p. 592-93. Applicant's statement was the very source of much of the evidence of his gang involvement. It had been introduced at the guilt phase through the testimony of Detective Alvarez, 30 RR 154-166, 31 RR 1-204; Agent Bukowski, 31 RR 205-26, 32 RR 20-53, and Detective Ochoa, 32 RR 54-185, and Applicant's admissions had presumably been accepted by the jury that had now convicted Applicant. It was not logically or legally possible to ask the jury to ignore that evidence for the purpose of sentencing. What was therefore relevant for trial counsel would have been to try to mitigate Applicant's sentence. Evidence of a dysfunctional family background and early exposure to criminal activities is precisely the kind of evidence that has typically been viewed as mitigating, *see, e.g., Sears v. Upton*, 561 U.S. 945, ___ , 130 S.Ct. 3259, 3264 (2010)(counsel ineffective for failure to introduce evidence of abusive upbringing and that petitioner's brother introduced him to life of crime)

and trial counsel's failure to investigate and present such evidence cannot be justified by concerns that would only have been pertinent at the outset of the guilt phase.

The conclusion stating that it was sound strategy for counsel to rely at sentencing on a theory that the State had not proved its case beyond reasonable doubt, para. 49, p. 597, is similarly insupportable. Indeed, this conclusion stands in marked contrast to that in para. 56, p. 599, which declares, "The record of Applicant's case demonstrates that the jury had made a finding, based on the evidence, that Applicant was a major participant in the killings involved and had thus rejected any claim that Applicant's role had merely been peripheral." This Court should have rejected these essentially contradictory conclusions.

e)    Use of Applicant's Prison Records.

The conclusion that failing to challenge evidence of Applicant's disciplinary violations in prison was a "valid strategic decision" because the evidence would have been admitted anyway, Para. 37, p. 593-94, cannot stand. Logically, a total absence of disciplinary violations suggests that an inmate is less dangerous than one who has only some violations. Therefore, in the context of a capital sentencing, the goal should have been to exclude all such evidence, rather than to fail altogether to challenge it. At least one argument for exclusion existed:

the Confrontation Clause. *See Russeau v. State*, 171 S.W.3d 871, 880-81 (Tex. Crim. App. 2005)(Confrontation Clause violated when State did not show that prison officials were unavailable to testify and defendant had no opportunity to cross-examine them concerning their testimonial statements). Moreover, contrary to counsel's other asserted justification for their failure to challenge the evidence, the violations in question included violent acts, among them a stabbing. State's Exhibits 430, 440A.

The Findings and Conclusions also state that counsel were implementing a "valid strategic decision" in not presenting prison records including certificates that presented Applicant in a positive light as humorous and well-liked and as having completed courses in prison, for fear of the State introducing "unfavorable aspects" of Applicant's prison life. Para. 39, p. 594. However, counsel had actually tried, but failed, to introduce the certificates through Applicant's mother, 35 RR 135- 6, undermining their claim of "strategy." Moreover, the purported "strategy" was groundless when the State had already introduced into evidence Applicant's prison disciplinary record and parole file, counsel could not identify any further negative incident that was not in the record, and could have introduced the records under the business records exception to the hearsay rule. 2 EHRR 172-78.

Further examples of conclusions that should not be approved by this Court are at para. 38, p. 602, which asserts that counsel made a sound decision not to call "too many" witnesses, including family witnesses, because they might mention other incidents or extraneous offenses involving Applicant. Trial counsel did not, however, point to any such actual incident or offense. Moreover, their belief that Applicant's statement "absolved" him of intent to commit the murders, Para. 38, p. 594, was misplaced, given that the jury had just found him guilty of the murders. That counsel "felt" that the jury would not give the death penalty even if it convicted Applicant, Para. 38, p. 594, also does not represent a sound strategy: a "feeling" is simply not a strategy that justifies limiting the investigation and evidentiary presentation in a case involving a six-victim homicide.

The Findings and Conclusions assert that trial counsel made a valid strategic decision to argue that Applicant had experienced a religious conversion. Para. 14, p. 587. There was, however, no evidence to support that argument. The hearing testimony of lead counsel that Applicant's religious devotion had changed over time is simply not borne out by the trial record or other evidence. While counsel claimed that he presented evidence of a jailhouse conversion, that was apparently based on such conversions being "a generally accepted phenomena (sic) that I personally believe in, but occurs in the minds of the jurors" who might

**3)** **The Convicting Court denied Applicant an Adequate Opportunity to Develop the Factual Basis for His Grounds of Relief Because of the Court's Consistent Failure to Provide Timely and Adequate Funding with Which Applicant Could Develop His Case.**

Successive counsel representing Applicant on both Direct Appeal and in these Habeas Corpus proceedings attempted from the earliest days following Applicant's conviction and death sentence to obtain sufficient funding with which to conduct a proper investigation relevant to both stages of Applicant's trial, and concerning events occurring during the trial itself. The need for such funding was particularly acute because the original attorney retained on Applicant's behalf, Charles Banker, and the actual trial attorneys, Ralph R. Martinez and Librado "Keno" Vasquez, failed to utilize any investigators, mitigation specialists or other expert assistance in the preparation of Applicant's trial.

Subsequently, Applicant's Direct Appeal counsel, F. Alan Futrell, filed a motion for investigative funding, seeking to investigate issues of juror misconduct in connection with a potential Motion for New Trial, on April 5, 2005, less than two weeks after Applicant was sentenced to death. 1 CR 982-92. The Convicting Court did not rule on that Motion.

In due course, both former habeas counsel, John E. Wright, and current habeas corpus counsel, the undersigned, filed numerous applications for investigative funding and funding for expert services in order to develop

Applicant's claims, repeated requests for rulings on those applications and repeated requests for payment for the individuals involved. Those Applications and requests to the trial court, most of which were made *ex parte* and under seal, are herein incorporated by reference and include those filed on: May 11, 2005; October 30, 2006; December 19, 2006; March 8, 2007; June 19, 2007; July 5, 2007; July 12, 2007; August 2, 2007; September 24, 2007; March 5, 2008; April 25, 2008; March 19, 2013; June 17, 2013; July 30, 2013; August 13, 2013; November 7, 2013; January 21, 2014; April 28, 2014; May 2, 2014; June 12, 2014; July 22, 2014; July 24, 2014; August 12, 2014 and October 17, 2014.

This Court repeatedly failed to rule on the applications that were filed, necessitating counsels' further written requests for rulings. Because former counsel was located in Huntsville and the undersigned is located in Austin, hundreds of miles from Hidalgo County, visiting the Court to try to obtain rulings was logistically extremely difficult for counsel. Because of the difficulty in obtaining funding from this Court, counsel for Applicant were obliged to resort to, e.g., using volunteer law students to assist in interviewing and investigation *(see, e.g.,* Application for Funding of July 12, 2007, requesting expenses for student investigators - no ruling obtained), and to conducting investigation themselves, *see, e.g., Ex parte* letter to the Court filed on September 18, 2013. Even such

funding as could be obtained had to be justified in great and time-consuming detail, *see, e.g., Ex parte* letter to the Court filed on December 10, 2013.

At one point, the Court of Criminal Appeals ordered this Court on April 7, 2014, to rule on all outstanding motions within thirty days. That was not done. Ultimately, it was only after the hearing in this case, on September 9, 2014, that a formal order denying then-outstanding requests for expert and investigative assistance was entered. Another request for funding, filed on November 7, 2013, and including a request funding for the mitigation specialist/investigator working on the case was only granted in part, despite counsel's detailed explanation of the work that remained to be done. Undersigned counsel attempted to make incremental requests for funding, *see, e.g.,* January 24, 2014, Unopposed Motion for Extension of Time at 14, since her predecessor's request for larger amounts at one time had not been ruled upon, let alone granted. Moreover, to try to ensure that rulings were obtained, counsel visited the Court in person to discuss the requested funding and present orders for signature, and sent repeated requests for rulings on outstanding items. In many instances, counsel repeatedly sought funding, but was unable to secure a prompt ruling, when the Court ruled at all. When funding was granted it was generally in amounts smaller than those requested, even where the need for the funding had been explained clearly and in

detail.[6]

Applicant's efforts to obtain sufficient funding for development of his case were also discussed in Motions for Extensions of Time and Advisories filed on his behalf in the Court of Criminal Appeals on December 28, 2012; June 21, 2013; and January 21, 2014.

Because of counsel's inability to obtain necessary funding, the work performed on behalf of Applicant fell far short of the comprehensive investigation and development of his case mandated by caselaw, statute and relevant guidelines. *See* January 24, 2014, Unopposed Motion for Extension of Time at 8-16. Consequently, Applicant was unable to adequately investigate and to present evidence that would assist in demonstrating entitlement to relief with regard to non-record based claims in his Application, such as Grounds for Relief 1 and 3, concerning trial counsel's ineffective assistance in preparing for and conducting the sentencing phase of Applicant's trial; Grounds for Relief 4-6, concerning the hostile atmosphere in the courtroom and the outside influences brought to bear on Applicant's jury; Grounds for Relief 15-16, concerning trial counsel's failure to investigate and prepare for the hearing on a Motion to Suppress Applicant's oral

---

[6]This convicting court failed entirely to pay the mitigation specialist who obtained the original mitigation affidavits filed with the Application for Writ of Habeas Corpus in 2007, and subsequently again declined to pay that mitigation specialist when requested to do so by the undersigned.

statements, and Grounds for Relief 17-19, concerning trial counsel's failure to investigate and litigate the admissibility of the testimony of the State's witnesses concerning gang activities.

As explained in, *inter alia*, Applicant's January 21, 2014, Unopposed Motion for Extension of Time, and accompanying *Ex Parte* Advisory to the Court, comprehensive investigation is necessary in capital cases, both at trial and in habeas corpus proceedings, and the availability of adequate funding appears to have a direct correlation with the likelihood of success in capital litigation. Applicant's ability to prevail in this litigation was compromised throughout by the Court's refusal to provide such funding or to timely rule on motions for funding. Applicant therefore objects to this Court's entry of these Findings of Fact and Conclusions of Law and Recommendation.

**4) The Convicting Court Rendered the Proceedings Unfair by Refusing to Admit the Reports of Expert Witnesses Who Were Unable to Testify Solely Because of The Timing Limitations Imposed upon this Case.**

Of great importance to Applicant's sentencing case was the issue of the impairment to his mental functioning brought about by his mother's alcohol use while he was *in utero*. In order to demonstrate the role that his mother's alcohol use had played in his mental and personal development, Applicant unsuccessfully sought the admission into evidence of his Exhibits 34 - 36, the reports of experts neuropsychologist Paul D. Connor, Ph.D., psychiatrist Richard S. Adler, M.D., and psychologist Natalie Novick Brown, Ph.D. Those experts had evaluated Applicant following the suggestion of Dr. Craig Henderson, a psychologist who interviewed Applicant in 2007 and recommended a comprehensive neuropsychological evaluation. *See* Exhibit 22. Dr. Henderson had suggested that Applicant might have a Fetal Alcohol Spectrum Disorder (FASD), given his mother's alcohol consumption during pregnancy and his previous psychological test results. Dr. Richard Adler did subsequently diagnose such a disorder in Applicant, and the excluded reports explain the nature of FASDs, the factors that led to the diagnosis being made, and the impact of Applicant's FASD on his life trajectory and choices.

Applicant filed the reports of Drs. Adler, Brown and Connor, along with

other exhibits, on May 27, 2014. Although it had indicated that it would stipulate the admissibility of numerous other exhibits, the State of Texas did not state until it wrote a letter to undersigned counsel dated July 23, 2014, that it would not stipulate to the admissibility of these reports.

The State indicated in its letter that it was not agreeing to stipulate the expert reports because it would have no opportunity to cross-examine the experts concerning their qualifications, their methodology or the validity of their work, and because it believed that it had been given insufficient notice of the subject matter of their reports.

The Court having set a date for an evidentiary hearing commencing August 6, 2014, Applicant's counsel checked the available dates on which the experts in question could testify. None of them were available at all before the beginning of October 2014, and the earliest date on which one of them would be available was mid-December 2014. 2 EHRR 26. The three experts were unable to testify at the live evidentiary hearing conducted on August 6-7, 2014, solely because their prior professional commitments prevented them from testifying until after a deadline imposed by the Court of Criminal Appeals in an Order of July 18, 2014, requiring that Applicant's case be completed and forwarded to that Court on or before

August 31, 2014.[7] Thus, because of the incompatibility of that time constraint and the availability of his experts, Applicant was unable to call them to testify.

The Court heard arguments concerning the admissibility of the reports during the hearing conducted on August 6-7, 2014, 2 EHRR 26 - 47, and subsequently permitted the parties to file submissions concerning admissibility. 3 EHRR 65-69. The State argued for the first time in its post-hearing briefing that:

(a) The reports failed to demonstrate that the experts were relying on the proper application of the methods involved in their field;

(b) The reports failed "to assert that the tests conducted were normed to the population of either South Texas or to prison populations or death row inmates in particular;"

(c) The reports were "hearsay without exception," citing TEX. R. EVID. 802-804.

The Court initially signed an Order on August 29, 2014, holding the reports to be inadmissible on two grounds: (1) that the third prong of the criteria for admissibility set out in *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998) was not met, i.e., that Applicant had not established that the experts's reports properly relied upon and/or utilized the principles involved in their field

---

[7]Counsel for the parties were obliged to file two joint motions in the Court of Criminal Appeals, seeking additional time for the preparation of the proposed Findings and Conclusions which were ultimately filed on September 30, 2014. Then, in response to a letter request for additional time filed by the Convicting Court on October 13, 2014, the Court of Criminal Appeals eventually extended the time for completion of the case to November 13, 2014. The proposed findings of fact and conclusions of law and the record of these proceedings have not been filed in the Court of Criminal Appeals as of today's date, March 19, 2015.

and (2) that the State would not have an opportunity to cross-examine the experts.

Having reviewed Applicant's subsequently filed Motion to Reconsider Admissibility of Expert Reports and supporting materials, the Court later acknowledged that the criteria for admissibility under TEX. R. EVID. 702 and *Nenno* had been met, but still declined to admit the reports into evidence because to do so denied the State the opportunity for cross-examination of these three experts. However, the State never suggested any actual flaw in these experts' credential, nor any lack of relevant expertise, or shortcoming in the reports that they produced, other than querying whether the tests utilized in evaluating Applicant were normed on appropriate populations. That concern was subsequently addressed in an affidavit from Dr. Connor, dated August 26, 2014, and was not referred to by the Court when it declined to admit the expert reports.

Thus, significant expert reports concerning potentially mitigating evidence in Applicant's case were excluded solely because of the Court of Criminal Appeals' deadline.

a)    <u>Affidavit Testimony is Admissible in Habeas Corpus Proceedings</u>

A trial court has discretion to admit affidavit evidence in TEX. CODE CRIM. PROC. Art. 11.071 proceedings. Under Art. 11.071 § 9(a) it may admit affidavits, depositions and interrogatories, and has wide latitude as to the means of resolving

the issues in the case. *See, e.g., Ex parte Fierro*, 934 S.W.2d 370, 371 (Tex. Crim. App. 1996)(considering evidence obtained by means of Letters Rogatory). Thus, the admission of these reports was well within the Court's discretionary powers, and the state failed to identify any substantive flaw in their reasoning or methodology, the results arrived at or their creators' credentials.

b)    Notice of Expert Testimony

The State claimed a lack of notice concerning the reports. However, the topic of "Fetal Alcohol Syndrome" was specifically raised in the July 17, 2007, Report of Craig Henderson Ph.D., filed as Exhibit 22 to Applicant's 2007 Application for Writ of Habeas Corpus, and in which Dr. Henderson recommended "a comprehensive neuropsychological evaluation," in light of Applicant's mother's alcohol consumption during pregnancy and of Applicant's school records and previous psychological testing. Familial alcohol and substance abuse are mentioned in Claim Three of the Application itself and in supporting affidavits, together with a statement from former counsel for Applicant John E Wright at p. 70, that he had filed applications for funding for expert and investigative assistance. As Mr. Wright stated, such funding was needed in order to enable Applicant to fully present his claim.

The Henderson report similarly makes reference to depression/dysthymic

disorder, Post Traumatic Stress Disorder and trauma, all concepts developed in the three more recent expert reports. Thus, the State had notice that those issues were likely to be further developed in Applicant's case.

The State has been aware since late 2012 that undersigned counsel was working on the case and was also aware that Applicant had sought extensions of time in which to develop support for the Application. However, the State did not, at any point prior to the filing of the three expert reports on May 27, 2014, seek to discover what expert testimony might be in preparation.

Under TEX. CODE CRIM. PROC. Art. 39.14(b) counsel may move for the court for an order for their adversary to disclose the name and address of potential experts, not later than the 20th date before a trial begins. The State made no equivalent request in this case, and had notice prior to the hearing - exceeding by three times the 20 day period set out in the rule - of these experts' names, their contact details and the actual substance of their testimony.

Even at the time of the hearing, the State had apparently made no effort to enlist any expert assistance of its own to formulate a substantive critique of, or challenge to, the three expert reports. It suggested absolutely no specific shortcoming in these experts' work other than their supposed failure to demonstrate that they were relying on the proper application of the methods

involved in their field when they assessed Applicant, and that their reports did not assert that the tests conducted were normed to specific populations - a supposed shortcoming whose relevance the State failed entirely to explain and which the Court rejected when it ultimately ruled that the *Nenno* criteria were satisfied. Thus, the State's protestation of lack of sufficient notice should be disregarded.

c)      An Expert Opinion May be Supported by Hearsay Evidence

TEX. R. EVID. 703 states that, "If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Thus, these expert reports were not inadmissible because they are based on information and data narrated or created by people other than the experts in question.

Moreover, the United States Supreme Court has affirmed that state hearsay rules must not be applied mechanistically to exclude reliable hearsay evidence so as to defeat the ends of justice. In *Sears v. Upton*, 561 U.S. 945, ___ , 130 S.Ct. at 3263 n.6 (2010), the applicant presented evidence, both lay and expert, concerning head trauma, substance abuse and traumatic experiences, in addition to evidence that Sears' brother introduced him to a life of crime. Although some of this evidence was hearsay, that did not undermine its probative value or admissibility in terms of sentencing.

The evidence in *Sears* was rightfully not excluded by strict operation of hearsay provisions, but admitted, considered and given effect owing to its possible relevance when assessing counsel's deficiency. *Id.* at 3262-3264. The Supreme Court noted that the exclusion of highly relevant evidence on a critical issue in the punishment phase of trial may violate due process, regardless of state evidentiary rules. *See also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Green v. Georgia*, 442 U.S. 95, 97 (1979). Similarly here, the critical question of whether counsel provided effective representation at sentencing in this capital case militates in favor of admission, and proper consideration, of these reports.[8]

This position is supported by state law also: TEX. CODE CRIM. PROC. Art. 11.04 states: "Every provision relating to the writ of habeas corpus shall be most favorably construed in order to give effect to the remedy, and protect the rights of the person seeking relief under it." Likewise, in a capital sentencing, the court may admit "any matter that the court deems relevant to sentence," so long as that is consistent with the Constitutions of the United States and of the State of Texas. TEX. CODE CRIM. PROC. Art. 37.071§ 2(a)(1). The Court should therefore have

_____

[8]It should be noted that the three experts stated in their supplemental affidavits that the materials on which they relied are of exactly the type that are relied on by other professionals in their fields, demonstrating that they were following the same methods used by equivalent professionals and that reliance on e.g. affidavits from family members is considered reasonable in their respective fields.

exercised its discretion under Art. 11.071 § 9(a) to admit these reports.

Applicant had the burden of proof in this TEX. CODE CRIM. PROC. Art. 11.071 proceeding to prove not only that his attorney's performance was deficient, but that he was thereby prejudiced. See *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). These exhibits were a component part of his mitigation case, reflecting what could and should have been presented at trial, and he now therefore reargues the admission of the reports either on remand to the Convicting Court or in the Court of Criminal Appeals. Applicant objects to the unfairness of the Convicting Court's ruling, and particularly so because the Convicting Court entered Findings of Fact and Conclusions of Law that do not recommend relief on Applicant's Ground for Relief Three, concerning the ineffective assistance of trial counsel in preparing and presenting mitigating evidence.

While the progress of this case has been protracted, and it is now nearly ten years since Applicant was sentenced to death in March 2005, it bears noting that half of that time period is attributable to the failure of the State of Texas to file an Answer to his Application, which was timely filed on July 19, 2007. The State's Answer was not filed until November 12, 2012, over five years later, and only after the Court of Criminal Appeals, on August 1, 2012, had ordered this Court to resolve remaining issues and conclude the case. Since taking over Applicant's

case upon the withdrawal of original State Habeas Counsel, undersigned counsel worked diligently to ensure proper factual development of the case, which included repeated attempts to obtain adequate funding for further investigation as well as the assistance of experts, creating further delays.

The content of the reports themselves demonstrates that Mr. Garza suffers from a condition created while he was in his mother's womb that caused life-long adaptive impairments and susceptibility to other mental disorders, while the same condition rendered him likely to be a low-risk inmate in the highly structured environment of prison, especially as he grows older. *See, e.g.*, Exhibit 36, Report of Dr. Natalie Novick Brown at 32-43.

Applicant hereby renews his objection to the arbitrary exclusion of this significant evidence due to factors for which he should bear no responsibility. Such a result does not comport with the due process requirement that the fact-finding procedures be adequate for reaching reasonably correct results, *Ex parte Davila*, 530 S.W.2d 543, 545 (Tex. Crim. App. 1975), or with the statutory mandate that "[e]very provision relating to the writ of habeas corpus shall be most favorably construed in order to give effect to the remedy, and protect the rights of the person seeking relief under it." TEX. CODE CRIM. PROC. Art. 11.04.

## CONCLUSION.

Applicant Humberto Garza, by and through counsel, therefore respectfully requests that this Honorable Court withdraw its Order of February 12, 2015, entering Findings of Fact and Conclusions of Law (hereafter "Findings and Conclusions) and containing a recommendation denying habeas corpus relief, and, taking into account the following objections, withdraw the Order of February 12, 2015, recuse itself and request the assignment of a different judge to preside over renewed proceedings or, in the alternative enter revised Findings of Fact and Conclusions of Law and recommend relief.

Respectfully submitted,

*Hilary Sheard*

HILARY SHEARD
Texas Bar # 50511187
7301 Burnet Road, # 102-328
Austin, TX 78757
Phone: (512) 524 1371
Fax: (512) 646 7067
HilarySheard@Hotmail.com

*Counsel for Humberto Garza III, Applicant.*

## CERTIFICATE OF SERVICE

I certify that on March 19, 2015, a copy of the foregoing pleading was served by U.S. Mail and electronically via www.efileTexas.gov on:

Theodore C. Hake, Esq.
Assistant Criminal District Attorney
Hidalgo County Courthouse
100 N. Closner, Room 303
Edinburg, Texas 78539.
Ted.Hake@da.co.hidalgo.tx.us

Michael W. Morris, Esq.
Assistant Criminal District Attorney
Office of the District Attorney
Hidalgo County Courthouse
100 N. Closner
Edinburg, TX 78539
Michael.Morris@da.co.hidalgo.tx.us


_Hilary Sheard_

_____
Hilary Sheard.

# ATTACHMENT

# Petition for Writ of Mandamus
# filed in the Court of Criminal Appeals
# July 9, 2014

No._____

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### IN RE HUMBERTO GARZA III,
**Relator**

**v.**

### HON. J.R. "BOBBY" FLORES, PRESIDING JUDGE, 139TH DISTRICT COURT OF HIDALGO COUNTY, TEXAS
**Respondent**

---

## PETITION FOR WRIT OF MANDAMUS
### AND MOTION FOR STAY OF PROCEEDINGS
### IN THE 370th DISTRICT COURT OF
### HIDALGO COUNTY, TEXAS

---

HILARY SHEARD
Texas Bar # 50511187
7301 Burnet Road, # 102-328
Austin, TX 78757
Phone: (512) 524 1371
Fax: (512) 646 7067
HilarySheard@Hotmail.com

*Counsel for Relator.*

## IDENTIFICATION OF THE PARTIES

Pursuant to TEX. R. APP. P. 52.3(a), a complete list of the names of all interested parties and counsel is provided below so that the members of this Honorable Court may at once determine whether they are disqualified to serve or should recuse themselves from participating in the decision of the case.

Relator:

    Humberto Garza III, TDCJ-ID # 999495
    TDCJ Polunsky Unit
    3872 FM 350 South
    Livingston, TX 77351

Counsel for Relator:

    Hilary Sheard
    7301 Burnet Road, # 102-328
    Austin, TX 78757
    Phone: (512) 524 1371
    Fax: (512) 646 7067

Respondent:

    Hon. J.R. "Bobby" Flores
    Presiding Judge
    139th District Court of Hidalgo County, Texas
    Hidalgo County Courthouse
    100 N. Closner, 1st Floor
    Edinburg, TX 78539[1]

---

[1] The Hon. J.R. "Bobby" Flores is the Presiding Judge of the 139th District Court of Hidalgo County, Texas. In this matter, he was sitting by assignment to decide a Motion to Recuse filed by Relator Humberto Garza III in Cause No. CR-3175-04-G(1), currently pending in the 370th Judicial District Court of Hidalgo County.

Counsel for the State of Texas in this matter:

Rene Guerra, Esq.
District Attorney of Hidalgo County

Theodore C. Hake, Esq.
Michael W. Morris, Esq.
Assistant Criminal District Attorneys

Office of the District Attorney
Hidalgo County Courthouse
100 N. Closner
Edinburg, TX 78539.

# TABLE OF CONTENTS

IDENTIFICATION OF THE PARTIES ................................................................................i

TABLE OF CONTENTS..................................................................................................iii

INDEX OF AUTHORITIES...............................................................................................v

CONTENTS OF THE APPENDIX ...................................................................................xi

STATEMENT OF THE CASE.........................................................................................xii

STATEMENT OF JURISDICTION...............................................................................xiii

ISSUE PRESENTED .....................................................................................................xiv

STATEMENT OF FACTS .................................................................................................1

ARGUMENT AND AUTHORITIES...............................................................................12

I.      THE WRIT OF MANDAMUS ...........................................................................12

II.     CLEAR ENTITLEMENT TO RELIEF .............................................................12

        A.      A REASONABLE PERSON, KNOWING THE FACTS OF THIS
                CASE, WOULD REASONABLY DOUBT JUDGE GONZALEZ'S
                ABILITY TO ADJUDICATE THE RELEVANT CLAIMS
                IMPARTIALLY.........................................................................................14

                1.      The Legal Standard for Deciding Whether a Judge's Impartiality
                        Might Reasonably Be Questioned.........................14

                2.      The Reasons Why Judge Gonzalez's Impartiality Might
                        Reasonably Be Questioned in this Case....................16

3. Any private communication or contact by a trial judge with a juror during a trial is improper....................17

4. Communication or contact by the trial bailiff with jurors during a trial may be improper if it goes beyond what is necessary for the purpose of shepherding the jury..................20

B. JUDGE GONZALEZ HAS PERSONAL KNOWLEDGE OF DISPUTED EVIDENTIARY FACTS WHICH REQUIRE HIS RECUSAL .......................................................23

1. A Clear Entitlement to Relief Exists in these Circumstances........................................25

2. That a Convicting Court Normally Has the Discretion to Use Personal Recollection in Resolving Issues in a Habeas Proceeding Does Not Alter the Conclusion That Judge Gonzalez May Not Preside over this Case ...............28

III. NO ADEQUATE REMEDY AT LAW ........................................32

1. Review of Denial of Recusal in the Context of Habeas Corpus Proceedings ......................................32

2. Awaiting Later Appeal or Review Is Not an Adequate Remedy in the Context of this Case ........................36

IV. A STAY OF THE PROCEEDINGS IN THE DISTRICT COURT IS NECESSARY IN ORDER TO ENSURE THAT AN ADEQUATE REMEDY IS AVAILABLE ........................................39

CONCLUSION........................................................42

CERTIFICATION........................................................43

CERTIFICATE OF SERVICE........................................................44

# INDEX OF AUTHORITIES

## FEDERAL CASES

*Arizona v. Fulminante*, 499 U.S. 279 (1991) .........................................................12,19

*Brown v. Lynaugh*, 843 F.2d 849, 850 (5th Cir. 1988)...............................................24

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009).........................................12

*Hopt v. Utah*, 110 U.S. 574 (1884) .........................................................................19

*Liteky v. United States*, 510 U.S. 540 (1994).....................................................passim

*Presley v. Georgia*, 558 U.S. 209 (2010) ................................................................20

*Remmer v. United States*, 347 U.S. 227 (1954) ......................................................17

*Rose v. Mitchell*, 443 U.S. 545 (1979)......................................................................30

*Rothgery v. Gillespie County*, 554 U.S. 191 (2008) ................................................19

*Rushen v. Spain*, 464 U.S. 114 (1983) ......................................................................19

*Skilling v. United States*, 561 U.S. 358 (2010)........................................................19

*Starr v. United States*, 153 U.S. 614 (1894).............................................................17

*Townsend v. Sain*, 372 U.S. 293 (1963) ...................................................................30

*Tumey v. Ohio*, 273 U.S. 510 (1927) .........................................................................12

*United States v. United States Gypsum Co. et al.*, 438 U.S. 422 (1978) ................17

*Ward v. Hall*, 592 F.3d 1144 (11th Cir. 2010) .........................................................20

*Wellons v. Hall*, 558 U.S. 220 (2010) .......................................................................30

## Texas Cases

*Abdygapparova v. State*, 243 S.W.3d 191 (Tex. App. - San Antonio 2007)........14, 27

*Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000) ...............................................18

*Brown v. Lynaugh*, 843 F.2d 849 (5th Cir. 1988) ........................................................24

*Buntion v. Harmon*, 827 S.W.2d 945 (Tex. Crim. App. 1992) ...........................passim

*Davis v. McCray Refrigerator Sales Corp.*, 136 Tex. 296,
150 S.W.2d 377 (Tex. 1941).....................................................................................35

*Ex parte Byars*, 176 S.W.3d 841 (Tex. Crim. App. 2005) .......................................30

*Ex parte Davila*, 530 S.W.2d 543 (Tex. Crim. App. 1975) ................................29,31

*Ex parte Ellis*, 275 S.W.3d 109 (Tex. App. - Austin 2008, no pet.) .......................27

*Ex parte Galvan*, 770 S.W.2d 822 (Tex. Crim. App. 1989) ....................................34

*Ex parte Humberto Garza*, No. WR-78,113-01
(Unpublished Order of April 7, 2014) ......................................................................39

*Ex parte Roundtree*, No. WR-74,550-01,
2011 Tex. Crim. App. Unpub. LEXIS 249 (Tex. Crim. App. 2011) .....................33

*Ex parte Van Alstyne*, 239 S.W.3d 815 (Tex. Crim. App. 2007) ...........................34

*Ex parte Simpson*, 136 S.W.3d 660 (Tex. Crim. App. 2004)................................. 38

*Ex parte Sinegar*, 324 S.W.3d 578 (Tex. Crim. App. 2010).........................13,33, 34

*Gaal v. State*, 332 S.W.3d 448 (Tex. Crim. App. 2011).......................................passim

*Garza v. State*, No. AP-75,217 (Tex. Crim. App. April 30, 2008) ...........................1

*Gentry v. State*, No. 06-05-00237-CR, 2006 Tex. App. LEXIS 2923
(Tex. App. - Texarkana 2006, no pet.) ............................................................24, 26

*Green v. State,* 374 S.W.3d 434 (Tex. Crim. App. 2012) ..............................35

*Hensarling v. State*, 829 S.W.2d 168 (Tex. Crim. App. 1992).................23, 25

*Keene Corp. v. Rogers,* 863 S.W.2d 168 (Tex. App. - Texarkana 1993, no writ) ..21

*Kemp v. State*, 846 S.W.2d 289 (Tex. Crim. App. 1992) ............................24

*Kniatt v. State,* 239 S.W.3d 910 (Tex. Crim. App. 2007) .............................15

*Lagrone v. State*, 84 Tex. Crim. 609, 209 S.W. 411 (Tex. Crim. App. 1919).........18

*Lueg v. Lueg,* 976 S.W.2d 308 (Tex. App. - Corpus Christi 1998, pet. denied).....21

*Mattox v. United States*, 146 U.S. 140 (1892) ..........................................20

*McClenan v. State*, 661 S.W.2d 108 (Tex. Crim. App. 1983)...............32, 35

*McQuarrie v. State*, 380 S.W.3d 145 (Tex. Crim. App. 2012)..................18

*Neveu v. Culver*, 105 S.W.3d 641 (Tex. Crim. App. 2003) ........................12

*North East Independent School Dist. v. Aldridge,*
400 S.W.2d 893 (Tex. 1966).............................................................................35

*O'Quinn v. Hall*, 77 S.W.3d 438 (Tex. App. - Corpus Christi 2002, no pet.)......22, 24

*O'Quinn v. Hall,* 77 S.W.3d 452 (Tex. App. - Corpus Christi 2002)....................22

*Padilla v. McDaniel*, 122 S.W.3d 805 (Tex. Crim. App. 2003).............................xiii

*Parker v. Gladden*, 385 U.S. 363 (1966) .................................................20

*Perkins v. Court of Appeals*, 738 S.W.2d 276 (Tex. Crim. App. 1987) ................38

*Simmons v. State*, 55 Tex. Crim. 441, 117 S.W.2d 141 (Tex. Crim. App. 1909)....18

*Smith v. Flack*, 728 S.W.2d 784 (Tex. Crim. App. 1987) ..........................................36

*Sommers v. Concepcion*, 20 S.W.3d 27
(Tex. Crim. App. - Houston [14th Dist.] 2000, pet. denied) ...................................31

*State ex rel. Hill v. Fifth Court of Appeals*, 34 S.W.3d 924
(Tex. Crim. App. 2001) .....................................................................................12, 26

*State ex rel. Millsap v. Lozano*, 692 S.W.2d 470 (Tex. Crim. App. 1985) ............41

*State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194 (Tex. Crim. App. 2003) ..................12

*State ex rel Wade v. Mays*, 689 S.W.2d 893, 899 (Tex. Crim. App. 1985)..............12

*Stearnes v. Clinton*, 780 S.W.2d 216 (Tex. Crim. App. 1989)...........................36,37

*Thi Van Le v. Perkins*, 700 S.W.2d 768, 776) (Tex. App. - Austin 1985) ..............38

*Thomas v. Stevenson*, 561 S.W.2d 845 (Tex. Crim. App. 1978) ...............................xiii

*Woodruff v. Wright*, 51 S.W.3d 727 (Tex. App. - Texarkana 2001, pet. denied) ...21

## TEXAS CONSTITUTION

TEX. CONST. Art. V, § 5(c) ........................................................................................xiii

## TEXAS STATUTES

TEX. CODE CRIM. PROC. Art. 4.04 .............................................................................xiii

TEX. CODE CRIM. PROC. Art. 11.07 ...........................................................................29

TEX. CODE CRIM. PROC. Art. 11.071 ................................................................. passim

TEX. CODE CRIM. PROC. Art. 30.01 ...................................................13

TEX. CODE CRIM. PROC. Art 36.22 ..............................................20,31

TEX. CODE CRIM. PROC. Art 36.23 .................................................20

TEX. CODE CRIM. PROC. Art 36.24 .................................................20

TEX. CODE CRIM. PROC. Art. 36.27 .............................................19,31

TEX. CODE CRIM. PROC. Art. 37.071...............................................16

TEX. CODE CRIM. PROC. Art. 38.05................................................19

TEX. CODE JUD. CONDUCT, Canon 3(B)(8) ........................................19

## TEXAS RULES

TEX. R. APP. P. 52 .............................................................passim

TEX. R. APP. P. 72.1 .............................................................xiii

TEX. R. APP. P. 73.4 ..............................................................34

TEX. R. CIV. P. 18a ..........................................................passim

TEX. R. CIV. P. 18b ..........................................................passim

TEX. R. EVID. 605 .............................................................23,25

TEX. R. EVID. 606(b) .............................................................16

## OTHER AUTHORITIES

48B Robert P. Schuwerk & Lillian B. Hardwick, *Texas Practice Series: Handbook of Texas Lawyer and Judicial Ethics* 40:26 (2010) .................................................15

Goode, Wellborn and Sharlot, *Texas Rules of Evidence: Civil and Criminal*, 33 Texas Practice 605.1 ...........................................................................................25

# CONTENTS OF THE APPENDIX

An Appendix is filed herewith, pursuant to TEX. R. APP. P. 52.3(k).

**Necessary Contents:**

Exhibit A    -    Order Denying Applicant's Motion to Recuse 370th District Court Judge Noe Gonzalez

Exhibit B    -    TEX. R. CIV. P. 18a

Exhibit C    -    TEX. R. CIV. P. 18b

Exhibit D    -    TEX. CODE CRIM. PROC. Art. 11.071.

**Optional Contents:**

Exhibit E    -    Applicant's Brief in Support of Applicant's Motion for Court to be Recused

Exhibit F    -    State's Memorandum in Response to Applicant's Motion to Recuse 370th District Court Judge Noe Gonzalez

Exhibit G    -    Applicant's Motion for Court to Recuse Itself

Exhibit H    -    Transcript:  Excerpt of Proceedings from Hearing on Applicant's Motion for Court to Recuse Itself, June 16, 2014

Exhibit I    -    Affidavit of Rose Marie Palacios, May 19, 2014

Exhibit J    -    Affidavit of Rose Marie Vera, July 14, 2007

Exhibit K    -    Affidavit of Melissa Guerrero, July 14, 2007

Exhibit L    -    July 7, 2014, Letter of Assistant District Attorney Theodore C. Hake to the Hon. Noe Gonzalez

## STATEMENT OF THE CASE

This is a petition for writ of mandamus against the Respondent, Hon. J.R. "Bobby" Flores, of the 139th District Court of Hidalgo County, Texas, arising out of a motion to recuse the presiding judge of the 370th District Court of Hidalgo County, Hon. Noe Gonzalez, in a capital habeas corpus proceeding filed pursuant to TEX. CODE CRIM. PROC. Art.§ 11.071.

The Relator seeks an order commanding the Respondent to vacate his Order Denying Applicant's Motion to Recuse 370th District Court Judge Noe Gonzalez, signed and entered on July 3rd, 2014, and to enter an Order recusing Judge Gonzalez.

The Relator also seeks a temporary stay of the proceedings in the 370th District Court, in order to permit this Court to resolve the issues presented in this petition.

# STATEMENT OF JURISDICTION

Jurisdiction of this Honorable Court is invoked pursuant to TEX. CONST. Art. V, § 5(c); TEX. CODE CRIM. PROC. Art. 4.04, § 1; TEX. R. APP. P. 72.1; and TEX. R. APP. P. 52. *Thomas v. Stevenson*, 561 S.W.2d 845, 847 (Tex. Crim. App. 1978)(amendment of TEX. CONST. Art. V, § 5(c) provides this Court with power to grant extraordinary writs in cases regarding criminal matters).

When a court of appeals and the Court of Criminal Appeals have concurrent, original jurisdiction over a petition for a writ of mandamus against the judge of a district or county court, the petition should be presented first to the court of appeals, unless there is a compelling reason not to do so. *Padilla v. McDaniel*, 122 S.W.3d 805, 808 (Tex. Crim. App. 2003). This petition is being presented to this Court in the first instance because this Court has sole jurisdiction over the appeal and review death penalty cases, of which this is one. *See* TEX. CODE CRIM. PROC. Art. 4.04, § 2; TEX. CODE CRIM. PROC. Art. 11.071. Moreover, the Court has previously ordered that the underlying case be expeditiously concluded. *See* Order of April 7, 2014 in *Ex parte Humberto Garza*, No. WR-78,113-01. Were this petition to be filed in the Thirteenth Court of Appeals, there is the likelihood that the matter would still be brought to this Court in due course, consuming additional time.

<u>**ISSUE PRESENTED**</u>

The Respondent judge denied a motion to recuse the judge presiding over an application for writ of habeas corpus, filed in a capital case pursuant to TEX. CODE CRIM. PROC. Art. 11.071. The judge presiding over the application was the convicting court at trial. The habeas application contained allegations of "jury misconduct, including the exposure of the jury to outside influences."

Further investigation of the case, conducted prior to a scheduled evidentiary hearing revealed that former jurors would testify that both Judge Gonzalez and his bailiff engaged in off-the-record communications with the jury during the trial, in the jury room, and outside the presence of counsel or the defendant. The subject matter of the communications included the concern of jury members about their personal safety in this gang-related case in which the jury was required to answer the "future dangerousness" special issue, TEX. CODE CRIM. PROC. Art. 37.071.

The basis for the motion to recuse was that, in the circumstances of this case Judge Gonzalez's ability to adjudicate impartially a ground for relief concerning his own and his bailiff's conduct "might reasonably be questioned," and that "the judge has personal knowledge of disputed evidentiary facts concerning the proceeding", TEX. R. CIV. P. 18b (b)(1) and (3).

Humberto Garza had a right to a trial where the jury only made its decisions

on the basis of evidence developed from the witness stand in a public courtroom, in his personal presence and with the full protection of his rights of confrontation, of cross-examination, and of counsel. Given the governing legal standards and the record as developed, Mr. Garza has a clear entitlement to relief from this Court, and would have no adequate remedy on appeal.

*The intervention of this Court is therefore necessary in this extraordinary situation in order to avert the continuation of a habeas proceeding that would inevitably have to be remanded later for renewed proceedings before a different judge.*

*An immediate stay of the proceedings in the trial court is also sought in order to permit this Court to resolve the issues presented in this petition, and for Mr. Garza to be able to actually receive the relief requested, namely that the habeas proceedings should only continue before a different judge.*

## STATEMENT OF FACTS

Humberto Garza was convicted of capital murder in the 370th Judicial District Court of Hidalgo County, Texas, Judge Noe Gonzalez presiding, and sentenced to death on March 24, 2005. Both the conviction and sentence of death was affirmed on direct appeal. *Garza v. State,* No. AP-75,217 (Tex. Crim. App. April 30, 2008)(not designated for publication).

A timely Application for Writ of Habeas Corpus was filed on July 19, 2007. On November 13, 2012, the Hidalgo County District Attorney's Office filed its Answer to the Writ Application. Claims Five and Six of the Application alleged that Mr. Garza's death sentence resulted from jury misconduct, including the exposure of the jury to outside influences.[2]

An affidavit of juror Rose Marie Vera, submitted as Exhibit 26 to the Application, indicated that the trial judge had "warned us that sometimes gang members come after the jury," and that the bailiff had told the jury that the judge always carried a gun. [3]

---

[2]Claims Five and Six are virtually identical and were not argued separately within the Application.

[3]Applicant was alleged to be a leader of the "Tri-City Bombers" gang, and was charged with carrying out a six-victim robbery-homicide along with other gang members.

-1-

Ms. Vera's affidavit, which was obtained by volunteer law students, did not specify whether the comment made by the judge about gangs was made in open court (it does not appear on the record), when that comment was made and in what circumstances, what the bailiff's name was, what were the circumstances in which the bailiff was talking to the jury about the judge, when the bailiff told the jury that the judge carried a gun, or what the influence of the judge and bailiff's comments had been on Ms. Vera's sentencing decision.

Mr. Garza's original habeas corpus counsel, John Wright, withdrew and undersigned counsel was appointed in his place on November 9, 2012. Undersigned counsel subsequently obtained funding to further investigate and develop the grounds for relief pleaded in Mr. Garza's habeas application.

On April 7, 2014, this Court entered an order directing the trial court to rule on any outstanding motions in the case within 30 days and to resolve any outstanding issues within 90 days. On May 14, 2014, the trial court set a hearing date of June 9, 2014. In the meantime, investigation on behalf of Mr. Garza continued.[4]

---

[4]As stated at the recusal hearing on June 16, 2014, it has only been possible to interview some, but not all, of the trial jurors in this case because of the difficulty that undersigned and former counsel experienced in obtaining necessary investigative funding.

Further information and clarification about the communications between the jury, Judge Gonzalez and his bailiff was obtained during an interview of juror Rose Marie Vera, now known as Rose Marie Palacios. Ms. Palacios signed a new affidavit stating that both Judge Gonzalez and his bailiff had engaged in communications with the jury in the jury room, and outside the presence of counsel, during which the statements mentioned in her earlier affidavit were made.

A motion asking Judge Gonzalez to recuse himself was therefore filed on May 27, 2014.[5] Judge Gonzalez declined to recuse himself, and referred this matter to the Regional Presiding Judge, who assigned the case to the Hon J.R. "Bobby" Flores of the 139th District Court of Hidalgo County.

A hearing was conducted on June 16, 2014.[6] Three witnesses testified: former jurors Rose Marie Palacios and Melissa Guerrero were called on behalf of Mr. Garza; the trial bailiff, Alicia "Licha" Salinas, was called by the State. Judge Flores also took judicial notice of the contents of the court file pertaining to the case, which included affidavits from Rose Marie Palacios dated May 19, 2014 and, under her former name, Rose Marie Vera, dated July 14, 2007, and from Melissa

---

[5]Ms. Vera reverted to her maiden name of Palacios after a divorce.

[6]A transcript of the testimony from the hearing is attached as Exhibit H.

Guerrero, dated July 14, 2007.[7]

**Rose Marie Palacios (formerly Vera).**

Ms. Palacios testified that she had been a juror at Mr. Garza's 2005 trial. RHR at 4.[8] She had had concerns for her personal safety during the trial, which were caused by the other jurors, and by the judge saying that jurors could be in danger, as well as by the evidence itself. RHR at 4-5. She had thought she might be followed or threatened. RHR at 4. Her concerns were increased by an incident where someone took photographs of the jury in court during the trial. RHR at 5. The jurors had been asking "if we were safe because of the gang activity." They were concerned about gang members' families being in the courtroom, and about the taking of the photograph. RHR at 8. Ms. Palacios acknowledged that the family members in the courtroom could have been family members of the victims in the case, which involved gangs on both sides. RHR at 18.

The bailiff, who was a woman named Licha, told the jury members that they would be safe because the judge carried a gun, but that made Mrs. Palacios more nervous. RHR at 5, 9. Licha's comments were made in the jury room, not the

---

[7]These exhibits are attached as Exhibits I-K.

[8]Page references are to the transcript of the testimony prepared and provided to the parties on June 17, 2014, which is attached as Exhibit H. It is referred to here as "RHR" (Recusal Hearing Record).

-4-

courtroom, and with all the jurors present. RHR at 5, 7. Some other jurors had told Licha they hoped she was carrying a gun: "And she said no, she didn't, but not to worry because the judge did." RHR at 6. Licha said that she never carried a gun, RHR at 17. This conversation occurred during the trial, and before the jury arrived at a guilty verdict. RHR at 8. Licha also said "that she would be surprised if [the judge] bought us lunch because he was a cheapskate[.]" RHR at 9.

The judge came into the jury room to talk to the jurors about their safety concerns. RHR at 10. Ms. Palacios believed that the judge came into the jury room in response to a note from another member of the jury. RHR at 10. That visit by the Judge to the jury room was while the trial was still going on, and before the guilty verdict. RHR at 10. All twelve members of the jury were there, but she could not remember if the bailiff was there also. RHR at 11. The court reporter may also have been present, but not the defendant or his attorneys, RHR at 11.[9] Ms. Palacios did not remember Mr. Garza or any of the attorneys ever being present in the jury room. RHR at 7-8. The judge had mentioned scheduling when he talked to the jurors. RHR at 15.

Ms. Palacios testified that the judge said "That he understood our fears, but

_____

[9]The Reporter's Record filed by the court reporter at trial, the late Francisco B. Moreno, does not include any transcript of proceedings conducted in the jury room.

-5-

... he was going to provide us security and that we would be fine ... That the gangs, sometimes they threaten the jurors and sometimes they – they may follow you." RHR at 11. The judge did not give any specific examples of gangs disrupting trials or threatening people. RHR at 16-17. The judge said that the person who had taken a photograph in court was "legitimate." RHR at 11. He said that it was a courthouse policy not to permit pictures of jurors to be taken. RHR at 13-14.

Mrs. Palacios thought that the judge may also have come into the jury room another time, in response to a note. RHR at 12. Later in the trial, the jury had been permitted to park on the west side of the courthouse, closer to the courtroom, and the deputies had escorted the jurors. RHR at 14-15.

Mrs. Palacios had been interviewed about the case seven years ago by people who said they were students from Austin, and she gave them an affidavit at the time. RHR at 15-16. Mrs. Palacios was asked additional questions when she was interviewed a second time. RHR at 19. In her earlier affidavit, Mrs. Palacios said she thought she saw Mr. Garza's mother sitting in a car out in the parking lot, and the jury had been told by court staff that "they'd take care of the situation." RHR at 16.

Ms. Palacios had not named the bailiff in her first affidavit, but she may not have been asked for a name at that time. RHR at 20-21.

-6-

**Melissa Guerrero**

Ms. Guerrero testified that she was a juror at Mr. Garza's 2005 trial. RHR at 22-23. She had had concerns for her personal safety because of the crime in question, which concerned gang violence, and was specifically concerned about being followed. RHR at 23. There was an incident during the trial when a reporter took a picture, which she herself did not see, but which worried other jurors. RHR at 23. She believed that jurors had expressed concern to court staff about the security situation. RHR at 24.

The judge had approached the jury in the jury room behind the courtroom on the fifth or sixth day of trial. RHR at 24. He said that he had come to calm the jury down, and that they would be parking in a different area from that point. RHR at 25. She assumed that the change in parking arrangements was because of security concerns. RHR at 25. When the judge spoke to the jurors, there was nobody else in the room, other than the twelve of them. RHR at 25. The jurors were told that they would be allowed to leave for their parking area before others were released from court. RHR at 25-26.

Ms. Guerrero did not know if it was a regular policy to let people park close by the courthouse after hours so that they did not have to walk across the street. RHR at 29. She had assumed the change in parking arrangements was because of

the security situation. RHR at 30.

Ms. Guerrero could not remember any other remarks made by the judge, but the conversation that did occur concerned security matters. RHR at 26. The conversation was not about scheduling. RHR at 30. The judge also came to the jury room after the trial to thank the jury and to provide information about counseling. RHR at 31. Ms. Guerrero remembered that the bailiff in the case was a woman, but did not recall any conversation with her about security arrangements. RHR at 26-27.

Mrs Guerrero had signed an affidavit in 2007 in which she said nothing about the judge going to the jury room. However, she had not been questioned about that at the time. RHR at 27-28. She had been visited in the past few days by defense counsel, together with another woman. RHR at 28. On cross-examination, Ms. Guerrero said that defense counsel had not suggested what Ms. Guerrero should say, other than telling her to be honest. RHR at 31.

She had been interviewed by two people in 2007, one of whom may have been a lawyer, or they may have been law students. RHR at 32. The questions asked more recently were in greater depth than on the previous occasion. RHR at 32. She may not have given further information in 2007 about her security concerns because she was not asked at the time. RHR at 32. Also, time

constraints may have prevented having a fuller conversation. RHR at 33.

Ms. Guerrero acknowledged that sentencing someone to death had been a tough decision for her. RHR at 33-34.

**Alicia "Licha" Salinas**

Ms. Salinas confirmed that her nickname is "Licha." RHR at 35. She has worked in the 370th District Court of Hidalgo County for 12 years. Noe Gonzalez has been judge of that court throughout that time. RHR at 35. She is now the court coordinator, but was working as bailiff back in 2005. RHR at 35. Ms. Salinas stated that she "sort of" remembered Mr. Garza's trial. RHR at 36.

Ms. Salinas testified that one does not have to be a certified peace officer to be a bailiff. RHR at 36. She did not carry a gun when she was acting as a bailiff in 2005. RHR at 36. She did not remember telling anybody on the jury that Judge Gonzalez carried a gun, and does not think she would have said that. RHR at 36. To her knowledge, Judge Gonzalez did not carry a gun back then. RHR at 36.

As a bailiff, Ms. Salinas would escort the jury and give them notice that they were needed in the courtroom. RHR at 37. She might escort them to a restaurant if lunch was not being brought in for the jury. RHR at 37. Jurors in the 370th district court would park in the big courthouse parking lot or, if they were working late, certain parking areas would be blocked off for them where there is

an entrance that goes right into the courtroom. RHR at 37-38.

Ms. Salinas did not specifically remember any jurors expressing security concerns during Mr. Garza's trial. RHR at 38. If the jury had a note, they would hand it to her to give to the judge so that the judge and lawyers could discuss the response. RHR at 38-39. Usually the judge would have a note handed back to the jury, rather than bringing them back into the courtroom. RHR at 39.

While working at the 370th District Court, Ms. Salinas has performed the functions of bailiff, interpreter and court coordinator. RHR at 39. She had been approved for promotion to court coordinator, and has been in that position since about February 2011. RHR at 39-40. The judge is her boss and writes her performance reviews. RHR at 40. He would have some influence over whether she would get an increase in salary. RHR at 40. She has worked for him for twelve years. RHR at 40. Her county job comes with benefits and a retirement plan, and is a valuable thing to have. RHR at 40. She is a valued member of the judge's staff and likes working where she does. RHR at 41.

Ms. Salinas' office is right next to the judge's chamber, so she is physically very close to him - he can just call out and she is at his side in a minute. RHR at 41. Her name appears on court transcripts, together with that of the judge and the attorneys. RHR at 41.

Ms. Salinas is aware that there is a Code of Ethics governing judicial behavior, including rules about behaving with dignity and being impartial, and that the judge's staff should follow those same rules. RHR at 41-42. She knows that it would be undignified to gossip about cases. RHR at 42. She has had training at officially-run court bailiff workshops. RHR at 42. She has been taught what she should and should not do, with regard to not exposing the jury to anything that might cause them to be prejudiced for one side or the other, other than by the evidence. RHR at 42-43. She understands that she should not talk about a case with the jury except in the presence of the judge and with his permission, that there are rules about the judge not communicating with the jury except in writing, and that breaking some of these rules can result in a fine or confinement in jail, or in a case reversal or a mistrial. RHR at 43. She knows that if she broke those rules she could lose her job or be demoted. RHR at 44.

She knows that the judge might lose his reputation if he allowed such breaches of the rules, and that such breaches could cause negative comment in the media, or reversal of a case which would also cause the judge a loss of reputation, RHR at 44.

## ARGUMENT AND AUTHORITIES

## I.    THE WRIT OF MANDAMUS

Mandamus relief may be granted if the relator can demonstrate that: (1) the act sought to be compelled is purely ministerial, and (2) that the relator has no other adequate legal remedy. *Neveu v. Culver*, 105 S.W.3d 641, 642 (Tex. Crim. App. 2003)(citing *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 198 (Tex. Crim. App. 2003). The ministerial act requirement has been described as a requirement that the relator have "a clear right to the relief sought" meaning that the relief sought must be "clear and indisputable" such that its merits are "beyond dispute" with "nothing left to the exercise of discretion or judgment." *State ex rel. Hill v. Fifth Court of Appeals*, 34 S.W.3d 924, 927-28 (Tex. Crim. App. 2001)(citing *Buntion v. Harmon*, 827 S.W.2d 945, 947 and 947 n. 2 (Tex. Crim. App. 1992); *State ex rel Wade v. Mays*, 689 S.W.2d 893, 899 (Tex. Crim. App. 1985).

## II.   CLEAR ENTITLEMENT TO RELIEF

The right to an impartial judge is a fundamental one. *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991)(infraction of right to an impartial judge at trial can never be treated as harmless error); *Tumey v. Ohio*, 273 U.S. 510, 535 (1927)(due process right to impartial judge exists regardless of the strength of the evidence); *See also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009).

Texas recusal law provides protection for a litigant's right to an impartial judge, providing for the disqualification of a judge who has an interest in the subject matter of a case or is sufficiently closely related to any of the parties, TEX. R. CIV. P. 18b(a)(2) and (3), and for the recusal of a judge for various reasons that might have a bearing on the judge's ability to preside with fairness over a case: TEX. R. CIV. P. 18b(b)(1)-(8).[10] This Court has recognized that the protections of TEX. R. CIV. P. 18a and 18b extends to criminal proceedings, including habeas proceedings in the trial court: *Gaal v. State*, 332 S.W.3d 448, 452-3 n. 12 (Tex. Crim. App. 2011); *Ex parte Sinegar*, 324 S.W.3d 578, 581 (Tex. Crim. App. 2010).

Mr. Garza sought recusal of Judge Gonzalez on two grounds under TEX. R. CIV. P. 18b, namely that:

- "[T]he judge's impartiality might reasonably be questioned," TEX. R. CIV. P. 18b (b)(1); and

- "[T]he judge has personal knowledge of disputed evidentiary facts concerning the proceeding", TEX. R. CIV. P. 18b (b)(3).[11]

---

[10]*See also* TEX. CODE CRIM. PROC. Art. 30.01 (no judge may sit in criminal case where he is the injured party, has been counsel to either party or is connected to either the defendant or the complainant by consanguinity or affinity within the third degree).

[11]No allegation of "personal bias or prejudice" under TEX. R. CIV. P. 18b (b)(2) was made against Judge Gonzalez.

-13-

### A. A REASONABLE PERSON, KNOWING THE FACTS OF THIS CASE, WOULD REASONABLY DOUBT JUDGE GONZALEZ'S ABILITY TO ADJUDICATE THE RELEVANT CLAIMS IMPARTIALLY.

#### 1. The Legal Standard for Deciding Whether a Judge's Impartiality Might Reasonably Be Questioned.

Judges normally enjoy a presumption that they will perform their roles impartially. *Abdygapparova v. State,* 243 S.W.3d 191, 198 (Tex. App. - San Antonio 2007). That presumption may be rebutted. *Id.* This Court's most recent substantive decision concerning recusal law in Texas, *Gaal v. State,* 332 S.W.3d 448, 453 (Tex. Crim. App. 2011), quoted the concurrence of Justice Kennedy, joined by three other justices in *Liteky v. United States,* 510 U.S. 540, 557-58 (1994), in referring to the *appearance* of "an aversion, hostility or disposition of a kind that a fair-minded person could not set aside " as being sufficient for a judge to be recused for lack of impartiality. Justice Kennedy in *Liteky* also noted that "[o]ne of the objects of law is the impartiality of its judges in fact and *appearance.*" *Id.* (emphasis added).

In *Gaal,* this Court confirmed that there is no need for a party moving for recusal on the basis of lack of impartiality to demonstrate what is going through a trial judge's mind, or to prove actual bias: "Under [Rule 18b (b)(1)], showing that the trial judge's impartiality 'might reasonably be questioned' suffices." *Id.* at

-14-

459.[12] In contrast, TEX. R. CIV. P. 18b (b)(2) requires a showing of actual bias, a "personal bias or prejudice." *Id.*

In *Gaal*, the Court referred to the standard applied by a recusal judge in *Kniatt v. State*, 239 S.W.3d 910 (Tex. Crim. App. 2007), functionally very similar to Justice Kennedy's position in *Liteky*, finding that recusal was required because:

> A reasonable member of the public at large, witnessing [the trial judge's] words and acts . . . and knowing all the facts in the public domain concerning the judge and the case, would have reasonably believed he [acted adversely to the defendant], and [those facts] would have caused such person to reasonably question, and to have a reasonable doubt about, [the trial judge's] impartiality and objectivity ... in a subsequent hearing . . . .

*Gaal*, 332 S.W.3d at 455 n. 26; *See also* 48B Robert P. Schuwerk & Lillian B. Hardwick, *Texas Practice Series: Handbook of Texas Lawyer and Judicial Ethics* 40:26 at 770 (2010) (quoting Findings of Fact and Conclusions of Law, *State v. Kniatt*, No. 25704-CR (40th Dist. Ct., Ellis County, Tex. Jan. 20, 2008).

Thus, the correct standard to be applied is simply that of TEX. R. CIV. P. 18b (b)(1): Recusal is required if "[T]he judge's impartiality might reasonably be questioned," because of a factor "of a kind that a fair-minded person could not set aside when judging the dispute" and it is not necessary to come to a conclusion

---

[12]*Gaal* was decided with reference to an earlier version of TEX. R. CIV. P. 18b, in which the paragraph numbering is different from the current version. The text of TEX. R. CIV. P. 18a and 18b appears in the Appendix as Exhibits B and C.

that the judge in question is, in fact, lacking in impartiality.

### 2. The Reasons Why Judge Gonzalez's Impartiality Might Reasonably Be Questioned in this Case.

A reasonable member of the public would reasonably doubt Judge Gonzalez's ability to be impartial in adjudicating the claims concerning jury misconduct or, perhaps more accurately here, the impact of "outside influences" improperly brought to bear on the jury.[13] In the hearing in Respondent's court, jurors Palacios and Guerra testified that Judge Gonzalez had private discussions with sitting jurors, outside the presence of the defendant, the court reporter or counsel for either party. The discussions concerned the jury's personal safety, in the context of a case whose subject matter concerned a six-victim homicide resulting from the activities of members of a local street gang, of which Mr. Garza was alleged to be a Captain. Moreover, this was a death penalty case in which the question whether Mr. Garza "would commit criminal acts of violence that would constitute a continuing threat to society," was one the jury would have to answer at sentencing. *See* TEX. CODE CRIM. PROC. Art. 37.071 § 2 (b)(2).

In addition to making findings of fact concerning his own conduct in the jury room, if he continues to preside over this case, Judge Gonzalez would be

---

[13]*See* TEX. R. EVID. 606(b): "[A] juror may testify ... whether any outside influence was improperly brought to bear upon any juror[.]"

required to make findings of fact concerning the conduct of his long-time employee, "Licha" Salinas, who was his bailiff at the time. According to the testifying jurors, Ms. Salinas had conversed with jury members who had expressed concern for their safety telling them that the judge carried a gun. As explained below, the conduct of both judge and bailiff breached court rules and constitutional safeguards and was improper. These facts would create the perception in a reasonable person that Judge Gonzalez could not be expected to adjudicate his own or his bailiff's behavior impartially.

3.  Any private communication or contact by a trial judge with a juror during a trial is improper.

"Any *ex parte* meeting or communication between the judge and ... jury is pregnant with possibilities for error," *United States v. United States Gypsum Co. et al.*, 438 U.S. 422, 460 (1978), and may alone warrant reversal of a conviction. *Id.* at 462;[14] *see also Remmer v. United States*, 347 U.S. 227 (1954):

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during

---

[14]"[I]t is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." *Starr v. United States*, 153 U.S. 614, 626 (1894).

-17-

the trial, with full knowledge of the parties.

*Remmer* was recently cited by this Court in *McQuarrie v. State*, 380 S.W.3d 145, 166 n.24 (Tex. Crim. App. 2012)(reversing and remanding for further proceedings where outside influence had potentially had impact on jury's verdict). As noted by Judge Johnson in *Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000)(plurality opinion):

> More than eighty years ago, we stated that too much caution cannot be exercised in the effort to avoid impressing the jury with the idea that the court entertains any impressions of the case which he wishes them to know, and putting before them matters which should not enter into or affect their deliberations ... should in all cases be avoided. To the jury the language and conduct of the trial court have a special and peculiar weight. The law contemplates that the trial judge shall maintain an attitude of impartiality throughout the trial. Jurors are prone to seize with alacrity upon any conduct or language of the trial judge which they may interpret as shedding light upon his view of the weight of the evidence, or the merits of the issues involved. The delicacy of the situation in which he is placed requires that he be alert in his communications with the jury, not only to avoid impressing them with any views that he has, but to avoid in his manner and speech things that they may so interpret.

*Blue*, 41 S.W.3d at 131, *quoting Lagrone v. State*, 84 Tex. Crim. 609, 209 S.W. 411, 415 (Tex. Crim. App. 1919).[15]

Texas statutory law prescribes how communication between a trial court

---

[15]*See also Simmons v. State*, 55 Tex. Crim. 441, 117 S.W.2d 141, 143 (Tex. Crim. App. 1909)("The trial judge is to the jury the Lord's anointed. His language and his conduct have to them a special and peculiar weight.").

and a jury should be conducted: TEX. CODE CRIM. PROC. Art. 36.27 sets out a regime whereby all communications from the jury to the court must be "written, prepared by the foreman, and shall be submitted to the court through the bailiff" with answers also being in writing and made, if possible, only after notice to the defendant and counsel, giving the defense an opportunity to object. Any instructions or answers to jury notes must be read out in open court, unless that is expressly waived, and all such proceedings should be made part of the record. Id. The trial court is specifically prohibited from "at any stage of the proceeding previous to the return of the verdict [making] any remark calculated to convey to the jury his opinion of the case." TEX. CODE CRIM. PROC. Art. 38.05.[16]

*Ex parte* contacts between a trial judge and a jury may therefore infringe on constitutional safeguards. In addition to the constitutional right to a fair trial before an impartial judge, *Fulminante*, 499 U.S. at 309-10, and impartial jury, *Skilling v. United States*, 561 U.S. 358, 377 (2010), a defendant has the right to be present in person, *Rushen v. Spain*, 464 U.S. 114, 118 (1983); *Hopt v. Utah*, 110 U.S. 574, 579-80 (1884), and to have the assistance of counsel, *Rothgery v.*

---

[16] *See also* TEX. CODE JUD. CONDUCT, Canon 3(B)(8) ("A judge shall not initiate, permit or consider *ex parte* communications outside the presence of the parties between the judge and [court appointee] ... concerning the merits of a pending or impending judicial proceeding.").

*Gillespie County*, 554 U.S. 191, 198 (2008), as well as having the right to a public trial. *Presley v. Georgia*, 558 U.S. 209, 211-12 (2010). All of these rights are jeopardized by *ex parte* and *in camera* communications by court officers with jurors outside the presence of the defendant and his counsel.

> 4. Communication or contact by the trial bailiff with jurors during a trial may be improper if it goes beyond what is necessary for the purpose of shepherding the jury.

While the services of a bailiff are necessary to "attend the wants of the jury," TEX. CODE CRIM. PROC. Art 36.24, communication with jurors about the case on trial is impermissible, "except in the presence and by the permission of the court." TEX. CODE CRIM. PROC. Art 36.22. Such communication may result in confinement in jail or a fine. TEX. CODE CRIM. PROC. Art 36.23.

Comments made privately by a bailiff to jurors may infringe on the right to be fairly tried only on the basis of evidence developed from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. *Parker v. Gladden*, 385 U.S. 363, 365 (1966) (bailiff's improper comment to jurors that petitioner was a "wicked fellow" required reversal); *see also Mattox v. United States*, 146 U.S. 140 (1892)(conviction reversed because bailiff remarked to jury that this was third person defendant had killed); *Ward v. Hall*, 592 F.3d 1144, 1173-81 (11th Cir.

2010)(petitioner's constitutional rights to fair trial and reliable sentence were violated when bailiff responded improperly to juror question).

The fact that a Judge has a personal or business relationship with a particular individual is not necessarily enough, in itself, to require recusal on the ground of a lack of impartiality. *See, e.g., Woodruff v. Wright*, 51 S.W.3d 727, 737-38 (Tex. App. - Texarkana 2001, pet. denied)(that doctor who was a party to case had operated on judge's mother and colleague, and judge had conducted doctor's wedding ceremony was insufficient to require recusal); *Lueg v. Lueg*, 976 S.W.2d 308, 309, 311 (Tex. App. - Corpus Christi 1998, pet. denied)(recusal not mandated although attorney for party was representing judge in separate lawsuit and was his former campaign manager).

However, in *Keene Corp. v. Rogers*, 863 S.W.2d 168 (Tex. App. - Texarkana 1993, no writ) where the judge's son-in-law had become an associate at one of the law firms involved in the case, but had no direct involvement in it, the Texas Supreme Court held that each situation where an individual to whom a judge has a personal connection is associated with a case "has to be determined on an *ad hoc* basis, considering such factors as whether and to what extent [that person] is participating in the case and whether [they] will be substantially affected by the outcome of the proceeding."

-21-

Here, the bailiff indicated in her hearing testimony that she has a long-standing work relationship with the judge in question and is a valued employee who he has promoted. She also acknowledged that both he and she could experience adverse consequences as a result of a finding that her conduct had jeopardized the outcome of a case. Thus, in this situation, the relationship between judge and bailiff goes beyond the mere fact of employment. The court that ultimately adjudicates the relevant claim will need to determine and evaluate the actions of Ms. Salinas, a bailiff who has committed potentially punishable misconduct, and who, given the close quarters in which the judge works with her, may have knowledge of the judge's own conduct in this case.

A reasonable observer would conclude that in these circumstances, Judge Gonzalez's ability to impartially adjudicate the allegations in the writ application might reasonably be questioned, given that his own, and his bailiff's, conduct departed from the normal standards of conduct with regard to sitting jurors.

The case of *O'Quinn v. Hall*, 77 S.W.3d 438, 447-48 (Tex. App. - Corpus Christi 2002, no pet.) arose from the same court as Mr. Garza's case, and was also presided over by the Hon. Noe Gonzalez, *see O'Quinn v. Hall*, 77 S.W.3d 452, 454 (Tex. App. - Corpus Christi 2002). In *O'Quinn*, there was a factual dispute concerning the time when counsel received notice of an Order entered by Judge

Gonzalez and supposedly conveyed to counsel by the court staff. The Thirteenth Court of Appeals rejected the idea that the judge could take judicial notice of what had occurred, and held that the judge's reliance on evidence about a contested fact, conveyed to him by his own staff, created an appearance of bias and lack of impartiality. 77 S.W.3d at 448. The same concerns militate here in favor of recusal.

## B. JUDGE GONZALEZ HAS PERSONAL KNOWLEDGE OF DISPUTED EVIDENTIARY FACTS WHICH REQUIRE HIS RECUSAL.

The State of Texas, in its Answer to the Writ Application, disputed Mr. Garza's claims of outside influences on the jury contending that they "are based on factual premises of doubtful validity," *Id.* at 387. Thus, there are disputed factual issues here that require that the case be adjudicated by a judge who is a "neutral arbiter in the courtroom," *Hensarling v. State*, 829 S.W.2d 168, 171 (Tex. Crim. App. 1992).

On the evidence developed thus far, Judge Gonzalez has knowledge of the existence - or non-existence - of facts concerning at least his own conduct and possibly that of a valued employee - his bailiff - also. It is therefore very possible that he will be called as a witness, which cannot be done while he is still presiding over the case. *See* TEX. R. EVID. 605: "The Judge presiding at the trial may not

testify in that trial as a witness."

Whether or not he testifies, for Judge Gonzalez to continue to preside over this case, at minimum, "give[s] the appearance of the court becoming a witness in this matter" and risks creating "the appearance of bias which Rule 605 seeks to prevent." *O'Quinn*, 77 S.W.3d at 447-48. See also *Brown v. Lynaugh*, 843 F.2d 849, 850 (5ᵗʰ Cir. 1988)("It is difficult to see how the neutral role of the court could be more compromised, or more blurred with the prosecutor's role, than when the judge serves as a witness for the state.").

In the analogous case of *Gentry v. State*, No. 06-05-00237-CR, 2006 Tex. App. LEXIS 2923 (Tex. App. - Texarkana 2006, no pet.) the court held that a judge could not decide the outcome of a suppression hearing where he may himself have observed the conduct leading to initial detention, and explicitly ruled on his personal knowledge of the sequence of events. The court noted that a lack of impartiality on the part of a trial judge deprives a defendant of due process, citing *Kemp v. State*, 846 S.W.2d 289, 305-06 (Tex. Crim. App. 1992). The facts of *Gentry* were described as a "clear instance" of "personal knowledge of disputed evidentiary facts," by this Court in *Gaal*, 332 S.W.3d at 454. Similarly, the facts here, concerning both Judge Gonzalez's own conduct and possibly that of his bailiff also, provide another "clear instance" of critical facts of a case being

personally known to a judge, who therefore cannot continue to preside.

*Hensarling v. State*, 829 S.W.2d 168, 171 (Tex. Crim. App. 1992), a case where the judge who had presided at trial testified at a retrospective competency hearing, noted the practical difficulties that would occur should a presiding judge attempt to testify as a witness in the same proceeding, and which underline why such an endeavor is infeasible, quoting Goode, Wellborn and Sharlot, *Texas Rules of Evidence: Civil and Criminal*, 33 Texas Practice 605.1, p. 384:

> A judge who testifies, for example, might be required to evaluate his own testimony in the course of deciding a motion for a directed verdict. Furthermore, the aura of impartiality surrounding the judge will likely cause the jury to give undue credence to his testimony. Opposing counsel might well be hesitant to attack the judge on cross-examination for fear of alienating either the judge or jury. Finally, practical problems inhere in such judicial testimony. Who, for example, will rule on objections?

The conclusion in *Hensarling* was that for the State to introduce the testimony of the judge who had presided at a previous stage of the proceedings did not violate TEX. R. EVID. 605, but on the facts of that case, a new judge was now presiding,

and the judge's own conduct was not in question, as it is here.

### 1.    A Clear Entitlement to Relief Exists in These Circumstances.

Mr. Garza has a "a clear right to the relief sought." The merits of the situation are "clear and indisputable" with "nothing left to the exercise of

-25-

discretion or judgment." *State ex rel. Hill v. Fifth Court of Appeals*, 34 S.W.3d

924, 927-28 (Tex. Crim. App. 2001)(citing *Buntion v. Harmon*, 827 S.W.2d 945,

947 and 947 n. 2 (Tex. Crim. App. 1992).[17]

That there is a disputed evidentiary issue, and that Judge Gonzalez would

have personal knowledge of his own role in what occurred in the jury room during

the trial, see TEX. R. CIV. PROC. 18b(b)(3) is itself beyond dispute: The State, in

its Answer, disputed Mr. Garza's claims of outside influences on the jury

contending that they "are based on factual premises of doubtful validity," *Id.* at

387. The State has also contested the strength and credibility of the juror

affidavits and testimony adduced at the recusal hearing. *See* Exhibit F: "State's

Memorandum Response to Applicant's Motion to Recuse 370th District Court

Judge Noe Gonzalez" at 12-19, 21.[18]

Likewise, given the allegations in the habeas application, the affidavits of

_____

[17]The fundamental nature of the right to an impartial trial judge was such
that the Sixth Court of Appeals in *Gentry*, where the trial judge relied on his
personal knowledge of the facts of the case in ruling, elected to address the issue
*sua sponte*. That court held that the trial judge had been disqualified from
presiding, and reversed and remanded to the trial court. *Gentry*, 2006 Tex. App.
LEXIS 2923 * 8.

[18]The State has acknowledged in its Response at 14 that there is a "clear-cut
factual dispute concerning whether Ms. Salinas had made a remark about Judge
Gonzalez carrying a gun for this court."

-26-

the two jurors and the hearing testimony, that Judge Gonzalez and his bailiff

brought an improper outside influence to bear on the jury, an outside observer

would question whether he could resolve those issues impartially. That is

apparent, whatever the merit of the underlying ground for habeas relief, and

whether or not Judge Gonzalez should decide to conduct a live hearing on the

allegation.[19] The question of whether he would in fact be partial may never be

resolved, and is not even relevant.

Moreover, the State in the proceeding below did not contest any of the basic

propositions of law either underlying the alleged ground for habeas relief or the

law on recusal.[20] The State has not contested the conclusion that Judge Gonzalez

---

[19]Applicant's Motion for Supplemental Order Designating Issues concerning the claim of jury misconduct, and requesting a hearing upon it, remains pending in the trial court.

[20]The State did refer, at the Seventh, Eighth, Ninth and Tenth points in its Response, to propositions that have a bearing on the issue of personal bias on the part of a judge, which is not alleged here. *See* State's Response at 9-10. The State also referred to there being a "high threshold" to be met in recusing a judge on the basis of perceived impartiality. *See* State's Response at 12. The only case cited by the State that actually mentions a "high threshold" is *Ex parte Ellis*, 275 S.W.3d 109, 112 (Tex. App. - Austin 2008, no pet.) which referred to the concurrence of Justice Kennedy in *Liteky*, which then explains that a judge should only be disqualified, under the relevant federal statute, if it "*appears* that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute" adding that "[o]ne of the objects of law is the impartiality of its judges in fact and *appearance*." (emphasis added). The State also cited *Abdygapparova*, 243 S.W.3d at 198, which refers to a "high

would have personal knowledge of the behavior alleged. Nor has the State offered any explanation of how a judge in his position could rule impartially. Finally, the State has offered no argument showing how the appearance of impartiality has not been compromised.

As *Buntion* explained, a ministerial act is one "clearly compelled by the facts and legal authority extant in a given situation." 827 S.W. 2d at 947. Even what might otherwise be deemed a discretionary function, may become "'ministerial' when the facts and circumstances dictate but one rational decision. *Id.* Here, the legal authorities and the facts in the record dictated that recusal was necessary, and there is "no ... principled reason" apparent from the record supporting the Respondent Judge's decision. On the contrary, the only rational decision was to recuse Judge Gonzalez.

> 2. <u>That a Convicting Court Normally Has the Discretion to Use Personal Recollection in Resolving Issues in a Habeas Proceeding Does Not Alter the Conclusion That Judge Gonzalez May Not Preside over this Case.</u>

The State contended in Respondent's court that because the trial court in a habeas proceeding may use personal recollection in determining the issues, recusal was not required in this instance. While that argument is collateral to the question

---

standard," but in the context of a case concerning personal bias as a basis for recusal, which does not discuss the *appearance* of partiality at all.

-28-

of whether recusal was mandated on the facts available to Respondent, it will be addressed here.

Both the capital and noncapital habeas corpus statutes provide that the convicting court "*may* use personal recollection" in determining "controverted, previously unresolved factual issues" in a writ application. *See* TEX. CODE CRIM. PROC. Art. 11.071 § 9(a) (emphasis added); TEX. CODE CRIM. PROC. Art. 11.07 § 3(d). There is, however, a dearth of authority concerning the scope of a trial court's proper discretion to use personal recollection in determining controverted issues. It is submitted that it may be appropriate to use personal recollection to determine facts that are unlikely to be disputed or that might be verified by the creation of a record to review. Here, however, the facts remain controverted, and the State has not declared itself willing to stipulate that the actions of the judge and bailiff testified to by former jurors Palacios and Guerrero did in fact take place.

In *Ex parte Davila,* 530 S.W.2d 543 (Tex. Crim. App. 1975), no hearing was conducted prior to the trial court making findings of fact and conclusions of law. In that case the ruling was based on "the files and records in this case and upon the pleadings," and the critical fact at issue was not disputed by the State. This Court, granting relief, concluded that the "proper standard in such cases as

the one before us is whether 'the fact-finding procedure there employed was ...

adequate for reaching reasonable correct results,'" quoting *Townsend v. Sain*, 372

U.S. 293 (1963)(hearing required in federal district court where state procedures

had been inadequate to ensure a full and fair hearing); *See also Wellons v. Hall*,

558 U.S. 220, 223 n. 3 (2010) (remanding case concerning alleged *ex parte*

contacts between the trial court and jurors, on which the petitioner had been

prevented from creating a record, noting that it would be "bizarre if a federal court

had to defer to state-court factual findings, made without any evidentiary record.")

The fact-finding procedure must be fair to both parties. In *Ex parte Byars*,

176 S.W.3d 841 (Tex. Crim. App. 2005), where a recommendation for the grant of

habeas relief was upheld, a recanting witness had been interviewed by the trial

court *in camera* with only a court reporter present, albeit with the acquiescence of

the parties. Members of this Court concurred in the decision but expressed

concern as to whether the procedure employed was adequate, given that

"adversarial testing is the constitutionally prescribed method of assessing

reliability," and the State had not cross-examined the witness. *Id.* at 841 (Keller,

P.J., and Hervey & Cochran, JJ., concurring). Similar concerns pertain where

there is a risk that the trial court will make findings on the basis of facts that

cannot actually be known, let alone properly tested or challenged. *Rose v.*

*Mitchell*, 443 U.S. 545, 563 (1979)(earlier state court determination of facts was not dispositive where "judge whose conduct [the petitioner] challenged decided the validity of that challenge.").

Moreover, weight should be given to the circumstances in which the convicting court acquires its knowledge of the facts: In *Sommers v. Concepcion*, 20 S.W.3d 27, 43-44 (Tex. Crim. App. - Houston [14th Dist.] 2000, pet. denied) a trustee in bankruptcy tried to recuse a judge who had testified in another proceeding concerning the same parties. It was held that it was no ground for recusal if a judge has learned facts in the course of prior proceedings, but that "where a party alleges the judge possesses personal knowledge of disputed facts, the party must show that this knowledge either was wrongfully obtained or led to a wrongful disposition of the case." Here, where the trial court's knowledge of the occurrences in the jury room were obtained - indeed, created - in violation of the relevant statutes, TEX. CODE CRIM. PROC. Art. 36.22 and 36.27 concerning contacts and communications with a jury during trial, it may be fairly said that the judge's personal knowledge seems to have been wrongfully obtained. Thus, to have that same judge rely on his personal recollection of those events would not be an adequate method "for reaching reasonably correct results." *Davila*, 530 S.W.2d at 545. A finding favorable to Mr. Garza's position here would require

-31-

Judge Gonzalez - explicitly or implicitly - to admit negative facts about his own conduct and possibly that of his longtime bailiff also. A finding adverse to Mr. Garza could also result in factual determinations which cannot adequately be reviewed later, since the court's contacts with the jury were *in camera*, *ex parte* and unrecorded.

## III. NO ADEQUATE REMEDY AT LAW

Mr. Garza has no adequate remedy at law. Unless mandamus relief is granted, the proceedings will continue to be presided over by a judge who should have been recused, and whose findings of fact and conclusions of law may have to be revisited by a subsequent judge.

### 1. Review of Denial of Recusal in the Context of Habeas Corpus Proceedings

There is no comparable criminal rule or statute to TEX. R. CIV. P. 18b, which provides the various statutory bases for recusal. However, this Court has held that the civil rules on recusal apply, absent legislative intent indicating otherwise. *Gaal v. State*, 332 S.W.3d 448, 453 n. 12 (Tex. Crim. App. 2011); *McClenan v. State*, 661 S.W.2d 108, 110 (Tex. Crim. App. 1983). Because there is no expressed legislative intent otherwise, TEX. R. CIV. P. 18b therefore certainly applies to Mr. Garza's case.

This Court has also specifically held that TEX. R. CIV. P. 18b(a), which

states the procedures governing recusal motions in the trial courts, applies to habeas proceedings "before the trial court." *Ex parte Sinegar*, 324 S.W.3d 578, 580 (Tex. Crim. App. 2010). However, TEX. R. CIV. P. 18a (j)(1)(A), provides that: "[a]n order denying a motion to recuse may be reviewed only for abuse of discretion on *appeal* from the final judgment," (emphasis added) and the specific application of that part of Rule 18a is not discussed in *Sinegar*.

*Sinegar* concerned a situation where the judge of a convicting court had declined to address a motion to recuse filed in the course of a habeas corpus proceeding in which the convicting court had already issued findings of fact and conclusions of law recommending that relief be denied. In *Sinegar*, this Court was presented with both the question of the trial court's handling of the recusal issue and that court's findings of fact and conclusions of law on the merits. However, in that case, unlike this, the trial court had not actually acted on the recusal motion, and the Court apparently felt it necessary to have the recusal issue addressed prior to deciding whether the findings and conclusions could even be reviewed, given that Sinegar's recusal efforts were underway prior to the issuance of the trial court's findings and recommendations. *See also Ex parte Roundtree*, No. WR-74,550-01, 2011 Tex. Crim. App. Unpub. LEXIS 249 (Tex. Crim. App. 2011) (Court of Criminal Appeals declined adoption of findings and conclusions because

-33-

recusal proceedings were pending when trial court made findings and conclusions); *see also* TEX. R. APP. P. 73.4 Action on Application: "The Court may deny relief based on its own review of the Application or may issue such other instructions or orders as may be appropriate."[21]

This Court has not stated whether its TEX. CODE CRIM. PROC. Art. 11.071 § 11 review of the trial court's proposed findings of fact and conclusions of law on a habeas application is an "appeal from the final judgment" for the purpose of TEX. R. CIV. P. 18a (j)(1)(A). It does not appear that it is: This Court reserves to itself all final decisions on both fact and law in habeas corpus cases, *Ex parte Van Alstyne*, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007)(Court of Criminal Appeals is "ultimate fact finder" in post-conviction habeas corpus review); *Ex parte Galvan*, 770 S.W.2d 822, 823-24 (Tex. Crim. App. 1989)(Court of Criminal Appeals not bound by trial court's conclusions of law). This Court's resolution of a capital habeas writ application is itself the "final judgment" in a habeas action which disposes of all issues and parties in a case. There is simply no "appeal" in

---

[21]Neither *Sinegar*, nor any other authority that counsel has located, articulate whether this Court's "review," see TEX. CODE CRIM. PROC. Art. 11.071 § 11, is in an "appeal" for the purpose of TEX. R. CIV. P. 18a (j)(1)(A)'s exclusive avenue to remedy the denial of a recusal motion.

Texas law from this Court's "final judgment."[22]

Moreover, the habeas statute, TEX. CODE CRIM. PROC. Art. 11.071 instructs this Court to review the application and possibly to request further briefing of "the issues," but in this context, that reference must be to the factual issues material to the underlying legality of an Applicant's confinement, see TEX. CODE CRIM. PROC. Art. 11.071 § 8(a). The statute contains no specific provision allowing presentation of arguments concerning irregularity or impropriety in the proceedings below.

The plain words of the recusal rule TEX. R. CIV. P. 18a (j)(1)(A) indicate that it requires the existence of an appeal from a trial court proceeding in order for a recusal decision to be challenged. Being drafted as a civil rule, it is hardly surprising that it makes no explicit provision for review of criminal habeas corpus proceedings, and while this Court has long since extended an invitation to the legislature to provide relevant rules specific to criminal cases, *see McLenan*, 661 S.W.2d at 111, no such rules have been provided.

There being no provision in the habeas context for an "appeal" in the usual

---

[22]*See Green v. State.* 374 S.W.3d 434, 445-46 (Tex. Crim. App. 2012) adopting Texas Supreme Court's interpretation of "final judgement," as that which disposes of all issues and parties in a case in *North East Independent School Dist. v. Aldridge*, 400 S.W.2d 893, 895 (Tex. 1966); *Davis v. McCray Refrigerator Sales Corp.*, 136 Tex. 296, 150 S.W.2d 377 (Tex. 1941).

sense from a trial court's denial of recusal, there is no adequate remedy at law for an improper denial.

## 2. Awaiting Later Appeal or Review Is Not an Adequate Remedy in the Context of this Case.

Even if TEX. CODE CRIM. PROC. Art. 11.071 § 11 review is an "appeal from the final judgment" for the purpose of TEX. R. CIV. P. 18a (j)(1)(A), and provides a potential remedy, that remedy would not be adequate in these circumstances.

In other cases where an appeal was a remedy that would eventually become available to a defendant seeking mandamus, it has been held that such a remedy was not adequate, given the circumstances. In *Stearnes v. Clinton*, 780 S.W.2d 216 (Tex. Crim. App. 1989), the relator complained that the respondent judge had arbitrarily removed his court-appointed attorneys. The relator conceded that if he was denied mandamus relief, and if convicted, he would be able to seek review of the issue through an appeal. *Id.* at 225. This Court held that the "remedy of appeal is simply inappropriate to the situation present here," and quoted *Smith v. Flack*, 728 S.W.2d 784, 792 (Tex. Crim. App. 1987) ("In some cases, a remedy at law may technically exist; however, it may nevertheless be so uncertain, tedious, burdensome, slow, inconvenient, inappropriate, or ineffective as to be deemed inadequate.") The Court held that failing to provide an immediate remedy would burden the defendant by compelling him "to again endure a trip through the

-36-

system creating in turn needless additional cost to the taxpayers of this state." *Id.* at 225. In *Buntion*, 827 S.W.2d at 948-49 where the trial court arbitrarily replaced counsel post-trial, this Court came to the same conclusion, emphasizing the fundamental nature of the right to counsel, and held that the relator had no adequate remedy at law.

Given "the subjective nature of such terms as 'plain' and 'uncertain,' 'convenient' and 'inconvenient,' 'effective' and 'ineffective,'" *Smith v. Flack*, 728 S.W.2d at 792, noted that the Court must examine the specific circumstances of each case in the course of carefully exercising its discretion as to whether a particular remedy at law would be adequate. While this case involved a different right - the right to an impartial judge - than that at play in *Stearnes* and *Buntion*, where the right to counsel was involved, the right to an impartial judge is equally fundamental to a fair proceeding.

Relator could continue through the habeas corpus process with the presiding judge unchanged, and then ask this Court to set aside any adverse findings and conclusions of the trial court, reverse the respondent judge's ruling on the recusal issue and remand for renewed litigation of the issues, untainted by the involvement of a judge whose impartiality and knowledge are at issue. However, to "require him to go through a complete [habeas proceeding] in order to assert

-37-

this right to which he is now entitled would be to require a mere formality, and would be wasteful of both time and money." *Thi Van Le v. Perkins*, 700 S.W.2d 768, 776) (Tex. App. - Austin 1985); *Perkins v. Court of Appeals*, 738 S.W.2d 276 (Tex. Crim. App. 1987)(denying writ of mandamus against court of appeals in *Thi Van Le*).

It should also be borne in mind that the trial court in a habeas proceeding performs multiple tasks in such a case, all of which may be affected by his discretionary decision-making: "He is 'Johnny-on-the-Spot.' He is the collector of the evidence, the organizer of the materials, the decisionmaker as to what live testimony may be necessary, the factfinder who resolves disputed factual issues, the judge who applies the law to the facts, enters specific findings of fact and conclusions of law, and may make a specific recommendation to grant or deny relief." *Ex parte Simpson*, 136 S.W.3d 660, 668 (Tex. Crim. App. 2004). Thus, rather than any adverse rulings adverse being easily segregable if the case were remanded to the trial court, the involvement of a judge whose impartiality might reasonably be questioned would properly demand that the entire proceeding be subject to a "do-over."

## IV.  A STAY OF THE PROCEEDINGS IN THE DISTRICT COURT IS NECESSARY IN ORDER TO ENSURE THAT AN ADEQUATE REMEDY IS AVAILABLE

This Court issued an Order on April 7, 2014, commanding Judge Gonzalez to resolve the outstanding issues and to have the completed case forwarded to the Court on or before July 31, 2014. The Order, which reflected that Mr. Garza had previously received extensions of time in which to prepare and investigate the case, stated that no further extensions of time would be entertained.[23] *See* Order of April 7, 2014 in *Ex parte Humberto Garza*, No. WR-78,113-01. The Order also stated that an order to show cause would issue "against the trial judge, the prosecutor and defense counsel," if the July 31, 2014 deadline was not met.

At the time that the additional information was obtained from former juror Rose Marie Palacios, giving rise to the Motion for Court to Recuse Itself filed on May 27, 2014, Judge Gonzalez had ordered an evidentiary hearing to commence during the week beginning June 9, 2014. However, because of the provisions of TEX. R. CIV. P. 18a (f)(2)(A) which prevent a judge against whom a recusal motion

---

[23]The Order states that undersigned counsel was seeking a fourth extension of time in the case. In fact, since appointment, undersigned counsel had received two previous motions for extension of time, one being granted on January 7, 2013 and one on August 2, 2013. An extension of time which appears on the Court's website as being granted on November 5, 2012, was at the behest of the trial court on behalf of the State which had not filed its Answer, even though over five years had elapsed since the Application was filed.

has been filed from taking any further action while the motion is pending, Judge Gonzalez was unable to proceed until the motion had been decided. That did not happen until Respondent Judge Flores denied the motion, on July 3, 2014.

While Judge Gonzalez is no longer subject to the strictures of TEX. R. CIV. P. 18a (f)(2)(A), Mr. Garza's need for his case to be decided by a different judge remains, and is the subject of this Petition for Writ of Mandamus. However, Assistant Criminal District Attorney Theodore C. Hake, who has been handling this matter for the appellate division of the Hidalgo County District Attorney's office has asked Judge Gonzalez, in a letter of July 7, 2014, to set a renewed date for an evidentiary hearing as soon as possible in light of this Court's Order of April 4, 2014.[24]

While Mr. Garza regrets the need for further delay in this case, he submits that his legitimate interest in having his habeas application adjudicated only in a reliable proceeding before a judge whose impartiality cannot be questioned, and who is not encumbered with personal knowledge of the disputed facts, should prevail over this Court's earlier order. Mr. Garza did not create the circumstances giving rise to the need to file his recusal motion, and his interests - and, he would

---

[24]A copy of that letter, as provided to undersigned counsel, is attached as Exhibit L.

-40-

submits, the wider interests of both justice and judicial economy - are imminently threatened if the district court proceeds to an evidentiary hearing at this time. [25]

He therefore moves, pursuant to TEX. R. APP. P. 52.10, for Temporary Relief in the form of an immediate stay of the proceedings in the 370th District Court so that this Court can resolve the case, and he can receive the relief he requests: namely that the habeas proceedings should only continue before a different judge. Without a stay, the proceedings in the district court may well have concluded before this Court has time to rule, and the subject matter of this Petition will have become moot. *State ex rel. Millsap v. Lozano*, 692 S.W.2d 470, 480 (Tex. Crim. App. 1985)(court lacks jurisdiction if it has no power to render the particular relief awarded or if the issue is moot).

---

[25]*See, e.g., In re McCann*, 2013 Tex. Crim. App. Unpub. LEXIS 1240 (Tex. Crim. App. 2013)(granting motion for Emergency Temporary Relief prior to filing of writ of mandamus, and staying contempt order entered by trial court, where "potentially far-reaching issues" were raised in habeas corpus proceedings, and trial counsel otherwise faced incarceration while mandamus petition was filed and considered).

# CONCLUSION.

WHEREFORE, PREMISES CONSIDERED, Mr. Garza prays that this

Court grant the requested writ of mandamus, by directing Respondent to vacate his

Order Denying Applicant's Motion to Recuse 370th District Court Judge Noe

Gonzalez, signed and entered on July 3rd, 2014, and to enter an Order recusing

Judge Gonzalez.

Respectfully submitted,

*Hilary Sheard*

HILARY SHEARD
Texas Bar # 50511187
7301 Burnet Road, # 102-328
Austin, TX 78757
Phone: (512) 524 1371
Fax: (512) 646 7067
HilarySheard@Hotmail.com

*Counsel for Humberto Garza III, Applicant.*

-42-

# CERTIFICATION

In accordance with TEX. R. APP. P. 52.3(I), the undersigned, counsel for Relator Humberto Garza III, certify that I have reviewed the foregoing petition and that every factual statement therein is supported by competent evidence included in the appendix or in the record of this case.

I also certify that I have complied with TEX. R. APP. P. 52.10 and promptly advised the Hon. J.R. "Bobby" Flores, the Hon. Noe Gonzalez and Assistant Criminal District Attorney Theodore C. Hake that temporary relief in the form of a stay of proceedings in the 370th District Court is being sought.

_____
Hilary Sheard.

-43-

## CERTIFICATE OF SERVICE

I certify that on July 8, 2014, a copy of the foregoing pleading was served electronically via www.efileTexas.gov:

Hon. J.R. "Bobby" Flores
Presiding Judge
139th District Court of Hidalgo County, Texas
Hidalgo County Courthouse
100 N. Closner, 1st Floor
Edinburg, TX 78539
RunBobbyRun@Yahoo.com

Rene Guerra, Esq.
District Attorney of Hidalgo County
Hidalgo County Courthouse
100 N. Closner, Room 303
Edinburg, Texas 78539.
Rene.Guerra@da.co.hidalgo.tx.us

Theodore C. Hake, Esq.
Assistant Criminal District Attorney
Hidalgo County Courthouse
100 N. Closner, Room 303
Edinburg, Texas 78539.
Ted.Hake@da.co.hidalgo.tx.us

Michael W. Morris, Esq.
Assistant Criminal District Attorney
Office of the District Attorney
Hidalgo County Courthouse
100 N. Closner
Edinburg, TX 78539
Michael.Morris@da.co.hidalgo.tx.us

_____
Hilary Sheard.

# APPENDIX

# Exhibit A

Order Denying Applicant's Motion to Recuse
370th District Court Judge Noe Gonzalez

CAUSE NO. CR-3175-04-G (1)

| | | |
|---|---|---|
| EX PARTE | § | IN THE 370TH DISTRICT COURT |
| HUMBERTO GARZA, | § | OF |
| APPLICANT | § | HIDALGO COUNTY, TEXAS |

## ORDER DENYING APPLICANT'S MOTION TO RECUSE
## 370TH DISTRICT COURT JUDGE NOE GONZALEZ

On May 27, 2014, Applicant Humberto Garza filed "Applicant's Motion to Court to Recuse Itself" in this post-conviction habeas proceeding in a death penalty case filed pursuant to TEX. CODE CRIM. PROC. ANN. Art. 11.071 (Supp. 2013).

In said motion, Applicant asked that 370th District Court Judge Noe Gonzalez, who had presided over the underlying death penalty case, to either recuse himself or request that the Presiding Judge of this administrative district hear the motion himself or assign another judge to do so.

Judge Gonzalez utilized the latter option and Judge J. Rolando Olvera, Presiding Judge of the Fifth Administrative Judicial Region of Texas, then assigned 139th District Court Judge J.R. "Bobby" Flores to hear the motion to recuse.

Accordingly, a hearing was held in the 139th District Court, before Judge Flores, on June 16, 2014.

During said hearing, testimony was presented by former juror Rose Marie Palacios, formerly known as Rose Marie Vera; former juror Melissa Guerrero; and Alicia "Licha" Salinas, who had been the bailiff for the 370th District Court at the time of the trial of Applicant's case.

After hearing said testimony and the argument of counsel, and having considered the further arguments presented in the memoranda submitted by each side, this Court is of the opinion that "Applicant's Motion to Court to Recuse Itself" should be, and same is hereby, DENIED.

Alexandra "Sandra" Gomez, the Criminal Appeals Deputy Clerk for the Hidalgo County District Clerk's Office, is ordered to provide a copy of this Order to Applicant Garza's habeas counsel Hilary Sheard and to Assistant Criminal District Attorney Theodore C. Hake.

SIGNED and ENTERED on this, the 3rd day of June, 2014.

J.R. "BOBBY" FLORES
Judge Presiding
139th District Court
Hidalgo County, Texas

DATE 7-7-14
A true copy I certify
LAURA HINOJOSA
District Clerk, Hidalgo County, Texas
By_____ Deputy 44

# Exhibit B

TEX. R. CIV. P. 18a



Texas Rules
Copyright (c) 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** This document is current through June 3, 2014 ***
*** Federal case annotations: Jan. 30, 2014 postings on Lexis.com ***
*** State case annotations: Feb. 19, 2014 postings on Lexis.com ***

STATE RULES
TEXAS RULES OF CIVIL PROCEDURE
PART II. RULES OF PRACTICE IN DISTRICT AND COUNTY COURTS
SECTION 1. General Rules

*Tex. R. Civ. P. 18a* (2014)

Rule 18a Recusal and Disqualification of Judges

(a)  *Motion; Form and Contents.* --A party in a case in any trial court other than a statutory probate court or justice court may seek to recuse or disqualify a judge who is sitting in the case by filing a motion with the clerk of the court in which the case is pending. The motion:

(1) must be verified;

(2) must assert one or more of the grounds listed in Rule 18b;

(3) must not be based solely on the judge's rulings in the case; and

(4) must state with detail and particularity facts that:

(A) are within the affiant's personal knowledge, except that facts may be stated on information and belief if the basis for that belief is specifically stated;

(B) would be admissible in evidence; and

(C) if proven, would be sufficient to justify recusal or disqualification.

(b)  *Time for Filing Motion.*

(1)  *Motion to Recuse.* --A motion to recuse:

(A) must be filed as soon as practicable after the movant knows of the ground stated in the motion; and

(B) must not be filed after the tenth day before the date set for trial or other hearing unless, before that day, the movant neither knew nor reasonably should have known:

(i) that the judge whose recusal is sought would preside at the trial or hearing; or

(ii) that the ground stated in the motion existed.

(2)  *Motion to Disqualify.* --A motion to disqualify should be filed as soon as practicable after the movant knows of the ground stated in the motion.

(c)  *Response to Motion.*

(1)  *By Another Party.* --Any other party in the case may, but need not, file a response to the motion. Any response must be filed before the motion is heard.

(2)  *By the Respondent Judge.* --The judge whose recusal or disqualification is sought should not file a response to the motion.

(d)  *Service of Motion or Response.* --A party who files a motion or response must serve a copy on every other party. The method of service must be the same as the method of filing, if possible.

(e)  *Duty of the Clerk.*

(1)  *Delivery of a Motion or Response.* --When a motion or response is filed, the clerk of the court must immediately deliver a copy to the respondent judge and to the presiding judge of the administrative judicial region in which the court is located ("the regional presiding judge").

(2)  *Delivery of Order of Recusal or Referral.* --When a respondent judge signs and files an order of recusal or referral, the clerk of the court must immediately deliver a copy to the regional presiding judge.

(f)  *Duties of the Respondent Judge; Failure to Comply.*

(1)  *Responding to the Motion.* --Regardless of whether the motion complies with this rule, the respondent judge, within three business days after the motion is filed, must either:

(A) sign and file with the clerk an order of recusal or disqualification; or

(B) sign and file with the clerk an order referring the motion to the regional presiding judge.

(2)  *Restrictions on Further Action.*

(A)  *Motion Filed Before Evidence Offered at Trial.* --If a motion is filed before evidence has been offered at trial, the respondent judge must take no further action in the case until the motion has been decided, except for good cause stated in writing or on the record.

(B)  *Motion Filed After Evidence Offered at Trial.* --If a motion is filed after evidence has been offered at trial, the respondent judge may proceed, subject to stay by the regional presiding judge.

(3)  *Failure to Comply.* --If the respondent judge fails to comply with a duty imposed by this rule, the movant may notify the regional presiding judge.

(g)  *Duties of Regional Presiding Judge.*

(1)  *Motion.* --The regional presiding judge must rule on a referred motion or assign a judge to rule. If a party files a motion to recuse or disqualify the regional presiding judge, the regional presiding judge may still assign a judge to rule on the original, referred motion. Alternatively, the regional presiding judge may sign and file with the clerk an order referring the second motion to the Chief Justice for consideration.

(2)  *Order.* --The ruling must be by written order.

(3)  *Summary Denial for Noncompliance.*

(A)  *Motion to Recuse.* --A motion to recuse that does not comply with this rule may be denied without an oral hearing. The order must state the nature of the noncompliance. Even if the motion is amended to correct the stated noncompliance, the motion will count for purposes of determining whether a tertiary recusal motion has been filed under the Civil Practice and Remedies Code.

(B)  *Motion to Disqualify.* --A motion to disqualify may not be denied on the ground that it was not filed or served in compliance with this rule.

(4)  *Interim Orders.* --The regional presiding judge or judge assigned to decide the motion may issue interim or ancillary orders in the pending case as justice may require.

(5)  *Discovery.* --Except by order of the regional presiding judge or the judge assigned to decide the motion, a subpoena or discovery request may not issue to the respondent judge and may be disregarded unless accompanied by the order.

(6) *Hearing.*

(A) *Time.* --The motion must be heard as soon as practicable and may be heard immediately after it is referred to the regional presiding judge or an assigned judge.

(B) *Notice.* --Notice of the hearing must be given to all parties in the case.

(C) *By Telephone.* --The hearing may be conducted by telephone on the record. Documents submitted by facsimile or email, otherwise admissible under the rules of evidence, may be considered.

(7) *Reassignment of Case If Motion Granted.* --If the motion is granted, the regional presiding judge must transfer the case to another court or assign another judge to the case.

(h) *Sanctions.* --After notice and hearing, the judge who hears the motion may order the party or attorney who filed the motion, or both, to pay the reasonable attorney fees and expenses incurred by other parties if the judge determines that the motion was:

(1) groundless and filed in bad faith or for the purpose of harassment, or

(2) clearly brought for unnecessary delay and without sufficient cause.

(i) *Chief Justice.* --The Chief Justice of the Supreme Court of Texas may assign judges and issue any orders permitted by this rule or pursuant to statute.

(j) *Appellate Review.*

(1) *Order on Motion to Recuse.*

(A) *Denying Motion.* --An order denying a motion to recuse may be reviewed only for abuse of discretion on appeal from the final judgment.

(B) *Granting Motion.* --An order granting a motion to recuse is final and cannot be reviewed by appeal, mandamus, or otherwise.

(2) *Order on Motion to Disqualify.* --An order granting or denying a motion to disqualify may be reviewed by mandamus and may be appealed in accordance with other law.

**HISTORY:** Amended by Texas Supreme Court, Misc. Docket No. 11-9126, effective August 1, 2011; Amended by Texas Supreme Court, Misc. Docket No. 11-9141, effective August 1, 2011.

**NOTES:**

*Change by amendment effective April 1, 1984:* Subdivision (a) is changed textually.

*Change by amendment effective September 1, 1986:* The words "the Court of Criminal Appeals" have been added in (a); and subsection "1" has been added to (g).

Comment to 2011 change by G.O. 11-9126 Rule 18a governs the procedure for recusing or disqualifying a judge sitting in any trial court other than a statutory probate court, justice court, or municipal court. Chapter 25 of the Government Code governs statutory probate courts, Rule 528 governs justice courts, and Chapter 29 of the Government Code governs municipal courts. Under Rule 18a, a judge's rulings may not be the sole basis for a motion to recuse or disqualify the judge. But when one or more sufficient other bases are raised, the judge hearing the motion may consider evidence of rulings when considering whether to grant the motion. For purposes of this rule, the term "rulings" is not meant to encompass a judge's statements or remarks about a case.
(Comment amended by Texas Supreme Court, Misc. Docket No. 11-9141, effective August 1, 2011)

PUBLICATION REFERENCES. --See *Texas Civil Trial Guide*, Unit 5, *Non-Evidentiary Motions*; *Texas Litigation Guide*, Ch. 110A, *Disqualification of Judge or Counsel*.

2011 amendment, by G.O. 11-9126, Rewrote the rule, which read:

"Recusal or Disqualification of Judges.

(a) At least ten days before the date set for trial or other hearing in any court other than the Supreme Court, the Court of Criminal Appeals or the court of appeals, any party may file with the clerk of the court a motion stating grounds why the judge before whom the case is pending should not sit in the case. The grounds may include any disability of the judge to sit in the case. The motion shall be verified and must state with particularity the grounds why the judge before whom the case is pending should not sit. The motion shall be made on personal knowledge and shall set forth such facts as would be admissible in evidence provided that facts may be stated upon information and belief if the grounds of such belief are specifically stated.

(b) On the day the motion is filed, copies shall be served on all other parties or their counsel of record, together with a notice that movant expects the motion to be presented to the judge three days after the filing of such motion unless otherwise ordered by the judge. Any other party may file with the clerk an opposing or concurring statement at any time before the motion is heard.

(c) Prior to any further proceedings in the case, the judge shall either recuse himself or request the presiding judge of the administrative judicial district to assign a judge to hear such motion. If the judge recuses himself, he shall enter an order of recusal and request the presiding judge of the administrative judicial district to assign another judge to sit, and shall make no further orders and shall take no further action in the case except for good cause stated in the order in which such action is taken.

(d) If the judge declines to recuse himself, he shall forward to the presiding judge of the administrative judicial district, in either original form or certified copy, an order of referral, the motion, and all opposing and concurring statements. Except for good cause stated in the order in which further action is taken, the judge shall make no further orders and shall take no further action in the case after filing of the motion and prior to a hearing on the motion. The presiding judge of the administrative judicial district shall immediately set a hearing before himself or some other judge designated by him, shall cause notice of such hearing to be given to all parties or their counsel, and shall make such other orders including orders on interim or ancillary relief in the pending cause as justice may require.

(e) If within ten days of the date set for trial or other hearing a judge is assigned to a case, the motion shall be filed at the earliest practicable time prior to the commencement of the trial or other hearing.

(f) If the motion is denied, it may be reviewed for abuse of discretion on appeal from the final judgment. If the motion is granted, the order shall not be reviewable, and the presiding judge shall assign another judge to sit in the case.

(g) The Chief Justice of the Supreme Court may also appoint and assign judges in conformity with this rule and pursuant to statute.

(h) If a party files a motion to recuse under this rule and it is determined by the presiding judge or the judge designated by him at the hearing and on motion of the opposite party, that the motion to recuse is brought solely for the purpose of delay and without sufficient cause, the judge hearing the motion may, in the interest of justice, impose any sanction authorized by Rule 215(2)(b)."

2011 amendment, by G.O. 11-9141, added "or disqualification" in (f)(1)(A).

# Exhibit C

TEX. R. CIV. P. 18b



1 of 1 DOCUMENT

Texas Rules
Copyright (c) 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** This document is current through June 3, 2014 ***
*** Federal case annotations: Jan. 30, 2014 postings on Lexis.com ***
*** State case annotations: Feb. 19, 2014 postings on Lexis.com ***

STATE RULES
TEXAS RULES OF CIVIL PROCEDURE
PART II. RULES OF PRACTICE IN DISTRICT AND COUNTY COURTS
SECTION 1. General Rules

*Tex. R. Civ. P. 18b* (2014)

Rule 18b Grounds for Recusal and Disqualification of Judges

(a) *Grounds for Disqualification.* --A judge must disqualify in any proceeding in which:

(1) the judge has served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter;

(2) the judge knows that, individually or as a fiduciary, the judge has an interest in the subject matter in controversy; or

(3) either of the parties may be related to the judge by affinity or consanguinity within the third degree.

(b) *Grounds for Recusal.* --A judge must recuse in any proceeding in which:

(1) the judge's impartiality might reasonably be questioned;

(2) the judge has a personal bias or prejudice concerning the subject matter or a party;

(3) the judge has personal knowledge of disputed evidentiary facts concerning the proceeding;

(4) the judge or a lawyer with whom the judge previously practiced law has been a material witness concerning the proceeding;

(5) the judge participated as counsel, adviser, or material witness in the matter in controversy, or expressed an opinion concerning the merits of it, while acting as an attorney in government service;

(6) the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(7) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(A) is a party to the proceeding or an officer, director, or trustee of a party;

(B) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or

(C) is to the judge's knowledge likely to be a material witness in the proceeding.

(8) the judge or the judge's spouse, or a person within the first degree of relationship to either of them, or the spouse of such a person, is acting as a lawyer in the proceeding.

(c) *Financial Interests.* --A judge should inform himself or herself about personal and fiduciary financial interests, and make a reasonable effort to inform himself or herself about the personal financial interests of his or her spouse and minor children residing in the household.

(d) *Terminology and Standards.* --In this rule:

(1) "proceeding" includes pretrial, trial, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system;

(3) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

(A) ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(B) an office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(C) the proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(D) ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities;

(E) an interest as a taxpayer or utility ratepayer, or any similar interest, is not a "financial interest" unless the outcome of the proceeding could substantially affect the liability of the judge or a person related to him within the third degree more than other judges.

(e)  *Waiving a Ground for Recusal.* --The parties to a proceeding may waive any ground for recusal after it is fully disclosed on the record.

(f)  *Discovery and Divestiture.* --If a judge does not discover that the judge is recused under subparagraphs (b)(6) or (b)(7)(B) until after the judge has devoted substantial time to the matter, the judge is not required to recuse himself or herself if the judge or the person related to the judge divests himself or herself of the interest that would otherwise require recusal.

**HISTORY:** Amended by Texas Supreme Court, Misc. Docket No. 11-9126, effective August 1, 2011.

**NOTES:**


Change by amendment effective September 1, 1990. The grounds for a judge's mandatory recusal have been expanded from those in prior Rule 18b(2).

Comment to 2011 change by G.O. 11-9126 The amendments to Rule 18b are not intended to be substantive.

PUBLICATION REFERENCES. --See *Texas Civil Trial Guide*, Unit 5, *Non-Evidentiary Motions*; *Texas Litigation Guide*, Ch. 110A, *Disqualification of Judge or Counsel*.

2011 amendment, by G.O. 11-9126, Renumbered former (1) as (a) and former (1)(a) through (1)(c) as (a)(1) through (a)(3); rewrote the introductory paragraph of (a), which read: "Disqualification. Judges shall disqualify themselves in all proceedings in which:"; substituted "the judge" for "they" or variant throughout (a); renumbered former (2) as (b) and former (2)(a) as (b)(1); rewrote the introductory paragraph of (b), which read: "Recusal. A judge shall recuse himself in any proceeding in which:"; substituted "the judge" for "he" or variant throughout (b); renumbered former (2)(b) as (b)(2) and (b)(3); renumbered former (2)(c) through (2)(g) as (b)(4) through (b)(8); substituted "the proceeding" for "it" in (b)(4); renumbered former (3) as (c) and added "Financial Interests.", and "herself" and "her" in (c); renumbered former (4) as (d) and former (4)(a) through (4)(d) as (d)(1) through (d)(4); added "Terminology and Standards" in the introductory paragraph of (d); renumbered former (5) and (6) as (e) and (f); added "Waiving a Ground for Recusal." in (e); in (f), added "Discovery and Divestiture.", substituted "a judge" or variant for "he", updated references, and added "herself"; and made related and stylistic changes throughout.

# Exhibit D

TEX. CODE CRIM. PROC. Art. 11.071



LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

CODE OF CRIMINAL PROCEDURE
TITLE 1.  CODE OF CRIMINAL PROCEDURE OF 1965
HABEAS CORPUS
CHAPTER 11.  HABEAS CORPUS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Code Crim. Proc. art. 11.071*  (2014)

Art. 11.071.  Procedure in Death Penalty Case

Sec. 1.  *Application to Death Penalty Case.*  --Notwithstanding any other provision of this chapter, this article establishes the procedures for an application for a writ of habeas corpus in which the applicant seeks relief from a judgment imposing a penalty of death.

Sec. 2.  *Representation by Counsel.*

(a) An applicant shall be represented by competent counsel unless the applicant has elected to proceed pro se and the convicting trial court finds, after a hearing on the record, that the applicant's election is intelligent and voluntary.

(b) If a defendant is sentenced to death the convicting court, immediately after judgment is entered under Article 42.01, shall determine if the defendant is indigent and, if so, whether the defendant desires appointment of counsel for the purpose of a writ of habeas corpus. If the defendant desires appointment of counsel for the purpose

of a writ of habeas corpus, the court shall appoint the office of capital writs to represent the defendant as provided by Subsection (c).

(c) At the earliest practical time, but in no event later than 30 days, after the convicting court makes the findings required under Subsections (a) and (b), the convicting court shall appoint the office of capital writs or, if the office of capital writs does not accept or is prohibited from accepting an appointment under *Section 78.054, Government Code*, other competent counsel under Subsection (f), unless the applicant elects to proceed pro se or is represented by retained counsel. On appointing counsel under this section, the convicting court shall immediately notify the court of criminal appeals of the appointment, including in the notice a copy of the judgment and the name, address, and telephone number of the appointed counsel.

(d) [Repealed by Acts 2009, 81st Leg., ch. 781 (S.B. 1091), § 11, effective January 1, 2010.]

(e) If the court of criminal appeals denies an applicant relief under this article, an attorney appointed under this section to represent the applicant shall, not later than the 15th day after the date the court of criminal appeals denies relief or, if the case is filed and set for submission, the 15th day after the date the court of criminal appeals issues a mandate on the initial application for a writ of habeas corpus under this article, move for the appointment of counsel in federal habeas review under *18 U.S.C. Section 3599.* The attorney shall immediately file a copy of the motion with the court of criminal appeals, and if the attorney fails to do so, the court may take any action to ensure that the applicant's right to federal habeas review is protected, including initiating contempt proceedings against the attorney.

(f) If the office of capital writs does not accept or is prohibited from accepting an appointment under *Section 78.054, Government Code*, the convicting court shall appoint counsel from a list of competent counsel maintained by the presiding judges of the administrative judicial regions under *Section 78.056, Government Code.* The convicting court shall reasonably compensate as provided by Section 2A an attorney appointed under this section, other than an attorney employed by the office of capital writs, regardless of whether the attorney is appointed by the convicting court or was appointed by the court of criminal appeals under prior law. An attorney appointed under this section who is employed by the office of capital writs shall be compensated in accordance with Subchapter B, Chapter 78, Government Code.

Sec. 2A.  *State Reimbursement; County Obligation.*

(a) The state shall reimburse a county for compensation of counsel under Section 2, other than for compensation of counsel employed by the office of capital writs, and for payment of expenses under Section 3, regardless of whether counsel is employed by the office of capital writs. The total amount of reimbursement to which a county is

entitled under this section for an application under this article may not exceed $ 25,000. Compensation and expenses in excess of the $ 25,000 reimbursement provided by the state are the obligation of the county.

(b) A convicting court seeking reimbursement for a county shall certify to the comptroller of public accounts the amount of compensation that the county is entitled to receive under this section. The comptroller of public accounts shall issue a warrant to the county in the amount certified by the convicting court, not to exceed $ 25,000.

(c) The limitation imposed by this section on the reimbursement by the state to a county for compensation of counsel and payment of reasonable expenses does not prohibit a county from compensating counsel and reimbursing expenses in an amount that is in excess of the amount the county receives from the state as reimbursement, and a county is specifically granted discretion by this subsection to make payments in excess of the state reimbursement.

(d) The comptroller shall reimburse a county for the compensation and payment of expenses of an attorney appointed by the court of criminal appeals under prior law. A convicting court seeking reimbursement for a county as permitted by this subsection shall certify the amount the county is entitled to receive under this subsection for an application filed under this article, not to exceed a total amount of $ 25,000.

Sec. 3. *Investigation of Grounds for Application.*

(a) On appointment, counsel shall investigate expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus.

(b) Not later than the 30th day before the date the application for a writ of habeas corpus is filed with the convicting court, counsel may file with the convicting court an ex parte, verified, and confidential request for prepayment of expenses, including expert fees, to investigate and present potential habeas corpus claims. The request for expenses must state:

(1) the claims of the application to be investigated;

(2) specific facts that suggest that a claim of possible merit may exist; and

(3) an itemized list of anticipated expenses for each claim.

(c) The court shall grant a request for expenses in whole or in part if the request for expenses is timely and reasonable. If the court denies in whole or in part the request for expenses, the court shall briefly state the reasons for the denial in a written order provided to the applicant.

(d) Counsel may incur expenses for habeas corpus investigation, including expenses for experts, without prior approval by the convicting court or the court of criminal appeals. On presentation of a claim for reimbursement, which may be presented ex parte, the convicting court shall order reimbursement of counsel for expenses, if the expenses are reasonably necessary and reasonably incurred. If the convicting court denies in whole or in part the request for expenses, the court shall briefly state the reasons for the denial in a written order provided to the applicant. The applicant may request reconsideration of the denial for reimbursement by the convicting court.

(e) Materials submitted to the court under this section are a part of the court's record.

(f) This section applies to counsel's investigation of the factual and legal grounds for the filing of an application for a writ of habeas corpus, regardless of whether counsel is employed by the office of capital writs.

Sec. 4. *Filing of Application.*

(a) An application for a writ of habeas corpus, returnable to the court of criminal appeals, must be filed in the convicting court not later than the 180th day after the date the convicting court appoints counsel under Section 2 or not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals, whichever date is later.

(b) The convicting court, before the filing date that is applicable to the applicant under Subsection (a), may for good cause shown and after notice and an opportunity to be heard by the attorney representing the state grant one 90-day extension that begins on the filing date applicable to the defendant under Subsection (a). Either party may request that the court hold a hearing on the request. If the convicting court finds that the applicant cannot establish good cause justifying the requested extension, the court shall make a finding stating that fact and deny the request for the extension.

(c) An application filed after the filing date that is applicable to the applicant under Subsection (a) or (b) is untimely.

(d) If the convicting court receives an untimely application or determines that after the filing date that is applicable to the applicant under Subsection (a) or (b) no application has been filed, the convicting court immediately, but in any event within 10 days, shall send to the court of criminal appeals and to the attorney representing the state:

(1) a copy of the untimely application, with a statement of the convicting court that the application is untimely, or a statement of the convicting court that no

application has been filed within the time periods required by Subsections (a) and (b); and

      (2) any order the judge of the convicting court determines should be attached to an untimely application or statement under Subdivision (1).

     (e) A failure to file an application before the filing date applicable to the applicant under Subsection (a) or (b) constitutes a waiver of all grounds for relief that were available to the applicant before the last date on which an application could be timely filed, except as provided by Section 4A.

    Sec. 4A.  *Untimely Application; Application Not Filed.*

     (a) On command of the court of criminal appeals, a counsel who files an untimely application or fails to file an application before the filing date applicable under Section 4(a) or (b) shall show cause as to why the application was untimely filed or not filed before the filing date.

     (b) At the conclusion of the counsel's presentation to the court of criminal appeals, the court may:

      (1) find that good cause has not been shown and dismiss the application;

      (2) permit the counsel to continue representation of the applicant and establish a new filing date for the application, which may be not more than 180 days from the date the court permits the counsel to continue representation; or

      (3) appoint new counsel to represent the applicant and establish a new filing date for the application, which may be not more than 270 days after the date the court appoints new counsel.

     (c) The court of criminal appeals may hold in contempt counsel who files an untimely application or fails to file an application before the date required by Section 4(a) or (b). The court of criminal appeals may punish as a separate instance of contempt each day after the first day on which the counsel fails to timely file the application. In addition to or in lieu of holding counsel in contempt, the court of criminal appeals may enter an order denying counsel compensation under Section 2A.

     (d) If the court of criminal appeals establishes a new filing date for the application, the court of criminal appeals shall notify the convicting court of that fact and the convicting court shall proceed under this article.

     (e) Sections 2A and 3 apply to compensation and reimbursement of counsel appointed under Subsection (b)(3) in the same manner as if counsel had been appointed by the convicting court, unless the attorney is employed by the office of capital writs, in which case the compensation of that attorney is governed by Subchapter B, Chapter 78, Government Code.

(f) Notwithstanding any other provision of this article, the court of criminal appeals shall appoint counsel and establish a new filing date for application, which may be no later than the 270th day after the date on which counsel is appointed, for each applicant who before September 1, 1999, filed an untimely application or failed to file an application before the date required by Section 4(a) or (b). Section 2A applies to the compensation and payment of expenses of counsel appointed by the court of criminal appeals under this subsection, unless the attorney is employed by the office of capital writs, in which case the compensation of that attorney is governed by Subchapter B, Chapter 78, Government Code.

Sec. 5. *Subsequent Application.*

(a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.

(b) If the convicting court receives a subsequent application, the clerk of the court shall:

(1) attach a notation that the application is a subsequent application;

(2) assign to the case a file number that is ancillary to that of the conviction being challenged; and

(3) immediately send to the court of criminal appeals a copy of:

(A) the application;

(B) the notation;

(C) the order scheduling the applicant's execution, if scheduled; and

(D) any order the judge of the convicting court directs to be attached to the application.

(c) On receipt of the copies of the documents from the clerk, the court of criminal appeals shall determine whether the requirements of Subsection (a) have been satisfied. The convicting court may not take further action on the application before the court of criminal appeals issues an order finding that the requirements have been satisfied. If the court of criminal appeals determines that the requirements have not been satisfied, the court shall issue an order dismissing the application as an abuse of the writ under this section.

(d) For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was not recognized by or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.

(e) For purposes of Subsection (a)(1), a factual basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the factual basis was not ascertainable through the exercise of reasonable diligence on or before that date.

(f) If an amended or supplemental application is not filed within the time specified under Section 4(a) or (b), the court shall treat the application as a subsequent application under this section.

Sec. 6. *Issuance of Writ.*

(a) If a timely application for a writ of habeas corpus is filed in the convicting court, a writ of habeas corpus, returnable to the court of criminal appeals, shall issue by operation of law.

(b) If the convicting court receives notice that the requirements of Section 5 for consideration of a subsequent application have been met, a writ of habeas corpus, returnable to the court of criminal appeals, shall issue by operation of law.

(b-1) If the convicting court receives notice that the requirements of Section 5(a) for consideration of a subsequent application have been met and if the applicant has not elected to proceed pro se and is not represented by retained counsel, the convicting court shall appoint, in order of priority:

(1) the attorney who represented the applicant in the proceedings under Section 5, if the attorney seeks the appointment;

(2) the office of capital writs, if the office represented the applicant in the proceedings under Section 5 or otherwise accepts the appointment; or

(3) counsel from a list of competent counsel maintained by the presiding judges of the administrative judicial regions under *Section 78.056, Government Code*, if the office of capital writs:

(A) did not represent the applicant as described by Subdivision (2); or

(B) does not accept or is prohibited from accepting the appointment under *Section 78.054, Government Code*.

(b-2) Regardless of whether the subsequent application is ultimately dismissed, compensation and reimbursement of expenses for counsel appointed under Subsection (b-1) shall be provided as described by Section 2, 2A, or 3, including compensation for time previously spent and reimbursement of expenses previously incurred with respect to the subsequent application.

(c) The clerk of the convicting court shall:

(1) make an appropriate notation that a writ of habeas corpus was issued;

(2) assign to the case a file number that is ancillary to that of the conviction being challenged; and

(3) send a copy of the application by certified mail, return receipt requested, or by secure electronic mail to the attorney representing the state in that court.

(d) The clerk of the convicting court shall promptly deliver copies of documents submitted to the clerk under this article to the applicant and the attorney representing the state.

Sec. 7. *Answer to Application.*

(a) The state shall file an answer to the application for a writ of habeas corpus not later than the 120th day after the date the state receives notice of issuance of the writ. The state shall serve the answer on counsel for the applicant or, if the applicant is proceeding pro se, on the applicant. The state may request from the convicting court an extension of time in which to answer the application by showing particularized justifying circumstances for the extension, but in no event may the court permit the state to file an answer later than the 180th day after the date the state receives notice of issuance of the writ.

(b) Matters alleged in the application not admitted by the state are deemed denied.

Sec. 8. *Findings of Fact Without Evidentiary Hearing.*

(a) Not later than the 20th day after the last date the state answers the application, the convicting court shall determine whether controverted, previously

unresolved factual issues material to the legality of the applicant's confinement exist and shall issue a written order of the determination.

(b) If the convicting court determines the issues do not exist, the parties shall file proposed findings of fact and conclusions of law for the court to consider on or before a date set by the court that is not later than the 30th day after the date the order is issued.

(c) After argument of counsel, if requested by the court, the convicting court shall make appropriate written findings of fact and conclusions of law not later than the 15th day after the date the parties filed proposed findings or not later than the 45th day after the date the court's determination is made under Subsection (a), whichever occurs first.

(d) The clerk of the court shall immediately send to:

(1) the court of criminal appeals a copy of the:

(A) application;

(B) answer;

(C) orders entered by the convicting court;

(D) proposed findings of fact and conclusions of law; and

(E) findings of fact and conclusions of law entered by the court; and

(2) counsel for the applicant or, if the applicant is proceeding pro se, to the applicant, a copy of:

(A) orders entered by the convicting court;

(B) proposed findings of fact and conclusions of law; and

(C) findings of fact and conclusions of law entered by the court.

Sec. 9. *Hearing.*

(a) If the convicting court determines that controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist, the court shall enter an order, not later than the 20th day after the last date the state answers the application, designating the issues of fact to be resolved and the manner in which the issues shall be resolved. To resolve the issues, the court may require affidavits, depositions, interrogatories, and evidentiary hearings and may use personal recollection.

(b) The convicting court shall hold the evidentiary hearing not later than the 30th day after the date on which the court enters the order designating issues under Subsection (a). The convicting court may grant a motion to postpone the hearing, but

not for more than 30 days, and only if the court states, on the record, good cause for delay.

(c) The presiding judge of the convicting court shall conduct a hearing held under this section unless another judge presided over the original capital felony trial, in which event that judge, if qualified for assignment under *Section 74.054 or 74.055, Government Code*, may preside over the hearing.

(d) The court reporter shall prepare a transcript of the hearing not later than the 30th day after the date the hearing ends and file the transcript with the clerk of the convicting court.

(e) The parties shall file proposed findings of fact and conclusions of law for the convicting court to consider on or before a date set by the court that is not later than the 30th day after the date the transcript is filed. If the court requests argument of counsel, after argument the court shall make written findings of fact that are necessary to resolve the previously unresolved facts and make conclusions of law not later than the 15th day after the date the parties file proposed findings or not later than the 45th day after the date the court reporter files the transcript, whichever occurs first.

(f) The clerk of the convicting court shall immediately transmit to:

(1) the court of criminal appeals a copy of:

(A) the application;

(B) the answers and motions filed;

(C) the court reporter's transcript;

(D) the documentary exhibits introduced into evidence;

(E) the proposed findings of fact and conclusions of law;

(F) the findings of fact and conclusions of law entered by the court;

(G) the sealed materials such as a confidential request for investigative expenses; and

(H) any other matters used by the convicting court in resolving issues of fact; and

(2) counsel for the applicant or, if the applicant is proceeding pro se, to the applicant, a copy of:

(A) orders entered by the convicting court;

(B) proposed findings of fact and conclusions of law; and

(C) findings of fact and conclusions of law entered by the court.

(g) The clerk of the convicting court shall forward an exhibit that is not documentary to the court of criminal appeals on request of the court.

Sec. 10. *Rules of Evidence.* --The Texas Rules of Criminal Evidence apply to a hearing held under this article.

Sec. 11. *Review by Court of Criminal Appeals.* --The court of criminal appeals shall expeditiously review all applications for a writ of habeas corpus submitted under this article. The court may set the cause for oral argument and may request further briefing of the issues by the applicant or the state. After reviewing the record, the court shall enter its judgment remanding the applicant to custody or ordering the applicant's release, as the law and facts may justify.

**HISTORY:** Enacted by Acts 1995, 74th Leg., ch. 319 (S.B. 440), § 1, effective September 1, 1995; am. Acts 1997, 75th Leg., ch. 1336 (S.B. 1728), §§ 1--5, effective September 1, 1997; am. Acts 1999, 76th Leg., ch. 803 (H.B. 1516), §§ 1--10, effective September 1, 1999; am. Acts 2003, 78th Leg., ch. 315 (H.B. 3306), §§ 1--3, effective September 1, 2003; am. Acts 2005, 79th Leg., ch. 787 (S.B. 60), § 13, effective September 1, 2005; am. Acts 2005, 79th Leg., ch. 965 (H.B. 1701), § 5, effective September 1, 2005; am. Acts 2007, 80th Leg., ch. 593 (H.B. 8), § 3.06, effective September 1, 2007; am. Acts 2009, 81st Leg., ch. 781 (S.B. 1091), §§ 2--5, effective September 1, 2009; am. Acts 2009, 81st Leg., ch. 781 (S.B. 1091), § 11, effective January 1, 2010; am. Acts 2011, 82nd Leg., ch. 1139 (H.B. 1646), § 1, effective September 1, 2011; am. Acts 2013, 83rd Leg., ch. 78 (S.B. 354), § 2, effective May 18, 2013.

**NOTES:**

Applicability. --
Acts 2007, 80th Leg., ch. 593 (H.B. 8), § 4.01(a) provides: "Except as provided by Subsections (b) and (c) of this section, the change in law made by this Act applies only to an offense committed on or after September 1, 2007. An offense committed before September 1, 2007, is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose. For the purposes of this section, an offense was committed before September 1, 2007, if any element of the offense occurred before that date."
Acts 2011, 82nd Leg., ch. 1139 (H.B. 1646), § 2 provides: "The change in law made by this Act applies to a subsequent application for a writ of habeas corpus filed on or after January 1, 2012. A subsequent application filed before January 1, 2012, is covered by the law in effect when the application was filed, and the former law is continued in effect for that purpose."

Acts 2013, 83rd Leg., ch. 78 (S.B. 354), § 6 provides: "The changes in law made by this Act apply only to a legal document delivered, filed, or served on or after the effective date of this Act [May 18, 2013]. A legal document delivered, filed, or served before the effective date of this Act is governed by the law in effect before the effective date of this Act, and the former law is continued in effect for that purpose."

2007 amendment,

added "or 37.072" in Section 5(a)(3); and made related changes.

2009 amendment,

in Section 2, added the second sentence in (b), in the first sentence of (c), added "the office of capital writs or, if the office of capital writs does not accept or is prohibited from accepting an appointment under *Section 78.054, Government Code*, other" and "under Subsection (f)", repealed (d), which read: "The court of criminal appeals shall adopt rules for the appointment of attorneys as counsel under this section and the convicting court may appoint an attorney as counsel under this section only if the appointment is approved by the court of criminal appeals in any manner provided by those rules. The rules must require that an attorney appointed as lead counsel under this section not have been found by a federal or state court to have rendered ineffective assistance of counsel during the trial or appeal of any capital case.", substituted "*18 U.S.C. Section 3599*" for "*21 U.S.C. Section 848*(q) or equivalent provision or, if necessary, move for the appointment of other counsel under *21 U.S.C. Section 848*(q) or equivalent provision" in the first sentence of (e), and rewrote (f), which read: "The convicting court shall reasonably compensate as provided by Section 2A an attorney appointed under this section, regardless of whether the attorney is appointed by the convicting court or was appointed by the court of criminal appeals under prior law."; in the first sentence of Section 2A(a), added "other than for compensation of counsel employed by the office of capital writs" and "regardless of whether counsel is employed by the office of capital writs"; added Section 3(f); added "unless the attorney is employed by the office of capital writs, in which case the compensation of that attorney is governed by Subchapter B, Chapter 78, Government Code" in Sections 4A(e) and 4A(f); and made stylistic changes.

2011 amendment,

added Sections 6(b-1) and Section 6(b-2).

2013 amendment,

added "or by secure electronic mail" in Section 6(c)(3).

# Exhibit E

Applicant's Brief in Support of Applicant's Motion for Court to be Recused

**IN THE DISTRICT COURT OF HIDALGO COUNTY, TEXAS
139th JUDICIAL DISTRICT**

FILED

AT_____O'CLOCK____M

JUN 2 5 2014

LAURA HINOJOSA, CLERK
District Court Hidalgo County
By_____Deputy#44

|  |  |
|---|---|
| **Ex parte HUMBERTO GARZA III,** | § |
|  | § |
| **Applicant.** | § |
|  | § |
|  | § |

No. CR-3175-04-G(1)

## BRIEF IN SUPPORT OF APPLICANT'S MOTION FOR COURT TO BE RECUSED

COMES NOW, Humberto Garza, III, the Applicant, by and through undersigned counsel, and files this, his brief in support of his motion for the Hon. Noe Gonzalez, Judge of the 370th District Court, to be recused from this case.

Mr. Garza is proceeding on two grounds under TEX. R. CIV. P. 18b, namely that:

- "[T]he judge's impartiality might reasonably be questioned," TEX. R. CIV. P. 18b (b)(1); and

- "[T]he judge has personal knowledge of disputed evidentiary facts concerning the proceeding", TEX. R. CIV. P. 18b (b)(3).

No allegation of "personal bias or prejudice" under TEX. R. CIV. P. 18b (b)(2) is made.

## I. THE FACTS SUPPORTING THIS MOTION.

The Writ Application in this case, filed on July 19, 2007, contains

-1-

allegations, in Claims 4-6, that Mr. Garza was denied his right to a fair trial before an impartial jury because of the hostile atmosphere in the courtroom, and that his death sentence resulted from jury misconduct, including the exposure of the jury to outside influences, namely a comment to the jury by the trial judge that gangs would sometimes come after jurors, and a remark to the jury by the bailiff, to whom jurors had expressed concern about their security, that the judge carried a gun.

Some additional interviewing of jurors was conducted recently.[1] Further information about the communications between the jury, Judge Gonzalez and his bailiff having thereby come to light, a motion asking Judge Gonzalez to recuse himself was filed on May 27, 2014. Judge Gonzalez declined to recuse himself, and referred this matter to the Regional Presiding Judge, who assigned the case to this Court. A hearing was conducted on June 16, 2014. Three witnesses testified: former jurors Rose Marie Palacios and Melissa Guerrero were called on behalf of Mr. Garza; Alicia "Licha" Salinas was called by the State.

---

[1]As stated at the hearing of June 16, 2014, it has thus far only been possible to interview some, but not all, of the trial jurors in this case because of the difficulty that undersigned and former counsel experienced in obtaining necessary investigative funding.

**Rose Marie Palacios (formerly Vera)** testified at the hearing as follows:

- She was a juror at Mr. Garza's 2005 trial, p. 4.[2]

- She had concerns for her personal safety during the trial, p. 4.

- Those concerns were caused by the other jurors, and by the judge saying that jurors could be in danger, as well as by the evidence, p. 4-5.

- She thought she might be followed or threatened, p. 4.

- Her concerns were increased by an incident where someone took photographs of the jury in court during the trial, p. 5.

- The bailiff told the jury members that they would be safe because the judge carried a gun, but that made Mrs. Palacios more nervous, p. 5.

- The bailiff's comment were made in the jury room, not the courtroom, and with all the jurors present, p. 5, 7.

- Other jurors had told the bailiff they hoped she was carrying a gun: "And she said no, she didn't, but not to worry because the judge did," p. 6.

- She did not remember Mr. Garza or any of the attorneys ever being present in the jury room, p. 7-8.

- The jurors had been asking "if we were safe because of the gang activity." Jurors were concerned about gang members' family being in the courtroom, and about the taking of the photograph, p. 8.

- The conversation with the bailiff occurred during the trial, and before the jury arrived at a guilty verdict, p. 8.

- The bailiff was a woman called "Licha," p. 9.

---

[2]Page references are to a transcript of the testimony prepared and provided to the parties on June 17, 2014.

- The bailiff also said "that she would be surprised if [the judge] bought us lunch because he was a cheapskate, and stuff like that," p. 9.

- The judge came into the jury room to talk to the jurors about their safety concerns, p. 10.

- Ms. Palacios believed that the judge came into the jury room that time in response to a note from another member of the jury, p. 10.

- When the judge came in, he was still wearing his robe, p. 10.

- The judge's visit to the jury room was while the trial was still going on, and before the guilty verdict, p. 10.

- All twelve members of the jury were there, but she could not remember if the bailiff was there also, p. 11.

- The court reporter may also have been present, but not the defendant or his attorneys, p. 11.[3]

- The judge said "That he understood our fears, but ... he was going to provide us security and that we would be fine ... That the gangs, sometimes they threaten the jurors and sometimes they – they may follow you," p. 11.

- The judge said that the person who took the photograph in court was "legitimate," p. 11.

- Mrs. Palacios thought that the judge may also have come into the jury room another time, in response to a note, p. 12.

- The judge said that it was a policy in the courthouse not to permit pictures of jurors to be taken, p. 13-14.

- Later in the trial the jury had been permitted to park on the west side of the

---

[3]The reporter's record filed by the court reporter at trial, the late Francisco B. Moreno, does not include any transcript of proceedings conducted in the jury room.

-4-

courthouse, closer to the courtroom, and the deputies had escorted the jurors, p. 14-15.

- The judge had mentioned scheduling when he talked to the jurors, p. 15.

- Mrs. Palacios has signed two affidavits concerning the case, p. 15.

- Mrs. Palacios had been interviewed seven years ago by people who said they were students from Austin, and she gave them an affidavit, p. 15-16.

- In her earlier affidavit, Mrs. Palacios said she thought she saw Mr. Garza's mother sitting in a car out in the parking lot, and the jury had been told by court staff that "they'd take care of the situation," p. 16.

- The judge did not give any specific examples of gangs disrupting trials or threatening people, p. 16-17.

- The bailiff said that she never carried a gun, p. 17.

- The family members in the courtroom could have been family members of the victims in the case, which involved gangs on both sides, p. 18.

- Mrs. Palacios was asked additional questions when she was interviewed a second time, p. 19.

- She did not name the bailiff in her first affidavit, but she may not have been asked about the bailiff's name at that time, p. 20-21.

**Melissa Guerrero** testified at the hearing as follows:

- She was a juror at Mr. Garza's 2005 trial, p. 22-23.

- She had concerns for her personal safety because of the crime in question, which concerned gang violence, p. 23.

- She was concerned about being followed, p. 23.

- There was an incident when a reporter took a picture, which she herself did not see, but which worried other jurors, p. 23.

- She believed that jurors expressed concern to court staff about the security situation, p. 24.

- The judge had approached the jury in the jury room behind the courtroom on the fifth or sixth day of trial, p. 24.

- The judge said that he had come to calm the jury down, and that they would be parking in a different area from that point, p. 25.

- She assumed that the change in parking arrangements was because of security concerns, p. 25.

- When the judge spoke to the twelve jurors, there was nobody else in the room, p. 25.

- The jurors were told that they would be allowed to leave for their parking area before others were released from court, p. 25-26.

- She could not remember any other remarks made by the judge, but the conversation that did occur concerned security matters, p. 26.

- She remembered the bailiff in the case as being a woman, but did not recall any conversation with her about security arrangements, p. 26-27.

- Mrs Guerrero had signed an affidavit in 2007 in which she said nothing about the judge going to the jury room. However, she had not been questioned about that, p. 27-28.

- She had been visited in the past few days by defense counsel, p. 28.

- She did not know if it was a regular policy to let people park close by the courthouse after hours so that they did not have to walk across the street, p. 29.

- She assumed the change in parking arrangements was because of the security situation, p. 30.

- When the judge came to the jury room to talk to the jury, it was not about scheduling, p. 30.

- The judge also came to the jury room after the trial to thank the jury and to provide information about counseling, p. 31.

- When defense counsel visited Mrs. Guerrero she was accompanied by another individual, named Vanessa, p. 31.

- Defense counsel had not suggested what Ms. Guerrero should say, other than telling her to be honest, p. 31.

- One of the two people who interviewed Ms. Guerrero in 2007 may have been a lawyer, or they may have been law students, p. 32.

- The questions asked more recently were in greater depth than on the previous occasion in 2007, p. 32.

- She may not have given further information in 2007 about her security concerns because she was not asked at the time, p. 32.

- Time constraints may have prevented having a fuller conversation, p. 33.

- Sentencing someone to death had been a tough decision, p. 33-34.

**Alicia "Licha" Salinas** testified at the hearing as follows:

- Ms. Salinas' nickname is "Licha," p. 35.

- She works in the 370th District Court of Hidalgo County, p. 35.

- She is now court coordinator, but was working as bailiff back in 2005, p. 35.

- She has worked in the 370th District Court for 12 years, p. 35.

- Noe Gonzalez has been judge of that court throughout that time, p. 35.

- Ms. Salinas "sort of" remembered Mr. Garza's trial, p. 36.

- One does not have to be a certified peace officer to be a bailiff, p. 36.

- She did not carry a gun when she was acting as a bailiff in 2005, p. 36.

- She did not remember telling anybody on the jury that Judge Gonzalez carried a gun, and does not think she would have said that, p. 36.

- To her knowledge, Judge Gonzalez did not carry a gun back then, p. 36.

- She works with Judge Gonzalez daily, p. 36-37.

- As bailiff she would escort the jury and give them notice that they were needed in the courtroom, p. 37.

- She might escort jurors to a restaurant if lunch was not being brought in for the jury, p. 37.

- Jurors in the 370th district court would park in the big parking lot or, if they came in late, certain parking areas would be blocked off for them where there is an entrance that goes right into the courtroom, p. 37-38.

- She did not specifically remember any jurors expressing security concerns during Mr. Garza's trial, p. 38.

- If the jury had a note they would hand it to her to give to the judge so that the judge and lawyers could discuss the response, p. 38-39.

- Usually the judge would have a note handed back to the jury, rather than bringing them back into the courtroom, p. 39.

- Ms. Salinas has performed the functions of bailiff, interpreter and court

coordinator at the 370th District Court, p. 39.

- She had been approved for promotion to court coordinator, and has been in that position since about February 2011, p. 39-40.

- The judge is her boss and would write her performance reviews, p. 40.

- The judge would have some influence over whether she would get an increase in salary, p. 40.

- A county job comes with benefits and a retirement plan, and is a valuable thing to have, p. 40.

- She has worked for the judge for twelve years, p. 40.

- Her room is right next to the judge's chamber, so she is physically very close to him - he can just call out and she is at his side in a minute, p. 41.

- She is a valued member of his staff and likes working where she does, p. 41.

- Her name appears on court transcripts, together with that of the judge and the attorneys, p. 41.

- She is aware that there is a Code of Ethics governing judicial behavior, including rules about behaving with dignity and being impartial, p. 41.

- She is aware that the judge's staff should follow those same rules, p. 42.

- It would be undignified to gossip about cases, p. 42.

- She has had training at officially-run court bailiff workshops, p. 42.

- She has been taught what she should and should not do, with regard to not exposing the jury to anything that might cause them to be prejudiced for one side or the other, other than by the evidence, p. 42-43.

- She understands that she should not talk about a case with the jury except in

the presence of the judge and with his permission, p. 43.

- She is aware that there are rules about the judge not communicating with the jury except in writing, p. 43.

- She understands that breaking some of these rules can result in a fine or confinement in jail, p. 43.

- She knows that breaking those rules can also result in a case reversal or a mistrial, p. 43.

- She knows that if she broke those rules she could lose her job or be demoted, p. 44.

- She knows that the judge might lose his reputation if he allowed such breaches of the rules, and that such breaches could cause negative comment in the media, or reversal of a case which would also cause the judge a loss of reputation, p. 44.

## II. A REASONABLE PERSON, KNOWING THE FACTS OF THIS CASE, WOULD REASONABLY DOUBT THE JUDGE'S ABILITY TO ADJUDICATE THE RELEVANT CLAIMS IMPARTIALLY.

### A. The Legal Standard for Deciding Whether the Judge's Impartiality Might Reasonably Be Questioned.

Judges normally enjoy a presumption that they will perform their roles impartially. *Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App. - San Antonio 2007). While, during argument at the hearing on this Motion, reference was made to *Ex parte Ellis*, 275 S.W.3d 109, 112 (Tex. App. - Austin 2008, no pet.), which states that a "high threshold" has to be passed in order to displace the

presumption of impartiality, the actual height of such a threshold is nowhere discussed in either Texas or federal law.

The "high threshold" reference in *Ellis* was to the concurrence of Justice Kennedy, joined by three other justices, in *Litely v. United States*, 510 U.S. 540, 557-58 (1994), which explained that a judge should only be disqualified, under the relevant federal statute, if it "*appears* that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute" and that "[o]ne of the objects of law is the impartiality of its judges in fact and *appearance*." (emphasis added). The Court of Criminal Appeals' most recent substantive decision concerning recusal law in Texas, *Gaal v. State*, 332 S.W.3d 448, 453 (Tex. Crim. App. 2011), also referred to the *appearance* of "an aversion, hostility or disposition" being sufficient for a judge to be recused for lack of impartiality, and confirmed that there is no need for a party moving for recusal to demonstrate what is going through a trial judge's mind, or to prove actual bias: "Under Rule 18b (2)(a), showing that the trial judge's impartiality 'might reasonably be questioned' suffices." *Id.* at 459.

In its opinion in *Gaal*, the Court of Criminal Appeals did not adopt, or even refer to, the idea of a "high threshold." However, it did refer to the standard applied by a recusal judge in *Kniatt v. State*, 239 S.W.3d 910 (Tex. Crim. App.

-11-

2007), finding that recusal was required because:

> A reasonable member of the public at large, witnessing [the trial judge's] words and acts . . . and knowing all the facts in the public domain concerning the judge and the case, would have reasonably believed he [acted adversely to the defendant], and [those facts] would have caused such person to reasonably question, and to have a reasonable doubt about, [the trial judge's] impartiality and objectivity ... in a subsequent hearing . . . .

*Gaal*, 332 S.W.3d at 455 n. 26; *See also* 48B Robert P. Schuwerk & Lillian

B. Hardwick, *Texas Practice Series: Handbook of Texas Lawyer and Judicial*

*Ethics* 40:26 at 770 (2010) (quoting Findings of Fact and Conclusions of Law,

*State v. Kniatt*, No. 25704-CR (40th Dist. Ct., Ellis County, Tex. Jan. 20, 2008).

Thus, the correct standard to be applied is simply that of TEX. R. CIV. P.

18b (b)(1): Recusal is required if "[T]he judge's impartiality might reasonably be

questioned," because of a factor such as "an aversion, hostility or disposition of a

kind that a fair-minded person could not set aside when judging the dispute" and it

is not necessary to come to a conclusion that the judge in question is, in fact,

lacking in impartiality.

B.    The Reasons Why the Judge's Impartiality Might Reasonably Be
       Questioned in this Case.

This Court is called on to decide whether a reasonable member of the public

would reasonably doubt Judge Gonzalez' ability to be impartial in adjudicating

claims concerning jury misconduct or, perhaps more accurately here, the impact of outside influences improperly brought to bear on the jury. On June 16, 2014, this Court heard testimony establishing that Judge Gonzalez had private discussions with sitting jurors, outside the presence of the defendant, the court reporter or counsel for either party. The discussions concerned the question of the jury's personal safety, in the context of a case whose subject matter concerned a six-victim homicide resulting from the activities of members of a local street gang, of which Mr. Garza was alleged to be a Captain. Moreover, this was a death penalty case in which the question whether Mr. Garza "would commit criminal acts of violence that would constitute a continuing threat to society," was one the jury would have to answer at sentencing. *See* TEX. CODE CRIM. PROC. Art. 37.071 § 2 (b)(2).

In addition to now having to make findings of fact concerning his own conduct, if he continues to preside over this case, Judge Gonzalez would be required to make findings of fact concerning the conduct of his long-time employee, Ms. Salinas, who was acting as his bailiff. Ms. Salinas had conversed with jury members who had expressed concern for their safety telling them, among other matters, that the judge carried a gun. The conduct of both judge and bailiff breached court rules and constitutional safeguards and was improper, creating the

-13-

perception in a reasonable person that Judge Gonzalez could not now be expected to adjudicate that behavior impartially.

C.      Any private communication or contact by a trial judge with a juror during a trial is improper.

"Any *ex parte* meeting or communication between the judge and ... jury is pregnant with possibilities for error," *United States v. United States Gypsum Co. et al.*, 438 U.S. 422, 460 (1978), and may alone warrant reversal of a conviction. *Id.* at 462; *see also Remmer v. United States*, 347 U.S. 227 (1954):

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Remmer* was recently cited by the Court of Criminal Appeals in *McQuarrie v. State*, 380 S.W.3d 145, 166 n.24 (Tex. Crim. App. 2012)(reversing and remanding for further proceedings where outside influence had potentially had impact on jury's verdict); *see also* TEX. CODE JUD. CONDUCT, Canon 3(B)(8) ("A judge shall not initiate, permit or consider *ex parte* communications outside the presence of the parties between the judge and [court appointee] ... concerning the merits of a pending or impending judicial proceeding.").

Texas statutory law prescribes how communication between a trial court

-14-

and a jury should be conducted: TEX. CODE CRIM. PROC. Art. 36.27 sets out a regime whereby all communications from the jury to the court must be "written, prepared by the foreman, and shall be submitted to the court through the bailiff" with answers also being in writing and made, if possible, only after notice to the defendant and counsel, giving the defense an opportunity to object. Any instructions or answers to jury notes must be read out in open court, unless that is expressly waived, and all such proceedings should be made part of the record. *Id.*

*Ex parte* contacts between a trial judge and a jury may infringe on constitutional safeguards. In addition to the constitutional right to a fair trial before an impartial jury, *Skilling v. United States*, 561 U.S. 358, 377 (2010), a defendant has the right to be present in person, *Rushen v. Spain*, 464 U.S. 114, 118 (1983); *Hopt v. Utah*, 110 U.S. 574, 579-80 (1884), and to have the assistance of counsel, *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008), as well as having the right to a public trial. *Presley v. Georgia*, 130 S.Ct. 721, 723 (2010). All of these rights are jeopardized by *ex parte* and *in camera* communications by court officers with jurors outside the presence of the defendant and his counsel.

D. **Communication or contact by the trial bailiff with jurors during a trial may be improper if it goes beyond what is necessary for the purpose of shepherding the jury.**

While the services of a bailiff are necessary to "attend the wants of the jury," TEX. CODE CRIM. PROC. Art 36.24, communication with jurors about the case on trial is impermissible, "except in the presence and by the permission of the court." TEX. CODE CRIM. PROC. Art 36.22. Such communication may result in confinement in jail or a fine. TEX. CODE CRIM. PROC. Art 36.23.

Comments made privately by a bailiff to jurors may infringe on the right to be fairly tried only on the basis of evidence developed from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. *Parker v. Gladden*, 385 U.S. 363, 365 (1966) (bailiff's improper comment to jurors that petitioner was a "wicked fellow" required reversal); *see also Mattox v. United States*, 146 U.S. 140 (1892)(conviction reversed because bailiff remarked to jury that this was third person defendant had killed); *Ward v. Hall*, 592 F.3d 1144, 1173-81 (11th Cir. 2010)(petitioner's constitutional rights to fair trial and reliable sentence were violated when bailiff responded improperly to juror question).

The fact that a Judge has a personal or business relationship with a particular individual is not necessarily enough, in itself, to require recusal on the

-16-

ground of a lack of impartiality. *See, e.g., Woodruff v. Wright*, 51 S.W.3d 727, 737-38 (Tex. App. - Texarkana 2001, pet. denied)(doctor who was a party to case had operated on judge's mother and colleague, and judge had conducted doctor's wedding ceremony insufficient to require recusal); *Lueg v. Lueg*, 976 S.W.2d 308, 309, 311 (Tex. App. - Corpus Christi 1998, pet. denied)(recusal not mandated although attorney for party was representing judge in separate lawsuit and was his former campaign manager).

However, in *Keene Corp. v. Rogers*, 863 S.W.2d 168 (Tex. App. - Texarkana 1993, no writ) where the judge's son-in-law had become an associate at one of the law firms involved in the case, but had no direct involvement in it, the Texas Supreme Court held that each situation where an individual to whom a judge has a personal connection is associated with a case "has to be determined on an *ad hoc* basis, considering such factors as whether and to what extent [that person] is participating in the case and whether [they] will be substantially affected by the outcome of the proceeding."

Here, the bailiff indicated that she has a long-standing work relationship with the judge in question and is a valued employee who he has promoted. She also acknowledged that both he and she could experience adverse consequences as a result of a finding that her conduct had jeopardized the outcome of a case.

Thus, in this situation, the relationship between judge and bailiff goes beyond the mere fact of employment. The court that ultimately adjudicates the relevant claim will need to determine and evaluate the actions of Ms. Salinas, a bailiff who has committed potentially punishable misconduct, and who, given the close quarters in which the judge works with her, may have knowledge of the judge's own conduct in this case.

A reasonable observer would conclude that in these circumstances, Judge Gonzalez' ability to impartially adjudicate the allegations in the writ application might reasonably be questioned, given that his own, and his bailiff's, conduct appears to have departed from the normal standards of conduct with regard to sitting jurors.

The case of *O'Quinn v. Hall*, 77 S.W.3d 438, 447-48 (Tex. App. - Corpus Christi 2002, no pet.) arose from the same court and was presided over by the same trial judge, the Hon. Noe Gonzalez, as Mr. Garza's case, *see O'Quinn v. Hall*, 77 S.W.3d 452, 454 (Tex. App. - Corpus Christi 2002). The Thirteenth Court of Appeals decision in *O'Quinn* clearly demonstrates what the correct outcome here should be: In *O'Quinn*, there was a factual dispute concerning the time when counsel received notice of an Order entered by Judge Gonzalez and supposedly conveyed to counsel by the court staff. The Thirteenth Court of

Appeals rejected the idea that the judge could take judicial notice of what had occurred, and held that the judge's reliance on evidence about a contested fact, conveyed to him by his own staff, created an appearance of bias and lack of impartiality. 77 S.W.3d at 448. The same concerns militate here in favor of recusal.

## III. THE JUDGE HAS PERSONAL KNOWLEDGE OF DISPUTED EVIDENTIARY FACTS WHICH REQUIRE HIS RECUSAL.

The State of Texas has, in its Answer to the Writ Application, disputed Mr. Garza's claims of outside influences on the jury contending that they "are based on factual premises of doubtful validity," *Id.* at 387. Thus, there are disputed factual issues here that require that the case be adjudicated by a judge who is a "neutral arbiter in the courtroom," *Hensarling v. State*, 829 S.W.2d 168, 171 (Tex. Crim. App. 1992).

On the evidence developed thus far, Judge Gonzalez has knowledge of the existence - or non-existence - of facts concerning at least his own conduct and possibly that of a valued employee - his bailiff - also. If the State has discovered what Judge Gonzalez' position is as to the facts, and that account is favorable to the State's position, it would likely have to call the Judge as a witness, which cannot be done while he is still presiding over the case. *See* TEX. R. EVID. 605:

-19-

"The Judge presiding at the trial may not testify in that trial as a witness."

Whether or not he testifies, for Judge Gonzalez to continue to preside over this case, at minimum, "give[s] the appearance of the court becoming a witness in this matter" and risks creating "the appearance of bias which rule 605 seeks to prevent." *O'Quinn*, 77 S.W.3d at 447-48. See also *Brown v. Lynaugh*, 843 F.2d 849, 850 (5th Cir. 1988)("It is difficult to see how the neutral role of the court could be more compromised, or more blurred with the prosecutor's role, than when the judge serves as a witness for the state.").

In the analogous case of *Gentry v. State*, 2006 Tex. App. LEXIS 2923 (Tex. App. - Texarkana 2006, no pet.) the court held that a judge could not decide the outcome of a suppression hearing where he may himself have observed the conduct leading to initial detention, and explicitly ruled on his personal knowledge of the sequence of events. The court noted that a lack of impartiality on the part of a trial judge deprives a defendant of due process, citing *Kemp v. State*, 846 S.W.2d 289, 305-06 (Tex. Crim. App. 1992). The facts of *Gentry* were described as a "clear instance" of "personal knowledge of disputed evidentiary facts," in *Gaal*, 332 S.W.3d at 454. Similarly, the facts here, concerning both Judge Gonzalez' own conduct and possibly that of his bailiff also, provide another "clear instance" of critical facts of a case being personally known to a judge, who

therefore cannot continue to preside.

*Hensarling v. State*, 829 S.W.2d 168, 171 (Tex. Crim. App. 1992), a case where the judge who had presided at trial testified at a retrospective competency hearing, noted the practical difficulties that would occur should a presiding judge attempt to testify as a witness in the same proceeding, and which underline why such an endeavor is infeasible, quoting Goode, Wellborn and Sharlot, *Texas Rules of Evidence: Civil and Criminal*, 33 Texas Practice 605.1, p. 384:

> A judge who testifies, for example, might be required to evaluate his own testimony in the course of deciding a motion for a directed verdict. Furthermore, the aura of impartiality surrounding the judge will likely cause the jury to give undue credence to his testimony. Opposing counsel might well be hesitant to attack the judge on cross-examination for fear of alienating either the judge or jury. Finally, practical problems inhere in such judicial testimony. Who, for example, will rule on objections?

The conclusion in *Hensarling* was that for the State to introduce the testimony of the judge who had presided at a previous stage of the proceedings did not violate Rule 605, but on the facts of that case, a new judge was now presiding, and the judge's own conduct was not in question, as it is here.

-21-

IV. THE JUDGE'S USE OF PERSONAL RECOLLECTION IN DETERMINING THESE CONTROVERTED, PREVIOUSLY UNRESOLVED FACTUAL ISSUES WOULD NOT BE ADEQUATE TO REACH A REASONABLY CORRECT RESULT IN THIS CASE.

Both the capital and noncapital habeas corpus statutes provide that the convicting court "may use personal recollection" in determining "controverted, previously unresolved factual issues" in a writ application. *See* TEX. CODE CRIM. PROC. Art. 11.071 § 9(a); TEX. CODE CRIM. PROC. Art. 11.07 § 3(d).

There is a dearth of authority concerning the scope of a trial court's proper discretion to use personal recollection in determining controverted issues. However, *Ex parte Davila*, 530 S.W.2d 543 (Tex. Crim. App. 1975) concerned a rape case, in which no hearing was conducted prior to habeas relief being granted. In that case the ruling was based on "the files and records in this case and upon the pleadings," and the critical fact at issue was not disputed by the State.

The Court granted relief, concluding that the "proper standard in such cases as the one before us is whether 'the fact-finding procedure there employed was ... adequate for reaching reasonable correct results,'" quoting *Townsend v. Sain*, 372 U.S. 293 (1963)(hearing required in federal district court where state procedures had been inadequate to ensure a full and fair hearing); *See also Vuong v. Scott*, 62 F.3d 673 (5th Cir. 1995)(federal courts accord state findings of fact a presumption

of correctness, provided the factfinding procedures employed are "adequate" under 28 U.S.C. § 2254(d)(2)); *Wellons v. Hall*, 558 U.S. 220, 223 n. 3 (2010) (remanding case concerning alleged *ex parte* contacts between the trial court and jurors, on which the petitioner had been prevented from creating a record, noting that it would be "bizarre if a federal court had to defer to state-court factual findings, made without any evidentiary record.")

It might be appropriate to use personal recollection to determine facts that are unlikely to be disputed or that might be verified by the creation of a record to review. Here, however, the facts remain controverted, and the State has not declared itself willing to stipulate that the actions of the judge and bailiff testified to by former jurors Palacios and Guerrero did in fact take place.

The fact-finding procedure must be fair to both parties. In *Ex parte Byars*, 176 S.W.3d 841 (Tex. Crim. App. 2005), where a recommendation for the grant of habeas relief was upheld, a recanting witness had been interviewed by the trial court *in camera* with only a court reporter present, albeit with the acquiescence of the parties. Members of the Court of Criminal Appeals concurred in the decision but expressed concern as to whether the procedure employed was adequate, given that "adversarial testing is the constitutionally prescribed method of assessing reliability," and the State had not cross-examined the witness. *Id.* at 841 (Keller,

-23-

P.J. and Hervey & Cochran, JJ., concurring). Similar concerns pertain here, where there is a risk that the trial court will make findings on the basis of facts that cannot be properly tested or challenged. *Rose v. Mitchell*, 443 U.S. 545, 563 (1979)(earlier state court determination of facts was not dispositive because "judge whose conduct [the petitioner] challenged decided the validity of that challenge.").

Moreover, weight should be given to the circumstances in which the convicting court acquires its knowledge of the facts: In *Sommers v. Concepcion*, 20 S.W.3d 27, 43-44 (Tex. Crim. App. - Houston [14th Dist.]) 2000, pet. denied) a trustee in bankruptcy tried to recuse a judge who had testified in another proceeding concerning the same parties. It was held that it was no ground for recusal if a judge has learned facts in the course of prior proceedings, but that "where a party alleges the judge possesses personal knowledge of disputed facts, the party must show that this knowledge either was wrongfully obtained or led to a wrongful disposition of the case." Here, where the trial court's knowledge of the occurrences in the jury room were obtained - indeed, created - in violation of the relevant statutes, TEX. CODE CRIM. PROC. Art. 36.22 and 36.27 concerning contacts and communications with a jury during trial, it may be fairly said that the judge's personal knowledge was wrongfully obtained. Thus, to have that same

-24-

judge rely on his personal recollection of those events would not be an adequate method "for reaching reasonably correct results." *Davila*, 530 S.W.2d at 545. A finding favorable to Mr. Garza's position here would require Judge Gonzalez - explicitly or implicitly - to admit negative facts about his own conduct and possibly that of his longtime bailiff also. A finding adverse to Mr. Garza could also result in factual determinations which cannot adequately be reviewed later, since the court's contacts with the jury were *in camera, ex parte* and unrecorded.

## V. CONCLUSION.

Recusal should be ordered on both of the grounds pleaded, TEX. R. CIV. P. 18b (b)(1) and (b)(3). A reasonable person would reasonably question the ability of Judge Gonzalez to rule impartially, with untainted decision-making, when his own reputational interest is at stake, and he has been shown to have personal knowledge of disputed facts.

WHEREFORE, PREMISES CONSIDERED, Mr. Garza prays that this Court grant his motion to recuse the judge hitherto presiding in this case, pursuant to TEX. R. CIV. P. 18b (b)(1) and (3). A proposed order is attached.

-25-

Respectfully submitted,

*Hilary Sheard*

HILARY SHEARD
Texas Bar # 50511187
7301 Burnet Road, # 102-328
Austin, TX 78757
Phone: (512) 524 1371
Fax: (512) 646 7067
HilarySheard@Hotmail.com

*Counsel for Humberto Garza III, Applicant.*

## CERTIFICATE OF SERVICE

I certify that on June 19, 2014, a copy of the foregoing pleading was served via e-mail on:

Theodore C. Hake, Esq.
Assistant Criminal District Attorney
Hidalgo County Courthouse
100 N. Closner, Room 303
Edinburg, Texas 78539.
Ted.Hake@da.co.hidalgo.tx.us

*Hilary Sheard*

Hilary Sheard.

## IN THE DISTRICT COURT OF HIDALGO COUNTY, TEXAS
## 139th JUDICIAL DISTRICT

| | | |
|---|---|---|
| Ex parte | § | |
| | § | |
| HUMBERTO GARZA III, | § | |
| | § | No. CR-3175-04-G(1) |
| Applicant. | § | |

## ORDER ON APPLICANT'S MOTION TO RECUSE

On June 16, 2014, the Court conducted a hearing on Applicant's motion to recuse, filed pursuant to TEX. R. CIV. P. 18b (b)(1) and (3) in the above cause. The Court has considered the motion, all attachments thereto, all evidence presented, all citations of authority and the arguments and submissions of counsel. The Court finds the motion should be, and is, hereby GRANTED.

It is further ordered that the Clerk of Court shall forward a certified copy of this order to the Regional Presiding Judge:

Hon. J. Rolando Olvera, Presiding Judge
Fifth Administrative Judicial Region of Texas
200 N. Almond Street
Alice, Texas 78332.

IT IS SO ORDERED.

SIGNED AND ENTERED THIS _____ day of _____, 2014.

_____
JUDGE PRESIDING

# Exhibit F

State's Memorandum in Response to Applicant's Motion to Recuse 370th District Court Judge Noe Gonzalez

CAUSE NO. CR-3175-04-G (1)

FILED

AT_____O'CLOCK____M

JUN 19 2014

LAURA HINOJOSA, CLERK
District Courts, Hidalgo County
By_____Deputy#44

EX PARTE § IN THE 370TH DISTRICT COURT

HUMBERTO GARZA, § OF

APPLICANT § HIDALGO COUNTY, TEXAS

## STATE'S MEMORANDUM RESPONSE TO APPLICANT'S MOTION TO RECUSE 370TH DISTRICT COURT JUDGE NOE GONZALEZ

I.     Background.

Applicant HUMBERTO GARZA was charged in Count One of the indictment in cause number CR-3175-04-G with the offense of Capital Murder, based on an allegation that he had caused the deaths of six individuals "during the same criminal transaction" and charged in Count Two of the indictment in said case based on an allegation that he had caused the deaths of six individuals "in the course of committing or attempting to commit the offense of robbery of (said individuals)".

At the end of the guilt phase of a trial on these charges before 370th District Court Judge Noe Gonzalez, the jury found Applicant guilty of the lesser-included offense of Murder as to Count One and the indicted Capital Murder as to Count Two.

1

The jury then answered "Yes" to the future dangerousness and anti-parties special issues and "No" to the mitigating circumstances issue as to Count Two and, accordingly, Judge Gonzalez sentenced Applicant to death.

The jury also assessed a life sentence as to Count One.

Judge Gonzalez later allowed trial counsel for Applicant to withdraw; appointed Alan Futrell to represent Applicant in his direct appeal; and appointed John E. Wright as habeas counsel for Applicant.

Since TEX. CODE CRIM. PROC. ANN. Art. 37.071, Sec. 2 (h) (Supp. 2013) provides that a capital murder conviction and death sentence is subject to automatic review by the Court of Criminal Appeals, Applicant's appeal of his conviction and death sentence based on Count Two of the indictment was submitted to said Court.

In addition, Applicant's murder conviction and life sentence as to Count One was submitted to the Thirteenth Court of Appeals.

On April 30, 2008, the Court of Criminal Appeals handed down a unanimous opinion affirming the judgment and death sentence as to Count Two. See Garza v. State, No. AP-75,217, 2008 Tex.Crim.App. Unpub. LEXIS 340 (April 30, 2008).

On August 28, 2008, the Thirteenth Court of Appeals issued an unpublished per curiam opinion in which it mentioned the Court of Criminal Appeals' opinion in the death penalty case appeal; stated that the remedy for a violation of a defendant's double jeopardy rights was to vacate one of the convictions; noted that the Court of

2

Criminal Appeals had retained the "most serious offense" and affirmed the judgment and sentence of death in Count Two; and reversed and rendered the conviction and sentence in Count One for entry of an acquittal as to said count. See Garza v. State, No. 13-05-00397-CR, 2008 Tex.App. LEXIS 6859 (Tex.App. – Corpus Christi 2008, no pet.) (not designated for publication).

On July 19 2007, Mr. Wright filed an application for writ of habeas corpus on behalf of Applicant.

The State accepted service of a copy of said application, in lieu of formal service thereof via certified mail, return receipt requested, on September 18, 2012.

On October 24, 2012, Mr. Wright filed an motion to withdraw and substitute attorney Hilary Sheard in which he says that he is unable to continue to represent Applicant because he has recently undergone open heart surgeries and because Texas law prohibits him, as an attorney who is now employed by a public defender's office, from engaging in the private practice of criminal law.

On November 9, 2012, this court granted Mr. Wright's motion to withdraw and substitute Ms. Sheard as habeas counsel for Applicant.

On November 13, 2012, the State filed Respondent's Original Answer to Applicant's application for writ, along with a proposed order designating issues.

On November 15, 2012, Judge Gonzalez entered an Order Designating Issues in which in which he indicated that there were unresolved fact issues; listed said

3

issues; pointed out that said issues may be resolved by having Applicant's trial attorneys, Ralph R. Martinez and Librado "Keno" Vasquez, each submit an affidavit responding to the allegations concerning their performance; and ordered each of those attorneys to file an affidavit within twenty days of the date of said Order. Said Order also stated that Applicant and Respondent were to then submit any proposed findings of fact, conclusions of law, and recommendation within twenty days after the filing of whichever affidavit was filed last.

Ralph R. Martinez submitted his affidavit on February 8, 2013 and Librado "Keno" Vasquez filed his affidavit on March 20, 2013.

Since Ms. Sheard took over this case from Mr. Wright, she has filed several extension requests asserting the need for additional time to be able to investigate the issues involved in this case.

Moreover, in an order dated April 7, 2014 addressing Ms. Sheard's latest extension request, the Court of Criminal Appeals indicated that it understands the intricacies involved in capital litigation, but that it also recognizes Ms. Sheard was, at this point, limited to the claims raised in the application which Mr. Wright had filed in 2007. The Court of Criminal Appeals further ordered the trial court to rule on any outstanding motions in this case within thirty days of the date of said order and to resolve any outstanding issues in the case within ninety days of the date of said order and indicated that an order to show cause and notice to appear would issue against

4

the trial judge, the prosecutor, and defense counsel if the completed case was not forwarded to it on or before July 31, 2014.

On May 12, 2014, Ms. Sheard filed a Motion for an Evidentiary Hearing in which she stated that the affidavits submitted by trial counsel lacked sufficient detail to be able to adequately resolve the issues concerning adequacy of their performance; that a live evidentiary hearing was thus necessary; and that the State had indicated that it did not oppose a hearing, although it was concerned about ensuring compliance with the deadlines set by the Court of Criminal Appeals.

Judge Gonzalez then held a scheduling conference with the attorneys in this case and indicated that he would hold a live evidentiary hearing on June 9, 2014.

On May 27, 2014, Ms. Sheard filed "Applicant's Motion to Court to Recuse Itself" in this case.

In said motion, Ms. Sheard stated that the application for writ filed in 2007 had included a claim that Applicant had been denied his right to a fair trial before an impartial jury because of the hostile atmosphere in the courtroom and that Applicant's death sentence had resulted from alleged jury misconduct, namely a judicial comment that gangs would sometimes come after jurors, a comment by the bailiff that the judge was carrying a gun; and the conduct of the trial in an atmosphere of gang violence. She also indicated that she and an investigator had interviewed former juror Rose Marie Palacios, who had been known as Rose Marie Vera when she served as a

juror; that Ms. Palacios had provided additional details not mentioned in the affidavit she had given in 2007; that this information had made it apparent to her that Judge Gonzalez had to be asked to recuse himself; and that it led to a conclusion that Judge Gonzalez' knowledge of evidentiary facts that are in dispute and the possible appearance of impropriety and lack of impartiality if Judge Gonzalez continued to determine the relevant issues compelled filing of the motion to recuse Judge Gonzalez.

After discussing the law governing recusal of judges, Ms. Sheard prayed that Judge Gonzalez either recuse himself or request that the Presiding Judge of this administrative district hear the motion himself or assign another judge to do so.

Judge Gonzalez utilized the latter option and 139th District Court Judge J.R. "Bobby" Flores was assigned to hear the motion to recuse.

Accordingly, a hearing was held in the 139th District Court, before Judge Flores, on June 16, 2014.

During said hearing, testimony was presented by former juror Rose Marie Palacios, formerly known as Rose Marie Vera; former juror Melissa Guerrero; and Alicia "Licha" Salinas, who had been the bailiff for the 370th District Court at the time of the trial of Applicant's case.

After hearing testimony from those witnesses and the argument of counsel, Judge Flores requested that the parties submit a memorandum and copies of the cases they were relying on. Accordingly, the State is now submitting this memorandum.

6

## II. Format of This Response.

In this document, the State will first describe the legal principles applicable to evaluation of the motion to recuse Judge Gonzalez. In next applying those principles to the evidence presented at the hearing on said motion, the State will demonstrate that Applicant has not presented sufficient evidence to support his request that Judge Gonzalez be recused from further involvement in this habeas proceeding.

## III. Applicable Legal Principles.

First of all, a Texas judge may be removed from presiding over a case if (1) he is constitutionally disqualified, (2) he is subject to a statutory strike, or (3) he is subject to statutory disqualification or recusal under Texas Supreme Court rules. See, e.g., Gaal v. State, 332 S.W.3d 448, 452 (Tex. Crim.App. 2011); Rhodes v. State, 357 S.W.3d 796, 799 (Tex.App. – Houston [14th Dist.] 2011, pet. ref'd).

Secondly, generally a motion to recuse seeks to prevent a judge from hearing a case because of a non-constitutional reason, while ground for disqualification are limited to those identified in the constitution. See Gaal, 332 S.W.3d at 452.

Third, the Court of Criminal Appeals has pointed out that Rule 18b (2) of the Texas Rules of Civil Procedure sets out the law concerning recusal and includes instances in which a judge must step down from hearing a case for reasons other than the disqualifying grounds listed in the constitution. See Gaal, 332 S.W.3d at 452-53.

7

Fourth, Texas Courts have also noted that Rule 18b (2) states, in pertinent part, that, "a judge shall recuse himself in any proceeding in which (a) his impartiality might reasonably be questioned or (b) he has a personal bias or prejudice concerning the subject matter or a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. See, e.g., Gaal, 332 S.W.3d at 43; Youkers v. State, 400 S.W.3d 200, 206 (Tex.App. – Dallas 2013, pet. ref'd); Rhodes, 357 S.W.3d at 799.

Fifth, the Court of Criminal Appeals has also stated that there is a lot of over-lap between the two subsections, but that the first basis for recusal mentioned in Rule 18b (2)--that the judge's impartiality might reasonably be questioned--appears to be one that the parties may use when in doubt as to any more concrete reason why the judge should not preside and noted that Justice Kennedy had stated, in his concurring opinion in Liteky v. United States, 510 U.S. 540, 558, 114 S.Ct. 1147, 1258, 127 L.Ed. 2d 474 (1994) that a judge's impartiality might reasonably be questioned "only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute". See Gaal, 332 S.W.3d at 453.[1]

Sixth, the Court of Criminal Appeals has also pointed out that Rule 18b (2)(b) is more specific and covers how the judge feels and what the judge knows; that the Fourth Court of Appeals had, for example, held in Abdygapparova v. State, 243

---

[1] Lower court cases have mentioned this reference to Justice Kennedy's remarks. See Diaz v. State, 380 S.W.3d 309, 312 (Tex.App. – Fort Worth 2012, pet. ref'd); Rhodes, 357 S.W.3d at 799-800.

8

S.W.3d 191, 208-10 (Tex.App. – San Antonio 2007, pet. ref'd) that the trial judge's feeling of personal bias was evidenced by ex parte communications with the prosecutor in which the judge provided guidance to the prosecutor on how to present his case and discussed the judge's initial ruling regarding the defendant's ongoing request for an interpreter; and that the situation where the trial judge interrupted a suppression hearing and announced that he had himself observed the conduct that had led to the defendant's initial detention which was involved in Gentry v. State, No. 06-05-00237-CR, 2006 Tex.App. LEXIS 2923 (Tex.App. – Texarkana 2006, no pet.) (not designated for publication) was an illustration of a clear instance of "personal knowledge of disputed evidentiary facts" requiring recusal. See Gaal, 332 S.W.3d at 453.

Seventh, said Court has also indicated that recusal is, however, generally not required when based solely on judicial rulings, remarks, or actions; that those acts almost never constitute a valid basis for a bias or partiality motion; that they may be proper grounds for appeal, but not for recusal; and that opinions formed by the judge on the basis of facts introduced, or events occurring, during the current or prior proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. See Gaal, 332 S.W.3d at 454, quoting Liteky, 510 U.S. at 555, 114 S.Ct. at 1157.

Eighth, Texas courts have further stated that a judge's remarks that are critical, disapproving, or hostile to counsel, the parties, or their cases will thus usually not

9

support a bias or partiality challenge, although they may do so if they reveal an opinion based on extrajudicial information and will require recusal if they reveal "such a high degree of favoritism or antagonism that would make fair judgment impossible"; that expressions of impatience, dissatisfaction, annoyance, and anger that are within the bounds of what imperfect people display do not establish bias or partiality; and that a judge's ordinary efforts at courtroom administration thus do not make him subject to recusal. See Gaal, 332 S.W.3d at 454; Rhodes, 357 S.W.3d at 800.

Ninth, said Court has also stated that, although intemperate remarks or unethical conduct may well violate a rule of judicial conduct, such a violation does not necessarily mean that the judge should be recused. See Gaal, 332 S.W.3d at 455; Wesbrook v. State, 29 S.W.3d 103, 121 (Tex.Crim.App. 2000); Kemp v. State, 846 S.W.2d 289, 305 (Tex.Crim.App. 1992), cert. denied, 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993).

Tenth, the courts have stated that judicial bias can result in disqualification, but only does so when it is shown to be of such a nature and to such an extent as to deny the defendant due process of law. See, e.g., Wesbrook, 29 S.W.3d at 121; McClenan v. State, 661 S.W.2d 108, 109 (Tex.Crim.App. 1983), overruled on other grounds by DeLeon v. Aguilar, 127 S.W.3d 1 (Tex.Crim.App. 2004); Abdygapparova, 243 S.W. 3d at 198; Rosas v. State, 76 S.W.3d 771, 775 (Tex.App. – Houston [1st Dist.] 2002, no pet.).

10

Eleventh, there is a presumption of judicial impartiality. See, e.g., Durrough v. State, 620 S.W.2d 134, 143 (Tex.Crim.App. 1981); Ex parte Ellis, 275 S.W.3d 109, 117 (Tex.App. – Austin 2008, no pet.); Abdygapparova, 243 S.W.3d at 198.

Twelfth, an appellate court must utilize an abuse of discretion standard in reviewing an order denying a motion to recuse and should not reverse a judge hearing the motion whose ruling on the motion is within the zone of reasonable disagreement. See, e.g., Gaal, 332 S.W.3d at 456; Wesbrook, 29 S.W.3d at 120-21; Kemp, 846 S.W.2d at 306; Rhodes, 357 S.W.3d at 800; Abdygapparova, 243 S.W.3d at 197-98.

Thirteenth, in applying said standard, the appellate court must consider the totality of the evidence and information elicited at the recusal hearing to see if the record reveals sufficient evidence to support the recusal judge's ruling that the trial judge was unbiased. See, e.g., Gaal, 332 S.W.3d at 456; Kemp, 846 S.W.2d at 306; Rhodes, 357 S.W.3d at 800.

Fourteenth, a high threshold must be met in order to recuse a judge and the proper inquiry to be made in evaluating a request to do so is whether a reasonable member of the public at large, knowing all of the facts in the public domain concerning the judge and the case, would have a reasonable doubt that the judge is actually impartial. See, e.g., Kemp, 846 S.W.2d at 305; McClenan, 661 S.W.2d at 109; Ellis, 275 S.W.3d at 116; Abdygapparova, 243 S.W.3d at 198; Burkett v. State, 196 S.W.3d 892, 896 (Tex.App. –Texarkana 2006, no pet.); Rosas, 76 S.W.3d at 774.

11

## IV. Application of These Principles to the Facts Presented at the Recusal Hearing.

Application of these legal principles to the facts adduced at the hearing on Applicant's motion to recuse Judge Gonzalez demonstrates that Applicant has not met his burden to establish a sufficient factual basis to warrant granting of his request.

First of all, former juror Rose Marie Palacios merely referred in general terms to having had concerns for her personal safety; said that other jurors and "the judge and stuff like that" had told the jurors that sometimes some of the jurors could be in danger; indicated that she had been afraid of being followed, or talked to, or maybe being threatened; indicated that her concerns had mostly been the result of other jurors talking about their fears; and stated that she had not really thought about "it".

However, Ms. Palacios never provided any specifics about any remarks made by any particular individual, including what exactly had been said, who had made said comments, or when said remarks had been made.

Secondly, Ms. Palacios also stated that the evidence of gang activity in the case had increased her concerns, but also admitted that the facts of the case involved gangs on both sides and that people she had seen in the parking lot or the courtroom that had concerned her could be family members of either the victims or Applicant.

Third, Ms. Palacios further stated that her concerns had been increased when someone in the audience took a photograph toward the jury, but further acknowledged that Judge Gonzalez had reassured the jury that that person was a legitimate

member of the media and that he would make sure that said individual was reminded of the policy not to take photographs which identified jurors when the jurors' concern about the photograph was somehow conveyed to him.

Fourth, Ms. Palacios also said that male members of the jury had been talking to the bailiff about gang activity, seeing gang members' families in the courtroom, and someone carrying the photograph while the jury was in the jury room at some unspecified point during the guilt phase of trial; that someone had told the bailiff that they hoped that she was carrying a gun; and that the bailiff had responded that she did not do so, but that the jurors did not have to worry because the judge had a gun.

However, Alicia "Licha" Salinas, who had been the bailiff during Applicant's trial, testified that she had not carried a gun while serving in that capacity; that she did not remember ever telling anyone that Judge Gonzalez carried a gun; that she does not think that she would have told anybody that Judge Gonzalez carried a gun; and that Judge Gonzalez did not, to her knowledge, carry a gun "back then".

Accordingly, there is a clear-cut factual dispute concerning whether Ms. Salinas had made a remark about Judge Gonzalez carrying a gun for this court, as the fact-finder in regard to the motion to recuse to resolve.

Moreover, the State would submit that Ms. Salinas' testimony on this subject is more credible than that of Ms. Palacios, particularly in light of the lack of any credible explanation why a court bailiff would volunteer such prejudicial information.

13

Fifth, even under Ms. Palacios' version of events, the remark Ms. Salinas allegedly made was that Judge Gonzalez had a gun, which literally merely means that he possessed some type of gun, such as a hunting rifle, at some undisclosed location, such as his residence.

Sixth, Ms. Palacios further indicated that the bailiff had further assured the jurors that the court would make sure that the jurors were allowed to park closer to the courtroom when they worked into the evening.

Seventh, Ms. Palacios said that Judge Gonzalez had, at one point during the guilt phase of trial, come into the jury room to re-assure the jurors that he understood their concerns about their safety, reassure them that he was going to provide security for them, and let the jury know that the person who had taken the photograph which had concerned them was legitimate and that he would make sure that the photograph would not become public.

However, Ms. Palacios also admitted that, when Judge Gonzalez came to talk to the jurors, it would concern issues concerning scheduling and whether the jurors would be available to finish the trial or work late.

Eighth, although Ms. Palacios mentioned Judge Gonzalez speaking to the jury in response to a note from some jurors, she did not give any specific information about the content of any such note, at what point the note had been sent, which juror or jurors had sent the note, or the content of the judge's response to the note.

Moreover, while it was suggested that an oral communication outside of the presence of Applicant and the attorneys involved in the case would be improper, any such improper conduct would merely involve an arguable violation of the rules of judicial conduct and would not constitute evidence of judicial bias or lack of impartiality sufficient to show that Judge Gonzalez should be recused from this case.

Ninth, Ms. Palacios acknowledged that her first affidavit, which she executed in 2007, mentioned a time when she thought that Applicant's mother was sitting alone in the parking lot when she went to her car; that someone had told a member of the court staff; and that she had been reassured that the court would take care of the situation.

Tenth, former juror Melissa Guerrero merely testified that she had had concerns about her personal safety during the first few days of the trial, because of the extent of the crime involved and the fact that the case had to do with gang violence.

Ms. Guerrero further indicated that "nothing really was mentioned" by the other jurors about the security situation; that they had been concerned about being followed while walking to their cars; and that the jurors had also been concerned about the incident where a reporter had taken a photograph of the jury.

Eleventh, Ms. Guerrero also said that Judge Gonzalez had come into the jury room on about the fifth or sixth day of the trial to calm down those jurors who had had questions or concerns about their safety; that the jurors had been allowed to park

15

in a different area at some point and to be released from court first; and that she *assumed* that the change had occurred because of the concerns about security.

Twelfth, Ms. Guerrero indicated that the only other time Judge Gonzalez had come to talk to the jury was when he came to thank them for their service and provide information if anyone wanted counseling after serving in this death penalty case.

Finally, although Ms. Palacios and Ms. Guerrero were not asked any questions about the effect of the events they were describing on their deliberations during their testimony at the hearing on the motion to recuse, Judge Flores took judicial notice of the contents of the court file pertaining to this case, which included the affidavits by Ms. Palacios which are attached to Applicant's motion to recuse Judge Gonzalez.

Furthermore, Ms. Guerrero says that she would have voted differently if she had known that a co-defendant had received a lesser sentence in her 2007 affidavit; states that certain defense witnesses at the punishment phase had not had any impact on her in her 2014 affidavit, and also says, in the latter affidavit, that the issue of security had played a big role in her decision on the future dangerousness special issue.

Because this material is thus arguably part of Applicant's effort to show that the jury had had concerns about their safety, the State must, out of an abundance of caution, note that TEX. R. EVID. ANN. 606 (b) does not allow a juror to testify or provide an affidavit "as to any matter or statement occurring during the jury's delib-

16

erations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assert to or dissent from the verdict or indictment".

The State would also note that the Court of Criminal Appeals recently discussed this principle in Colyer v. State, 428 S.W.3d 117 (Tex.Crim.App. 2014).[2]

In particular, in Colyer, said Court noted that the purpose of Rule 606 (b) is to limit "the role jurors may play in attacking the validity of a verdict"; that this limitation serves the important policy interests of (1) encouraging jurors to candidly discuss the case; (2) protecting jurors from post-trial harassment, (3) promoting finality, and (4) preventing tampering and fraud; that courts try to maintain the balance between the goal of a trial by a jury free from bias or misconduct and the need to prevent losing parties from trying the jury; and that Rule 606 (b) and the case law have generally struck the balance in favor of the privacy of deliberations. Id. at 15-16.

The Court of Criminal Appeals next stated that the most common, but disallowed, means to impeach the jury's verdict is the "disgruntled juror"; that a juror who reluctantly joined a verdict is likely to be sympathetic to overtures by the loser and persuadable to the view that his own consent rested on false or impermissible considerations; that allowing such jurors to impeach their former verdict would give the losing party much to gain and little to lose in harassing all of the former jurors in

---

[2] Although LexisNexus indicates that Colyer has now been published at 428 S.W.3d 117, it does not include mention of page numbers within said publication of said case. For this reason, in describing passages in said case, the State has utilized the references found in the Lexis citation to Colyer v. State, No. PD-0305-13, 2014 Tex.Crim.App. LEXIS 636 (April 30, 2014).

a search for a "disgruntled" one; and that "Rule 606 (b) flatly prohibits 'disgruntled juror' evidence either by affidavit or testimony". Id. at *17.

Said Court next indicated that the purpose of the exception to Rule 606 (b) which allows testimony about outside influences is to allow proof of external pressures that are likely to influence the verdict; that, in McQuarrie v. State, 380 S.W.3d 145, 154 (Tex.Crim.App. 2012), it had explained that an "outside influence" is "something originating from a source outside of the jury room and other than from the jurors themselves"; that a Rule 606 (b) inquiry is, therefore, limited to that which occurs both outside of the jury room and outside of the jurors' personal knowledge and experience; that external events or information, unrelated to the trial, which happen to cause jurors to feel personal pressure to hasten or end deliberations are not "outside influences" because they are caused by a juror's personal and emotional reaction to information that is irrelevant to the trial issues; that those kinds of internal personal pressures are normal and may be expected in any trial; and that they are, furthermore, not "improperly brought to bear" upon the juror in a manner designed or likely to influence deliberations. Id. at *17-19.

The Court of Criminal Appeals also stated that Texas cases have concluded that allowing normal personal pressures to qualify as 'outside influences" would jeopardize the finality of virtually every verdict; that, under Colyer's interpretation, any juror who had had second thoughts about his vote could retroactively claim that a

18

personal pressure made him apprehensive and eager to conclude the deliberations; that Rule 606 (b) explicitly prohibits post-verdict testimony about a juror's mental processes to impeach the verdict; and that most jurors feel some type of normal internal, individual pressures throughout the entire trial. Id. at *26-30.

The State would submit that the remarks about jurors who have second-thoughts about their decisions which the Court of Criminal Appeals made in Colyer are clearly relevant to evaluation of the credibility of the testimony and affidavits provided by former jurors Rose Marie Palacios and Melissa Guerrero.

## V.  The Unique Aspect of This Recusal Motion:  It Seeks Recusal In Regard to a Proceeding In Which the Judge Is Allowed to Utilize Personal Recollection.

The State is compelled to mention one more other point before concluding this response to Applicant's motion to recuse Judge Gonzalez.

Applicant's motion seeks to recuse Judge Gonzalez from further involvement in this post-conviction habeas proceeding in a death penalty case under TEX. CODE CRIM. PROC. ANN. Art. 11.071 (Supp. 2013).

The present status of this case is that an application for writ and an answer have been filed, an Order Designating Issues has been entered, trial counsel have sub-mitted affidavits, Applicant has filed a motion for a live courtroom hearing, said motion has been granted, and the hearing which Judge Gonzalez had scheduled has been put on hold pending disposition of the motion to recuse Judge Gonzalez.

Accordingly, the next step to be taken once the recusal issue is resolved would be to hold the live courtroom hearing; have both sides submit proposed findings of fact, conclusions of law, and a recommendation; and have whatever judge ends up presiding over this case enter findings of fact and conclusions of law.

Moreover, the Court of Criminal Appeals April 7, 2014 order imposes some time pressure for those matters to occur.

Typically, a trial judge is expected to be unfamiliar with the facts of the case and the parties involved, although the case law mentioned earlier indicates that some knowledge of the case, such as information derived from having tried the case involving a co-defendant, is not necessarily grounds for recusal.

However, this case, a post-conviction habeas proceeding, involves a somewhat different situation.

After all, TEX. CODE CRIM. PROC. ANN. Art. 11.071, Sec. 9 (a) (Supp. 2013) states that, in order to resolve any designated controverted, previously un-resolved fact issues material to the legality of the applicant's confinement, "the court may require affidavits, depositions, interrogatories, and evidentiary hearings *and may use personal recollection*".

The clear implication of this last phrase is thus that the court may have some level of personal knowledge of the relevant disputed fact issues and is not required to be totally without any knowledge concerning them.

20

Admittedly, the statute and case law do not specify the extent of personal recollection which the trial judge is allowed to utilize and what level of knowledge would be too much to allow him to remain impartial and would thus require recusal.

The State would, nonetheless, submit that, wherever the line should be drawn, the evidence which Applicant has produced in support of his motion to recuse does not support a conclusion that Judge Gonzalez' impartiality might reasonably be questioned and that he should be recused from further involvement in this case.

VI.   Conclusion and Prayer.

This Court should deny Applicant's motion to recuse Judge Gonzalez based upon the lack of sufficient factual support for Applicant's contention that Judge Gonzalez' impartiality might reasonably be questioned.

Accordingly, the State prays that this Court deny Applicant's motion to recuse Judge Gonzalez.

Respectfully submitted,

RENE GUERRA,
CRIMINAL DISTRICT ATTORNEY
HIDALGO COUNTY, TEXAS

THEODORE C. HAKE, ASSISTANT
CRIMINAL DISTRICT ATTORNEY
HIDALGO COUNTY, TEXAS

21

State Bar No. 08716800

Hidalgo County Courthouse
Edinburg, Texas 78539

Telephone No. (956) 318-2300
Telecopier No. (956) 318-0407

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I, THEODORE C. HAKE, certify that I have E-mailed a copy of the foregoing State's Memorandum Response to Applicant's "Motion to Recuse 370th District Court Judge Noe Gonzalez to Applicant's habeas counsel Hilary Sheard at Ms. Sheard's E-mail address of HilarySheard@Hotmail.com and have also sent a copy of said item via the United States mail to Hilary Sheard, Attorney at Law, 7301 Burnet Road # 102-328, Austin, Texas 78757.

Dated this, the 19th day of June, 2014.

THEODORE C. HAKE, ASSISTANT
CRIMINAL DISTRICT ATTORNEY
HIDALGO COUNTY, TEXAS

# Exhibit G

Applicant's Motion for Court to Recuse Itself

At_____O'CLOCK___/___M

MAY 2 7 2014

LAURA HINOJOSA, CLERK

No._____ County

By_____Deputy#44

Ex parte HUMBERTO GARZA III,

Applicant.

§
§
§
§
§

## APPLICANT'S MOTION FOR COURT TO RECUSE ITSELF

## TO THE HONORABLE JUDGE OF SAID COURT AND THE PRESIDING JUDGE OF THE FIFTH ADMINISTRATIVE JUDICIAL REGION:

COMES NOW, Humberto Garza, III, the Applicant, by and through undersigned counsel, and files this, his motion for the Hon. Noe Gonzalez, Judge of the 370th District Court, to recuse himself from all further proceedings in this case, pursuant to TEX. R. CIV. P. 18b(b)(1) and (3).

### A. Background Facts.

1. Judge Noe Gonzalez is the district judge of the 370th Judicial District Court of Hidalgo County, Texas.

2. Humberto Garza III is the Applicant in this capital habeas corpus proceeding, filed pursuant to Tex. Code Crim. Proc. Art. 110.071.

3. The habeas Application in this case was filed on July 19, 2007, by former counsel John E. Wright, Esq. The Application contained allegations that:

- Mr. Garza was denied his right to a fair trial before an impartial jury under the Sixth Amendment, the Eighth Amendment and the Due

Process Clause of the Fourteenth Amendment, because of the hostile atmosphere in the courtroom (Claim 4);

- Mr. Garza's death sentence resulted from jury misconduct, including the exposure of the jury to outside influences, namely a comment to the jury by the trial judge that gangs would sometimes come after jurors, a comment by the bailiff that the judge was carrying a gun, and the conduct of the trial in an atmosphere of gang violence, as well as premature deliberations, and the conveying of extra-record information by two jurors to the other jury members (Claims 5 & 6).

4. These allegations were supported by:

- Exhibit 2: A listing of coverage of the trial from the local newspaper "The Monitor;"

- Exhibit 23 and 24: Affidavit and Declaration of juror Miguel Martinez;

- Exhibit 25: Declaration of juror Felipe Hernandez;

- Exhibit 26: Affidavit of juror Rose Marie Vera;

- Exhibit 27: Affidavit of juror Melissa Guerrero

5. The affidavit of juror Rose Marie Vera, Exhibit 27, indicated that the trial judge had "warned us that sometimes gang members come after the jury," that the judge had given reassurance to the jurors about a journalist who had taken a photograph in the courtroom, and that a bailiff had told the jury that the judge carried a gun. [1]

_____

[1]Applicant was alleged to be a leader of the "Tri-City Bombers" gang, and was charged with carrying out a six-victim robbery-homicide along with other gang members.

6. Jurors Miguel Martinez and Melissa Guerrero, as well as Rose Marie Vera, indicated that they had been concerned for their safety during the trial. *See* Exhibits 24, 26, 27.

7. The Answer filed by the State of Texas on November 13, 2012, contended, at 387, that these claims "are based on factual premises of doubtful validity."

8. The Answer continued: "the fact that Applicant merely argues that exposure of the jury to the information to which he refers had been likely to have denied him the impartial system to which he was entitled demonstrated the lack of validity of his arguments. ... Habeas relief must be based on a showing that a constitutional right was violated, and not merely a claim that it is likely that it was violated." *Id.*

9. The 2007 affidavit of Rose Marie Vera, which was obtained by volunteer law students, did not specify whether the comment made by the judge about gangs was made in open court (it does not appear on the record), what were the circumstances in which the bailiff was talking to the jury about the judge, and what the influence of the judge and bailiff's comments had been on Ms. Vera's sentencing decision.

10. Undersigned counsel filed a series of funding applications for investigative expenses in this matter. Unfortunately, the requested funding was not granted in full, and investigative work on the case has therefore been

sporadic. Counsel experienced great difficulty in scheduling her investigator's work as a result: neither she nor the investigator are local to the area, and the investigator has had other substantial commitments to capital trial cases. Thus, additional jury interviewing was only recently conducted, with undersigned counsel accompanying the investigator, Kristi Bishop.

**B. Newly-Discovered Facts Indicating the Need for the Court's Recusal.**

11. On Sunday May 18, 2014, undersigned counsel, together with Ms. Bishop, interviewed Rose Marie Vera, now known as Rose Marie Palacios, at her home.

12. On Monday May 19, 2014, Ms. Palacios signed an affidavit repeating matters she had discussed in the interview of May 18, 2012, which included more detailed information than was previously known to counsel:[2]

13. In her affidavit, Ms. Palacios explained that the judge, the Hon. Noe Gonzalez, had spoken to the jury in the jury room behind the courtroom on more than one occasion. In addition to talking to the jury about the security risk that gang members represented to jurors, the judge also spoke to them in response to notes they had sent out.

---

[2]Copies of both Ms. Vera/Palacios' affidavits are attached. The affidavit of May 19, 2014, will be submitted as part of a volume of supplemental exhibits to the habeas application being filed with the court.

14. Ms. Palacios stated that, so far as she could recall, the attorneys representing the State and the defense were not present at the time the judge warned the jury about gangs, or at any time when he was with them in the jury room.

15. Ms. Palacios identified the bailiff who had told the jury members that the judge carried a gun as being a woman named "Licha." Some members of the jury had told Licha that they were concerned about their personal safety, and Licha had told them that Judge Gonzalez always carried a gun. Ms. Palacios believed that Judge Gonzalez was in the habit of carrying a gun because he had been threatened in the past.

16. Ms. Palacios concluded that: "It is my belief that the issue of security during the trial played a big role in my decision on the issue of deciding whether Mr. Garza was a future danger to society. I had my own security concerns very much in mind, and they were increased by Licha's comment about the judge carrying a gun, and by what the judge said about the gang following jurors."

17. Now that Ms. Palacios has explained the circumstances of both the court and its bailiff's conduct, for example, by ascertaining that her reference to the trial court talking about gangs following jurors was not a mishearing of something said on the open record, it has become apparent to undersigned counsel that the court must be asked to recuse itself.

18. This motion is not predicated on any allegation that Judge Gonzalez harbors any personal bias against applicant. However, and unfortunately, the newly discovered facts lead to the inevitable conclusion that the court's personal knowledge of evidentiary facts that are in dispute, and the possible appearance of impropriety and lack of impartiality if he continues to determine the relevant issues, compel the filing of this motion on Mr. Garza's behalf.[3]

## Law and Argument

### The court cannot preside over this proceeding because it has personal knowledge of disputed evidentiary facts concerning Applicant's trial.

Texas Rule of Civil Procedure 18b(b) provides various grounds for recusal, such as where the judge's impartiality might reasonably be questioned, where the judge has a personal bias or prejudice concerning the subject matter or party, or has personal knowledge of disputed evidentiary facts concerning the proceeding. TEX. R. CIV. P. 18b(b); *Gaal v. State*, 332 S.W.3d 448, 453 (Tex. Crim. App. 2011)(discussing statutory bases for recusal).

---

[3]Undersigned counsel has discussed this situation with Assistant District Attorney Theodore C. Hake who, like undersigned counsel, is concerned that this motion for the court to recuse itself may jeopardize the deadline for completion of the case of July 31, 2014, imposed by the Court of Criminal Appeals in an order of April 7, 2014. Notwithstanding the scheduling difficulties that this motion for recusal might entail, undersigned counsel has no alternative but to file it, in order to ensure that Mr. Garza's receive an appropriate adjudication of these habeas corpus proceedings.

Although there is no comparable criminal rule or statute to TEX. R. CIV. P. 18b, the Court of Criminal Appeals has held that the civil rules on disqualification apply unless there is legislative intent indicating otherwise. *See McClenan v. State*, 661 S.W.2d 108, 110 (Tex. Crim. App. 1983). Because there is no legislative intent otherwise, TEX. R. CIV. P. 18b applies in this case.

TEX. R. CIV. P. 18b(b)(3) plainly states that a "judge must recuse in any proceeding in which . . . the judge has personal knowledge of disputed evidentiary facts concerning the proceeding." TEX. R. CIV. P. 18b(b)(3). When a judge has personally witnessed the events whose existence and legal significance he would have to decide, he must recuse himself. *See, e.g., Gentry v. State*, No. 06-05-00237-CR, 2006 Tex. App. LEXIS 2923 (Tex. App. - Texarkana April 12, 2006, no. pet.)(judge could not conduct suppression hearing where he had himself observed conduct leading to initial detention).

It appears that the court here was communicating with the jury privately, whereas TEX. CODE CRIM. PROC. Art. 36.27 mandates that all communications between jurors and the trial court must be written, with the court's responses to juror questions also being in writing, where possible after securing the presence of the defendant and counsel, and being read out in open court unless expressly waived by the defendant.[4] The court will have personal knowledge of whether or

---

[4]There are jury notes in the record, 2 CR 925-942, many dealing with "housekeeping" matters such as bathroom breaks or requests for food, to which no written response appears.

not there were such communications conducted without following the strictures of TEX. CODE CRIM. PROC. Art. 36.27.[5]

Moreover, the court would have personal knowledge both of whether or not he carries a gun, and whether the bailiff would know that fact. The court may also have personal knowledge of what the bailiff said to the jury members about his owning a gun.

The State has already questioned the "validity" of the factual premises of Applicant's claims concerning outside influences upon the jury; Applicant contends that those outside influences did exist, and did have a deleterious impact on the fairness of the proceedings against him. Thus, there exist here "controverted, previously unresolved factual issues," under TEX. CODE CRIM. PROC. Art. 11.071 § 9 (a).[6]

---

Two notes, requesting guidance as to the charge, do include the court's written response, 2 CR 931 and 935, but there is nothing in the record to indicate that there was any consultation with counsel, nor were the responses read in open court. While there is one note indicating juror concern that people were able to overhear their deliberations at a point when they had gone into the courtroom in order to deliberate there, 2 CR 929, there is no written response to that note. Thus, it appears that TEX. CODE CRIM. PROC. Art. 36.27 was not being scrupulously followed.

[5]"[A]ny private communication, contact, or tampering, directly or indirectly, with a juror during a trial about a matter pending before the jury is ... deemed presumptively prejudicial, if not made in pursuance of known rules of the court ... with full knowledge of the parties." *Remmer v. United States*, 347 U.S. 227, 229 (1954); *Mattox v. United States*, 146 U.S. 140 (1892).

[6]The existing Order Designating Issues of November 15, 2012, drafted by the State, does not include these claims among those to be resolved by way of a hearing. Applicant's Motion for Evidentiary Hearing of May 9, 2014, indicated that it might be necessary to ask for additional issues to be designated. Now that Applicant has clarification from Ms. Palacios as to what occurred at Mr. Garza's trial, a proposed order designating additional issues to be heard by the

## The court cannot preside over this proceeding because its impartiality might reasonably be questioned.

A trial judge must recuse himself in any proceeding in which "the judge's impartiality might reasonably be questioned." TEX. R. CIV. P. 18b(b)(1).

The impartiality of the judiciary is indeed one of the most fundamental and indispensable aspects of the American system of justice and of due process. *See, e.g., Tumey v. Ohio*, 273 U.S. 510, 532 (1927).[7] In order "to promote public confidence in the integrity of the judicial process," judges must not only be impartial, but reasonably be perceived to be impartial. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859-860 (1988). Due process requires recusal not only when a judge is biased, but when there is merely an appearance of bias in the eyes of a reasonable, non-judicial observer. The Supreme Court explained:

> Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between the contending parties, but to perform its high function in the best way, "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954).

*In re Murchison*, 349 U.S. 133, 136 (1955).

The court's recusal is mandated not only by caselaw and the Rules of Civil Procedure, but also by the Code of Judicial Conduct. The Code of Judicial

---

Court is being filed separately.

[7]*See also Panetti v. Quarterman*, 551 U.S. 930, 949-50 (2007)(even after conviction and sentence, state court proceedings must still provide sufficient procedural due process to accord with fundamental fairness).

Conduct requires a judge to avoid involvement in any case where he or she would not be impartial, or where the *appearance of impartiality would not exist. See* TEX. CODE JUD. CON., Canons 2(A) & (B), 3(B)(5). The appearance of justice is an essential part of the right to a fair tribunal. *Bradshaw v. McCotter*, 785 F.2d 1327, 1329 (5th Cir. 1986). Bias may be used as a basis for disqualifying a judge when it is shown to be of such a nature and to such an extent as to deny the defendant due process of law. *Gaal*, 332 S.W.3d at 454-5; *McClenan v. State*, 661 S.W.2d 108, 110 (Tex. Crim. App 1983); *Norton v. State*, 755 S.W.2d 522, 524 (Tex. App. - Houston [1st Dist.] 1988), *pet. ref.* 771 S.W.2d 560 (Tex. Crim. App. 1989).

In order to adjudicate Claims 5 and 6 - with or without a hearing - the court would be compelled to decide the extra-record factual issue of whether his own bailiff had told the jury that it always carried a gun, and to decide the issues of whether the court itself had communicated with the jury off the record, what had been said, and whether what was said would have prejudiced the outcome of Applicant's trial and sentencing.[8]

However the court might strive to reach fair and impartial factual findings and to make correct conclusions of law as to those issues, it is axiomatic that "[n]o man is allowed to be a judge in his own cause," *see Caperton v. A.T. Massey Coal*

---

[8]The impact of such off-the-record communications to a jury can be sufficient to deprive a defendant of his right to trial by an impartial jury. *Parker v. Gladden*, 385 U.S. 363, 365 (1966) (bailiff's improper comment to jurors that petitioner was a "wicked fellow" required reversal).

*Co.,* 556 U.S. 868, 876 (2009)(recusal required when probability of actual bias is too high to be tolerable). Moreover, a judge's impartiality might reasonably be questioned when deciding issues concerning not only his own conduct but that of a member of his own court staff. Where a judge's impartiality might reasonably be questioned, it is unnecessary for the movant to prove actual bias, or the thought processes of the judge. *Gaal,* 332 S.W.3d at 459.

"In determining whether a judge's impartiality might be reasonably questioned so as to require recusal, the proper inquiry is whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge and the case, would have a reasonable doubt that the judge is actually impartial." *Burkett v. State,* 196 S.W.3d 892, 896 (Tex. App. - Texarkana 2006, *no pet.*); *Kemp v. State,* 846 S.W.2d 289, 305 (Tex. Crim. App. 1992); *Rosas v. State,* 76 S.W.3d 771, 774 (Tex. App. - Houston [1st Dist.] 2002). Applicant submits that in the circumstances of Mr. Garza's case, regardless of the court's actual conduct or approach to this case, a rational observer would reasonably doubt whether the court can be impartial.

**Prior to _any_ further proceedings in the case or entering any orders in this case, the court is required either to recuse itself or to request the presiding judge of the administrative judicial district to assign a judge to hear this motion.**

Prior to conducting any further proceedings or entering any further orders in this case, a judge against whom a motion to recuse is filed is required either to recuse himself or request that the presiding judge of the administrative judicial district assign a judge to hear the motion. TEX. R. CIV. P. 18a(c); TEX. GOVT. CODE § 74.059(c)(3) ("A district... judge shall request the presiding judge to assign another judge to hear a motion relating to the recusal of the judge from a case pending in his court..."); *See McClenan v. State*, 661 S.W.2d 108, 110 (Tex. Crim. App. 1983); *In re Chavez*, 130 S.W.3d 107, 112 (Tex. App. - El Paso 2003). The filing of the motion does not, in itself, disqualify the judge, but merely requires that another judge be assigned to determine the merits of the motion. *Chastain v. State*, 667 S.W.2d 791, 795 (Tex. App. - Houston [14th Dist.] 1983, pet. rej.). This requirement is *mandatory. Id.*

The judge must take no further action on the case until a motion for recusal has been decided. TEX. R. CIV. P. 18a (f)(2)(A). In fact, any order entered by the challenged judge after a proper recusal motion is filed, other than an order of recusal or referral, is void. *Crawford v. State*, 807 S.W.2d 597, 598 (Tex. App. - Dallas 1991, *no pet.*). The only exception to this rule is the "ministerial task exception": a disqualified judge or one who is subject to a motion to recuse may

perform purely ministerial tasks, which is defined as one where the law requires that a duty be performed and leaves nothing to the exercise of discretion or judgment. *See Burkett v. State*, 196 S.W.3d 892, 895 (Tex. App. - Texarkana 2006) (Judge's act granting excuse from jury service to potential juror not ministerial because it involved exercise of discretion).

## Conclusion

Applicant prays that the court immediately either:

(a) recuse itself, pursuant to TEX. R. CIV. P. 18a (f)(1)(A); or

(b) request the Presiding Judge of this administrative district to hear this motion, or assign another judge to hear this motion, pursuant to TEX. R. CIV. P. 18a (f)(1)(B),

Applicant further prays that, upon resolution of this motion, the court should take no further action in any proceeding concerning this case.

Respectfully submitted,

*Hilary Sheard*

HILARY SHEARD
Texas Bar # 50511187
7301 Burnet Road, # 102-328
Austin, TX 78757
Phone: (512) 524 1371
Fax: (512) 646 7067
HilarySheard@Hotmail.com
*Counsel for Humberto Garza III, Applicant.*

## CERTIFICATE OF SERVICE

I certify that on May 24, 2014, a copy of the foregoing pleading was served via Federal Express on:

Theodore C. Hake, Esq.

Assistant Criminal District Attorney

Hidalgo County Courthouse

100 N. Closner, Room 303

Edinburg, Texas 78539.

*Hilary Sheard*

HILARY SHEARD

Counsel for Applicant.

THE STATE OF TEXAS          §
                                      §

COUNTY OF TRAVIS         §

## AFFIDAVIT

**BEFORE ME**, the undersigned authority, on this day personally appeared Hilary Sheard, who being by me duly sworn, upon oath deposes and says:

"I am Hilary Sheard, Attorney for Applicant Humberto Garza III in this cause; I hereby state that all allegations set out within the above motion to recuse the Hon. Noe Gonzalez, Judge of the 370[th] District Court of Hidalgo County, Texas, are true and correct to the best of my knowledge."

_____
Hilary Sheard, Affiant

**SUBSCRIBED AND SWORN TO BEFORE ME** on _MAY 24 2014_, to certify which witness my hand and seal of office:



JERRY D. HARPER
MY COMMISSION EXPIRES
October 15, 2016

Notary Public, State of Texas

# IN THE DISTRICT COURT OF HIDALGO COUNTY, TEXAS
## 370th JUDICIAL DISTRICT

Ex parte § 
§ 
**HUMBERTO GARZA III,** § 
§ **No. CR-3175-04-G(1)** 
Applicant. § 
§ 
§

## ORDER CONCERNING APPLICANT'S MOTION FOR
## THE COURT TO RECUSE ITSELF

Counsel for the Applicant, Humberto Garza, has filed a Motion For The Court to Recuse Itself, pursuant to TEX. R. CIV. P. 18b (b)(1) and (3).

- The Court having duly considered Applicant's Motion, it is hereby GRANTED, and the Court hereby signs and files with the clerk this Order of Recusal in compliance with TEX. R. CIV. P. 18a (f)(1)(A), and will take no further action in this case.

Alternatively:

- The Court having considered Applicant's Motion, it is hereby DENIED, and the Court hereby signs and files with the clerk this Order referring Applicant's motion to the Regional Presiding Judge in compliance with TEX. R. CIV. P. 18a (f)(1)(B).

IT IS SO ORDERED.

SIGNED AND ENTERED THIS _____ day of _____, 2014.

_____
JUDGE PRESIDING

**FILED**

AT_____O'CLOCK____M

MAY 2 7 2014

LAURA HINOJOSA, CLERK
District Courts, Hidalgo County

By_____Deputy#44

# Exhibit H

Transcript: Excerpt of Proceedings from Hearing on Applicant's Motion for Court to Recuse Itself, June 16, 2014

*REPORTER'S RECORD*
*VOLUME 001 OF 001 VOLUME*

*TRIAL COURT CAUSE NO. CR-3175-04-G(1)*

| | | |
|---|---|---|
| *EX PARTE* | \| | *IN THE DISTRICT COURT OF* |
| | \| | |
| *HUMBERTO GARZA, III* | \| | *HIDALGO COUNTY, T E X A S* |
| | \| | |
| *APPLICANT* | \| | *370TH JUDICIAL DISTRICT* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**APPLICANT'S MOTION FOR COURT TO RECUSE ITSELF**
**(Excerpt of proceedings)**

**June 16, A.D., 2014**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 16th day of June, A.D., 2014, the foregoing Proceedings came on to be heard outside the presence of a Jury, in the above-entitled and -enumerated cause; and the following proceedings were had before the Honorable Roberto "Bobby" Flores, Judge Presiding, held in Edinburg, Hidalgo County, Texas, USA:

Proceedings reported by COMPUTERIZED INTEGRATED COURTROOM REALTIME, STENOTYPE MACHINE; Reporter's Record produced BY COMPUTER-ASSISTED TRANSCRIPTION.

*JESSIE C. SALAZAR, Texas CSR #4286*
Official Court Reporter - 139th Judicial District Court
Hidalgo County Courthouse
100 North Closner, Second Floor
Edinburg, Texas 78539 USA
956.318.2260

<u>*A P P E A R A N C E S:*</u>

*HON. THEODORE C. HAKE*
*SBOT NO. 08716800*
*HON. MICHAEL WESTON MORRIS*
*SBOT NO. 24076880*
*HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE*
*HIDALGO COUNTY COURTHOUSE*
*100 North Closner*
*Edinburg, Texas  78539*
*Telephone:  956.318.2300*
*Facsimile:  956.318.2301*

        *ATTORNEYS FOR THE STATE OF TEXAS*


*HON. HILARY SHEARD*
*SBOT NO. 50511187*
*LAW OFFICES*
*7301 Burnet Road, #102-328*
*Austin, Texas  78757*
*Telephone:  512.524.1371*
*Facsimile:  512.646.7067*

        *ATTORNEY FOR HUMBERTO GARZA III, APPLICANT*

JUNE 16, 2014

AFTERNOON SESSION

...(proceedings in progress)

THE COURT: Ms. Palacios, you have been sworn in, okay? Take the chair on the outside.

THE WITNESS: Okay.

THE COURT: Yes, ma'am.

Ms. Palacios, you are going to be asked some questions, ma'am.

THE WITNESS: Okay.

THE COURT: Answer loud enough so everybody can hear you, and the court reporter can hear you, okay?

THE WITNESS: Yes. Yes, Your Honor.

MS. SHEARD: Yes.

THE COURT: Thank you.

ROSE MARIE PALACIOS,

having been duly sworn, testified as follows, to-wit:

DIRECT EXAMINATION

BY MS. SHEARD:

    Q.    Please, will you state your name for the record.

    A.    Rose Marie Palacios.

    Q.    And have you ever been known by a different name?

    A.    Rose Marie Vera.

    Q.    What caused your name to be changed?

    A.    Divorce. I went back to my maiden name.

Q.  Were you a juror at the time of the trial of Humberto Garza in 2005?

A.  Yes.

Q.  Okay.  What was your name at that time?

A.  Rose Marie Vera.

Q.  Was that the first time you have done jury service?

A.  Yes.

Q.  During the trial of Mr. Garza, did you have any concerns for your personal safety?

A.  Yes.

Q.  And what caused those concerns?

A.  The other jurors and, well, the judge and stuff like that, telling us that sometimes some of the jurors could be in danger.

Q.  Okay.  Well, let's back up a moment.  When we talk about concerns for your personal safety, what were you concerned might happen?

A.  I -- I just -- I just was afraid to be followed, or to be talked to, maybe to be threatened.

Q.  Okay.  Did you have any concerns about the security arrangements in the courtroom?

A.  No.  At first, but we --

Q.  What caused those concerns?

A.  Well, mostly that the jurors were, well, they talked about being their fears.  I really didn't think about it.

Q. And what impact of the evidence of gang activity in this case have on you? Did that increase your concerns?

A. Yes. Yes.

Q. Were there specific incidents during the trial that caused your concerns to increase?

A. Well, there was a time that there was somebody in the audience that took pictures and then they took it towards the jury.

Q. Was there anything else?

A. Let me think.

Q. Was there any person who caused you to have a concern for your safety?

A. Like another juror maybe. They did. That -- well, the -- the bailiff, I guess she -- she did try to tell us that we would be safe because the judge had a gun on him, but that made me more nervous.

Q. Okay. Well, let's talk about that. When -- when, during the trial, did the bailiff talk to you about the comment you just made?

A. We were in the jury -- we were not in the jury room, we were in the room next to the -- where the jury meets. I don't know what you call it.

Q. Let's first clarify. There's a courtroom which is the room of the trial itself --

A. That's not where we were.

Q. -- where the trial is conducted, where the jury sits in the box, like the box to your right now, and there's a room which is separate, which is where the jury stays when the court is not in session.

A. That's the room.

Q. And was it the latter room?

A. Yes.

Q. So that is the room that is private and away from the public eyes?

A. Yes, correct.

Q. Okay. And how was it that you came to have the conversation with the bailiff?

A. I think that I remember the other jurors were asking questions about that, and that they hoped that she was carrying a gun. And she said no, she didn't, but not to worry because the judge did.

Q. Okay.

THE COURT: I missed the last part.

THE WITNESS: The judge did.

THE COURT: That --

THE WITNESS: She said --

THE COURT: She said she didn't carry a gun, but what now?

THE WITNESS: But not to worry. We didn't have to worry because the judge had a gun.

THE COURT:  Okay.

Q.   (BY MS. SHEARD)  That the judge had a gun?

A.   Right.

Q.   Okay.

A.   And he -- he even came in once and told us.

Q.   Okay.  Let's --

A.   Okay.

Q.   -- back it up.

A.   Sorry.

Q.   Let's take it bit by bit.

A.   Okay.

Q.   When that conversation with the bailiff happened, exactly who else was in the room?

A.   That I remember, all of the jurors.

Q.   Was there anybody else in the room at that time apart from the 12 jurors and the bailiff?

A.   I don't remember.  It -- no, I don't remember.

Q.   Do you remember, for example, Mr. Garza himself ever being brought back to that jury room?

A.   No.

Q.   So the Defendant was not present?

A.   No.

Q.   And what about defense counsel, the lawyers for the Defendant?

A.   I don't remember them ever going back in there.

Q. Or the prosecution?

A. No.

Q. Okay. So it was just 12 jurors and the bailiff?

A. Uh-huh. Yes.

Q. And why was it that she started talking to you about the judge carrying a gun? What started that conversation?

A. Jurors that were asking her about if -- if we were safe because of the gang activity. They thought they saw the gang member's family in the courtroom and then whoever took the picture, which -- that they were very concerned about that.

Q. Do you remember which of the jurors raised those issues?

A. No. I know it was a male because the men were more --

Q. More nervous?

A. It seemed like it, yes.

Q. Okay. When this conversation occurred was it during the trial itself?

A. Like on a break.

Q. Was the trial still continuing at the time that you had this conversation?

A. Yes.

Q. So was it before you arrived at a guilty verdict against Mr. Garza?

A. Yes.

Q. Did the bailiff say anything else that you recall?

A.   Just assured us that they would have somebody get us to our cars, make sure that when it was already evening and there were just like a few cars in the parking lot, and that we would start parking in the back, and that's about it.

Q.   Do you remember anything else that the bailiff said?

A.   Not right now.  I can't.  Sorry.

Q.   Was the bailiff in question a man or a woman?

A.   A woman.

Q.   Okay.  Do you remember her name?

A.   Licha.

Q.   Okay.  Do you know what her full name is?

A.   (Nods head.) I don't remember.

Q.   Okay.  Were there any other occasions you recall where she had any type of conversation with the jury about security matters?

A.   That's the only -- that's the only thing I remember.

Q.   Did she say anything else about the judge?

A.   She kidded sometimes about him, but it was not -- I think she was just trying to relieve our concerns, you know. Nothing about the --

Q.   What kind of things was she saying?

A.   That she would be surprised if he bought us lunch because he was a cheapskate, and stuff like that.  And then --

Q.   Okay.

A.   Well, that's the kind of stuff she said.  I'm sorry.

I think she was just trying to make us laugh.

Q. Was there anyone else that you and your fellow jurors talked to about your safety concerns?

A. I -- the judge came in.

Q. Okay. Why was it the judge came in when you said this?

A. Into the juror's room.

Q. Do you know why he came into the jury room?

A. I believe someone sent him a note because they asked the bailiff to give him a note. I didn't see the note. I don't know what it --

Q. You don't know the contents of the note; is that correct?

A. (Nods head.)

Q. When the judge came into the jury room, do you remember if he was wearing his robe?

A. Yes.

Q. Was this while the trial was still going on?

A. Yes.

Q. Do you recall at what stage it happened? Whether it was before the guilty verdict or afterwards?

A. Oh before.

Q. When the judge came to the jury room, how many other people were there?

A. As far as I can remember the jurors. I can't remember

if the bailiff came with him or not.

Q.   Okay.  So that would be all 12 jurors?

A.   Uh-huh.

Q.   Was anybody else there apart from the 12 jurors, the judge, perhaps, the bailiff?

A.   Maybe the court reporter, but I don't remember.

Q.   And Mr. Garza was not brought to hear what was said?

A.   No, I don't remember seeing him there.

Q.   Nor defense counsel?

A.   No.

Q.   What did the judge say to you?

A.   That he understood our fears, but that we were -- we were -- he was going to provide us security and that we would be fine.  That this happens.  That the gangs, sometimes they threaten the jurors and sometimes they -- they may follow you.  Stuff like that.

Q.   Did he say anything else about the gangs, or about Mr. Garza?

A.   Not that I recall.

Q.   And did he say anything about the photographer, the person who took the photographs in the court?

A.   He said that he was legitimate.  I guess that he was from a newspaper, or from a news station, but that he would talk to him and that make sure that that wouldn't get out, that picture, that photograph wouldn't get out in public.

Q. On how many occasions did the judge come back to the jury room?

A. Wow. I only remember that time.

Q. Were there other times when the judge may have come in in response to a note?

A. I think, yes. I do believe that he did. I don't remember why though. I know he came in after the verdict, but before the verdict, I don't -- I'm not positive.

Q. So you only clearly remember one occasion --

A. Once. Uh-huh.

Q. -- before the guilty verdict?

A. Yes.

Q. Do you remember any other aspect of the conversation between the judge and the jury about security?

A. Do I remember anymore?

Q. Yes.

A. No.

MS. SHEARD: At this time, I will pass the witness.

CROSS EXAMINATION

BY MR. HAKE:

Q. Your name at the time of the trial was Rose Marie Vera?

A. Correct.

Q. And you're now Rose Marie Vera Palacios?

A.   No Vera.

Q.   Okay.  Your maiden -- you took back your maiden name Palacios?

A.   Yes.  Yes.

Q.   Where are you from?

A.   Corpus Christi, Texas.

Q.   Where in the Valley?  Obviously --

A.   Where do I live in the Valley?  I live in McAllen, Texas.

Q.   What Palacios are you related to?

A.   None in the Valley that I know of because I wasn't born and raised here.

Q.   Not the county commissioner or Palacios from Edinburg?

A.   No, sir.

Q.   You said that at one point you were concerned because somebody took a photograph?

A.   Yes.  Well --

Q.   And the judge told you that he was a legitimate member of the media?

A.   Correct.

Q.   And he talked to him about making sure that they follow the policy that they didn't film jurors?

A.   Correct.

Q.   Is that the policy in this courthouse that nobody can see pictures of jurors or identify them?  He told you that,

right?

A. Correct. Yes.

Q. How did you get to the courthouse today?

A. I drove here.

Q. From what direction? From McAllen?

A. Yes.

Q. Did you come down 107?

A. Yes.

Q. Is the west side of the courthouse, where the parking is, the same as was it was back when you were a juror? It's been remodeled, right? They put in those portable buildings?

A. I don't remember. On the --

Q. When you drove in today, you saw one of the buildings there on the southwest side, right? Those portable buildings?

A. I don't remember. I was in a hurry.

Q. Okay.

A. Southwest?

Q. Well, back -- back when the trial was going on, you were allowed to park on the right side of the 370th courtroom, right? In the parking lot on the west side that used to be there?

A. In the evening.

Q. That's what I meant.

A. The would judge come in and out, right.

Q. The judge and the bailiff told you that if you worked

late, you could park close and --

A. After dinner.

Q. -- it's for you all and the deputies escorted you, right?

A. If after dinner we could park there. After we had --

Q. So you didn't have to walk all the way from the bank parking lot?

A. That was later in the -- yes.

Q. When the judge came to talk to you, he came in there to talk to you about scheduling, whether you'd be available to finish the trial, right, or work late?

A. Correct.

Q. That's where he came in to talk to you about, right?

A. I believe so. He did mention that, yes.

Q. And he -- and I believe you said a minute ago that he said that if you had concerns about security, he'd make sure that you were taken care of?

A. Correct.

Q. You gave two affidavits, right?

A. Yes.

Q. One seven years ago and one recently?

A. Correct.

Q. In the first one, tell me the circumstances. Who came and talked to you about this case?

A. They said they were students from Austin.

Q.   And what did they tell you?

A.   That they were -- they were just following up on the case.

Q.   And what did they ask you?

A.   Basically, the same questions.  How did it go?  Did -- what did I think about the outcome?  How did I feel about it?  Things like that.

Q.   And in your first affidavit, at one point you said that you thought maybe Humberto Garza's brother was sitting alone in the car out in the parking lot when you went out to your car?

A.   Correct.

Q.   You told somebody of the court staff about that, didn't you?

A.   I don't remember if I told them, but some -- one of us did.  One of the jurors.

Q.   You told the court reporter, who's now deceased, right?  Frank Moreno, Francisco Moreno, didn't you?

A.   I don't remember if it was me.

Q.   He said they'd take care of the situation, right?

A.   Yes.

Q.   Did anybody ever mention to you if there had ever been any incidents involving gangs disrupting court proceedings or threatening people here in this courthouse?

A.   No.  The judge said it happens, but he didn't give us

any specific time or example.

Q. Now, when the bailiff met with you, it's her job to bring you in and out of the courtroom, right?

A. Correct.

Q. And if the judge took you to lunch, to keep you together and to walk you to wherever you are going to eat, right?

A. Right. Correct.

Q. Now, how did the subject about a gun come up allegedly?

A. The guys -- somebody asked her if she had a gun on her and she said no, she never carried a gun.

Q. You've seen movies about courtroom proceedings, right?

A. Some. I don't really care for that kind of TV, but, or movies, but I have.

Q. The bailiff almost always carries a gun, or there are deputies in the courtroom any time either in the movies or on TV or real life, right?

A. I don't know. I have seen the deputies, yes.

Q. They have a gun usually, right?

A. Correct. As far as I -- yes.

Q. You had mentioned that other jurors had said they're concerned about their safety, but you're very general. Can you give any specific remarks you might have heard?

A. That they saw -- they saw people parked in the parking

lot that could be family members, that there was people -- family members in the audience while -- while the courtroom is going on and they -- that they were staring at us. I don't --

Q. That could be family members of the victim or the Defendant, right?

A. Correct.

Q. Because the case involved gangs on both sides?

A. Correct. Correct.

MR. HAKE: Pass the witness.

REDIRECT EXAMINATION

BY MS. SHEARD:

Q. Mrs. Palacios, the students who came to talk to you back in 2007.

A. Uh-huh.

Q. Did they ask you precisely the same questions that you were asked recently when you met with me and my investigator?

A. Very near, yes.

Q. Were there some questions that were different and that you had not been asked before?

A. I don't remember.

Q. Okay. If you made written statements when you were under less stress than today, you clarified that those would refresh your memory, wouldn't it?

A. It may. It's been a long time.

MS. SHEARD: If I may, Your Honor? I'm going to

approach Mrs. Palacios with her affidavit --

THE COURT: You may.

MS. SHEARD: -- of May 19.

THE COURT: You may.

Q. (BY MS. SHEARD) Mrs. Palacios, may I ask you to take a look at your affidavit. And in particular, at paragraph 3.

Does that refresh your memory as to whether the questions that you were asked on the latter occasion were of the same identical to the former occasion?

A. Seems to be, yes.

Q. Okay. So you were, in fact, asked additional questions at the second interview, isn't that true?

A. Yes.

Q. Okay. So the questions were not precisely the same. There were some subject matter that was --

A. Yes.

Q. -- somewhat different?

A. Correct.

Q. And the students that you saw, did they say whether they were law students?

A. Yes.

Q. Okay. They were younger people?

A. Yes.

Q. Did they make it clear that they were working for Mr. Garza?

A.    They said they were working for an organization that -- some kind of an -- I don't remember.  I'm sorry.  It was an organization to help people to get a fair trial.

Q.    All right.  Okay.

MS. SHEARD:  Your Honor, I don't think I have any further questions for Mrs. Palacios.

MR. HAKE:  I just have one or two, Judge.

RECROSS EXAMINATION

BY MR. HAKE:

Q.    That paragraph you were just asked to look at, the only thing new in there is the name.  You certainly remember the name of the person, right, the bailiff?

A.    Correct.

Q.    The first one has the same part about the gun, it's just the name --

MS. SHEARD:  Your Honor, I don't think that Ms. Palacios could be properly cross-examined about her affidavit.  It's not in front of her.  She wouldn't know what's in each paragraph specifically.

THE COURT:  You can ask questions.  If she remembers, she is going to answer them.

Q.    (BY MR. HAKE)  How come you didn't remember her name, when all of a sudden seven years later you did if somebody didn't suggest it to you?

A.    I don't know.  I just -- I remembered her name.

MR. HAKE: Pass the witness.

FURTHER REDIRECT EXAMINATION

BY MS. SHEARD:

Q. Mrs. Palacios, do you know whether seven years ago you were asked the name of the bailiff?

A. I don't remember. Maybe not.

Q. Is it possible that she was just referred to as the bailiff?

A. As the bailiff. Very possible.

Q. Okay.

MS. SHEARD: I have no further questions.

MR. HAKE: No further questions, Judge.

THE COURT: May Ms. Palacios be excused?

MR. HAKE: Yes, sir.

MS. SHEARD: Yes, she may.

THE COURT: You need her anymore? You need her anymore?

MS. SHEARD: I think she -- out of an abundance of caution, I'd ask that she wait in the hallway.

THE COURT: Can you wait outside, ma'am?

THE WITNESS: Sure.

THE COURT: Don't leave yet.

THE WITNESS: Yes, Your Honor.

THE COURT: Call your next witness, please.

MS. SHEARD: The next witness is Melissa

Guerrero.

THE COURT: Okay. Ms. Guerrero, can you approach up -- can you come up here, ma'am? Come up here to this chair over here.

You can bring it with you.

THE WITNESS: No, I can leave it there.

THE COURT: Okay. Too heavy or what?

THE WITNESS: Yeah.

THE COURT: Take that chair on the outside, ma'am.

You are going to be asked questions. Answer out loud so that the court reporter and everybody else can hear you, okay?

THE WITNESS: Okay.

THE COURT: Thank you. Go ahead.

MELISSA GUERRERO,

having been duly sworn, testified as follows, to-wit:

DIRECT EXAMINATION

BY MS. SHEARD:

Q. Please state your name for the record.

A. Melissa Guerrero.

Q. Is it Mrs. Guerrero?

A. Yes.

Q. Okay. Mrs. Guerrero, were you a juror in the 2005 trial of Humberto Garza?

A. Yes, I was.

Q. Was that the first time you had done jury service?

A. Yes.

Q. During your jury service, did you have any concerns for your personal safety?

A. The first couple of days only because of the extent of the crime, and that it had to do with gang violence. So just that in itself, you know, had me worried.

Q. What was the -- what were the other jurors saying about the security situation?

A. Nothing really was mentioned. Pretty much the same at the beginning. The getting to our cars and looking over your shoulder. You just kind of had that doubt.

Q. What were you concerned might happen?

A. Just being followed. I really didn't know. You just you don't know.

Q. Were there any specific incidents during the trial that caused people to have a concern about their safety?

A. There was one incident that there was a reporter in the room. I didn't see anything.

Q. What was supposed to have happened?

A. A picture was taken, or pictures were taken of the jury.

Q. And what was the reaction of the other jurors to that?

A. Well, they were concerned or worried.

Q.   Was there anything else that caused you concern about your personal safety?

A.   No.

Q.   What -- at some point, did members of the jury express some kind of concern to the court staff about the security situation?

A.   I believe so.

Q.   Did anything happen as a result of that?

A.   We were approached.  I want to say it was the middle, maybe the fifth, sixth day.

Q.   The fifth or sixth day of trial?

A.   Yes.  Uh-huh.

Q.   And who was it that approached you?

A.   The judge.

Q.   Okay.  Where did the judge approach you?

A.   In our holding room, or whatever it is called.

Q.   Is that the jury room --

A.   The jury room.

Q.   -- that's behind the courtroom?

A.   Yes.

Q.   Which is normally a private room, it's not a public area?

A.   Right.

Q.   And did the judge explain why he had come to talk to you?

A. Pretty much just to calm us down, or those who had questions or concerns that safety, you know, we would be parking in a different area. By that point, I think they moved us towards the back.

Q. Let's talk for a moment about the parking. Was there a change in parking arrangements during the trial?

A. Yes, I want to say it was around that same time because of this certain concern.

Q. And was it explained to you that it was concern about security that caused a change in the parking arrangements?

A. Not direct. I mean, since that issue was the one being addressed, I assumed it was because of that.

Q. And when the judge came to talk to you was anybody else in the room with you?

A. Not that I can recall. With me?

Q. With -- with the other jurors?

A. Well, the other jury just us.

Q. It was 12 jurors and the judge?

A. Right.

Q. And nobody else in the room?

A. No.

Q. And what else did the judge say to you?

A. Just that we would be the ones let out first to this new -- towards the back of the parking.

Q. Uh-huh.

A.    And they would wait until we were all gone and then they would release the rest of them.

Q.    Did he say anything else?  Anything specific that you remember?

A.    No.

Q.    Were there other remarks that he made you can't remember?

A.    No.

Q.    Are you sure that there was nothing, no additional conversation?

A.    At that point, no.  Not that I can remember.

Q.    Do you recall him coming back to the jury room on any other occasion?

A.    At the end of the trial.

Q.    Okay.  Let me just back up.  So the conversation with the judge did happen with you during the trial was to do with security concerns?

A.    Correct.

Q.    And with nobody else present?

A.    No.

Q.    Okay.  Do you recall the bailiff in this case?

A.    Yes.

Q.    Do you remember her name?

A.    No.

Q.    Did she ever have a conversation with you that you

recall about security arrangements in court?

A. No, not with me.

MS. SHEARD: I don't think I have any further questions at this time.

THE COURT: Mr. Hake.

CROSS EXAMINATION

BY MR. HAKE:

Q. Ms. Guerrero, you gave an affidavit in this case before, right?

A. Yes.

Q. Where you talked about being the last juror to decide the answer to the questions at the punishment phase?

A. I believe.

Q. You and the other ones?

A. I believe so.

Q. That was back in 2007?

A. I think so.

Q. And nothing you're saying today about these concerns about safety, or these conversations, or the judge going to the jury room, none of that is in that affidavit, is it?

A. I don't think they were ever -- those questions were ever an issue, or they never were brought to my -- I was never asked those questions.

Q. Did you volunteer that information now, or did somebody go find you in the last couple of days and ask you

about those things?

A.   Well, I -- I'm sorry I forgot your name.

          MS. SHEARD:  It's Mrs. Sheard.

A.   Okay.

Q.   (BY MR. HAKE)  You didn't mention it in 2007, all of a sudden now you are.  Did you suddenly remember, or did somebody come and suggest it and bring up those subjects?

A.   Right.  Well, when I was being questioned different things came up.

Q.   Who came and talked to you?  You're pointing to Ms. Sheard?

A.   I went blank again.

          MS. SHEARD:  It's quite -- it's Ms. Sheard.

          THE WITNESS:  Ms. Sheard.

          MS. SHEARD:  I'm defense counsel for Mr. Garza.

          THE WITNESS:  Yes, Mrs. Sheard.

          MS. SHEARD:  And you recognize me as the person who spoke to you, right?

          THE WITNESS:  Yes.

Q.   (BY MR. HAKE)  And they're the ones that asked you about the same kind of questions that you're answering now about safety that you didn't bring up before?

A.   Yes.

Q.   Back when this case was tried -- well, even currently, the 370th District Court is on the first floor of this

courthouse, right?

A. Uh-huh. Yes.

Q. And back then there was a parking lot right outside the door?

A. Yes. Towards the back?

Q. No, on the west side. The right.

A. Okay. Yes.

Q. You go through like where the jury room is, then the judge's chambers and there's --

A. Yes. Yes.

Q. There was a parking lot there?

A. Yes.

Q. In the last couple of years they closed it off, put that iron fence, and changed it, but back then it was right on there by the courtroom, right?

A. Right.

Q. And you said that in the middle of trial, they said you could start parking there?

A. Right.

Q. Particularly when you worked late at night?

A. Uh-huh. Yes.

Q. After hours?

A. Uh-huh.

Q. And you also said you assumed it was because some people were concerned about safety?

A. Correct.

Q. How many times did you have jury duty?

A. During that time?

Q. Just this once? The one time for Mr. Garza's case?

A. No, I was called a couple of times before. I never served on a case.

Q. How about in the 370th District Court? You never have been on another jury in that court, right?

A. No.

Q. So you don't know if it was a regular policy to let people park close by, particularly after hours so they wouldn't have to walk all the way across the street?

A. Right. I'm not sure about that.

Q. In fact, you said a minute ago you assumed it was because of the security, but you didn't know why.

A. Why didn't I know?

Q. No. But you didn't know why the judge had decided to let you park there, you are just guessing.

A. I just assumed because that's what was brought up, yes.

Q. Right. Okay. When the judge came to talk to you all in the jury room was it about scheduling of the case, working -- whether or not you all could work late, or how long the trial would last and things like that?

A. No.

Q. You said the judge also came to talk to you after the trial was over?

A. Yes.

Q. That was probably just to thank you for your service, especially since it was a death penalty case and it took a long time?

A. That and to provide information if anyone needed further counseling, or stuff like that.

Q. Counseling because of the fact that it was a death case and it was traumatic for you all?

A. That and -- exactly.

MR. HAKE: Pass the witness.

REDIRECT EXAMINATION

BY MS. SHEARD:

Q. Ms. Guerrero, when I saw you yesterday was there anybody else with me?

A. Yes.

Q. Okay. Do you remember the name of that person?

A. I believe her name is Vanessa.

Q. Okay. And when we were with you, did we, either of us, suggest that you ought to say a specific thing today?

A. No. You just told me to be honest.

Q. And when you were interviewed back in 2007, or in the past by other people, you gave a statement, didn't you?

A. Yes.

Q.    Okay.  Do you remember who the people were that came to see you at that time?

A.    I don't.

Q.    Okay.  Did they appear to be lawyers?

A.    One was.  I think it was two young men.

Q.    Okay.  Well, could they have been law students?

A.    Perhaps, yes.

Q.    Okay.  And the questions that you were asked on that occasion, were they different from the questions you were asked yesterday?

A.    No, I just think --

Q.    Were the details different?

A.    Right, details.

Q.    It was the same subject matter, but you had --

A.    Same subject matter, but I think your questions were a little more in depth.

Q.    Okay.  And do you recall telling those young men that you did fear for your safety while you were doing jury service?

A.    Yes.

Q.    Okay.  So is it, perhaps, just they didn't ask you the questions about what happened as a result of that?

A.    Correct.

Q.    And that might result in you not having given further details?

A.    Yes.

Q.   You wouldn't necessarily know what needed to be relevant, would you?

A.   Uh-huh.

Q.   Okay.  And when somebody comes to interview you at your home, that person is eating into your free time, aren't they?

A.   Yes.

Q.   So there may be some time constraints, things like that, to prevent having an absolute full conversation about every detail?

A.   Right.

Q.   Okay.

MS. SHEARD:  I don't think I have any further questions.  May I --

THE COURT:  Mr. Hake.

MR. HAKE:  Just one question.

RECROSS EXAMINATION

BY MR. HAKE:

Q.   You said a minute ago that the judge offered you all counseling to be on a death penalty case is traumatic?

A.   Yes.

Q.   Particularly when there's gangs involved on both sides?

A.   Right.

Q.   I mean, it's a tough decision?

A. Uh-huh. Yes.

Q. Something you'd rather not have to do, but you were picked to sit as a juror?

A. Right.

MR. HAKE: No further questions.

MS. SHEARD: Your Honor, I have no further questions.

May I ask if Mrs. Guerrero could -- could she be excused for now, but remain just out of an abundance of caution.

THE COURT: You can remain outside, ma'am, just in case we need you.

THE WITNESS: Okay.

MS. SHEARD: I have no further witnesses.

THE COURT: Mr. Hake.

MR. HAKE: It's my understanding, Judge, that -- that Liche Salinas is waiting in your jury room. Liche Salinas.

THE BAILIFF: Over here?

MR. HAKE: Yes. She's the one sitting in your office. Mr. Devino went to go get her.

THE BAILIFF: Okay.

THE COURT: Ms. Salinas, step forward. How are you doing?

THE WITNESS: Good. How are you Judge? Hello.

(Witness sworn.)

THE COURT: Ms. Salinas, answer the questions as

they're asked of you, okay, and loud enough so everybody can hear you.

THE WITNESS:  Yes, sir.

THE COURT:  Go ahead, Mr. Hake.

ALICIA SALINAS,

having been duly sworn, testified as follows, to-wit:

DIRECT EXAMINATION

BY MR. HAKE:

Q.  Would you state your name for the record.

A.  Alicia Salinas.

Q.  And your nickname?

A.  Liche.

Q.  And how are you employed?

A.  I work for the County of Hidalgo for the 370th District Court.

Q.  You're currently the court coordinator?

A.  Yes, sir.

Q.  Back at the time of the trial of Humberto Garza in 2005 you were the bailiff?

A.  Yes, sir.

Q.  How long have you worked for the 370th District Court?

A.  I'm going on 12 years.

Q.  And Judge Noe Gonzalez has been the judge of that court that entire time?

A.  Yes, sir.

Q. Do you remember the Humberto Garza case?

A. Sort of, yes.

Q. One of three death penalty cases from Edinburg.

A. Yes, sir.

Q. One of two that were tried in your court.

A. Yes, sir.

Q. In order to be a bailiff you have to be certified, right?

A. As?

Q. As far as like you have to be a peace officer?

A. No, sir.

Q. You don't?

A. No.

Q. Okay. Back in 2005 when you were the bailiff during the Humberto Garza trial, did you carry a gun?

A. No, sir.

Q. Do you remember ever telling anybody in the jury in that case that Judge Gonzalez carried a gun?

A. No, sir.

Q. You don't remember, or you did not?

A. I don't remember. I don't recall, and I don't think I would have told somebody.

Q. Did he carry a gun back then?

A. Not to my knowledge, no.

Q. And you work with him daily?

A. Yes, sir.

Q. Except weekends obviously.

A. Right.

Q. What was the policy -- as a bailiff, you would escort the jury in and out of the jury room, right, when they would go into court?

A. Yes, sir.

Q. You'd go in the jury room and tell them, you know, finish your coffee, it's time. The judge has finished with his docket and we are going to take you into the courtroom in a minute?

A. Yes, we'd kind of give them a heads-up if they need to go to the restroom, or finish up your coffee or donut, whatever they're snacking on just to prepare them to get them ready to go in.

Q. And if --

A. We would give them a little bit of notice. We normally do.

Q. If the judge provided them lunch and he didn't have it brought in, would you escort them to the restaurant or whenever they were currently at as the bailiff?

A. Yes.

Q. Where would jurors park when they were serving in the 370th?

A. In the big parking lot unless we were going to work

late, or there was some inconvenience, or we had jurors coming in late then we would make accommodations and block off certain parking area for them.

Q. And you're talking --

A. Just to make it --

Q. -- on the west side where the security area use to be?

A. Yes, sir.

Q. Where the portables were put in?

A. Yes.

Q. I mean, that's -- there's an entrance right into your courtroom, right?

A. That's correct.

Q. In your chambers and offices?

A. Yes.

Q. Do you remember any of the jurors ever expressing any concerns to you about the security at the courthouse during this trial of Humberto Garza?

A. I don't recall specifically, you know, it's --

Q. As the bailiff, you sit outside the juror room while the jury is deliberating, right?

A. Yes, sir.

Q. If they had a note, they'd hand it to you and you would give it to the judge?

A. They would knock on the door and we'd proceed to go and open the door and they would hand over the note.

Q.   And then the judge and the lawyers can discuss how they're going to respond?

A.   Exactly, yes.

Q.   And then usually the judge would ask and say, well, instead of bringing the jury back into the courtroom, is it okay if the bailiff hands them back this note where I wrote on the bottom of it what my response was, right?

A.   Right.  Correct.

MR. HAKE:  Pass the witness.

<u>CROSS EXAMINATION</u>

<u>BY MS. SHEARD</u>:

Q.   Ms. Salinas, you have performed various functions in the 370th court, haven't you?

A.   Yes.

Q.   You have been bailiff some of the time; is that correct?

A.   Yes.  Yes, ma'am.

Q.   Sometimes you acted as interpreter?

A.   Yes, ma'am.

Q.   You're currently the court coordinator?

A.   Yes, ma'am.

Q.   And you were approved of that promotion to be court coordinator?

A.   If you want to put it that way, yes.

Q.   A little step up.  And you have been in that position

since about February 2011, haven't you?

A. Yes, ma'am.

Q. And at the moment, the -- your boss is the judge?

A. Yes, ma'am.

Q. Okay. So he would do things like write performance reviews for you, wouldn't he?

A. Excuse me?

Q. If you have performance reviewed for the human resources department, he would write comments about you, wouldn't he?

A. Yes.

Q. He might have some say in whether you get an increase in salary or not?

A. Yes.

Q. And being a county employee is a position, isn't it, that comes with things like benefits?

A. Yes, ma'am.

Q. And a retirement plan?

A. Yes.

Q. So it's quite a valuable thing to have?

A. Absolutely.

Q. You have been consistently working with the judge for about 12 years?

A. Yes, ma'am.

Q. Isn't it right that the room that you work in is right

outside the judges's chambers itself?

A. Yes.

Q. So you're physically very close to him?

A. Yes.

Q. He can just call out and you are at his side in a minute?

A. Yes, ma'am.

Q. Okay. And it would be fair, wouldn't it, to describe you as a valued member of his staff?

A. Yes.

Q. You like certainly working here?

A. Yes, absolutely.

Q. And in fact, it's been a practice, or it was the practice with the court reporter, Mr. Moreno, who's now deceased, that they would put your name on the trial transcript along with the judge and the lawyers?

A. Yes.

Q. Right. Are you aware that there's a Code of Ethics that governs what judges can in fact do?

A. Yes.

Q. There are rules about what judges should and shouldn't do --

A. Yes.

Q. -- in their role as judges. And that includes things like behaving with dignity and being impartial in cases?

A. Yes.

Q. And that he is supposed to make sure that his staff follows some of those same rules?

A. Yes, absolutely.

Q. And also don't discriminate?

A. Right.

Q. And behave with dignity?

A. Yes.

Q. And for example, that they shouldn't -- it might be undignified to gossip with people about cases?

A. Right.

Q. Right. Do you have training in a way that you supervise jurors when you acted as bailiff?

A. I've gone to some trainings, yes. The court bailiff workshops.

Q. Who run those workshops?

A. I believe it's the State.

Q. Okay. So that's an official training?

A. Yes, ma'am.

Q. And they teach you the rules, don't they, about what you should and shouldn't do to keep the jury room a private place?

A. Yes.

Q. And do you understand, don't you, that the jury is not supposed to be exposed to anything that might cause them to be

prejudiced one side or the other?

A. Absolutely.

Q. Apart from the evidence they hear in the courtroom from the witness stand where you are sitting now?

A. Yes.

Q. You understand, don't you, that you are not supposed to talk about the case with the jury except in the presence of the judge and with his permission?

A. Absolutely.

Q. There's actually rules about the judge not communicating with the jury except in writing?

A. Right.

Q. Okay. And that if you breach some of those rules, do you understand that that can result in confinement in jail or a fine?

A. Yes.

Q. Yeah. It's a serious matter, isn't it?

A. Yes, ma'am.

Q. Okay. And if you were to break those rules, it could result in a mistrial of the case, couldn't it?

A. Yes, ma'am.

Q. Or the case being reversed later on appeal?

A. Yes.

Q. And if you as a court member, staff member caused problems like that, it would have repercussions for you,

wouldn't it?

A. Absolutely.

Q. You might be demoted?

A. Right.

Q. You could lose your job?

A. Yes.

Q. There might also be severe consequences for the judge mighten there?

A. Yes.

Q. He would lose his reputation if he'd allow something like that to go on?

A. Right.

Q. It could cause negative comments in the media?

A. Right.

Q. And the reversal of the case would also result in some loss of reputation for him?

A. Yes.

MS. SHEARD: I don't have any -- I don't have any further questions.

THE COURT: Mr. Hake.

MR. HAKE: Just one question.

REDIRECT EXAMINATION

BY MR. HAKE:

Q. That long discussion about possible affects on your reputation or judge's, that's all based on speculation, right?

A. Yes.

Q. That something had happened, or something improperly happened with no evidence, or discussion if there had been? She's just talking about possibilities, she never said anything actually happened and that --

A. Right. Right.

Q. -- you or the judge actually did anything?

A. Right. No.

MR. HAKE: Pass the witness.

MS. SHEARD: I have no further questions.

THE COURT: You may be excused.

THE WITNESS: Thank you.

THE COURT: State.

MR. HAKE: I don't have anymore. The State rests, Your Honor.

(End of requested excerpt.)

THE STATE OF TEXAS §

COUNTY OF HIDALGO §

I, JESSIE C. SALAZAR, Official Court Reporter in and for the 139th Judicial District Court, Hidalgo County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total copy rate for preparation of this Reporter's Record is $90.00 and was paid by the DISTRICT ATTORNEY'S OFFICE.

WITNESS MY OFFICIAL HAND this 17th day of June, A.D., 2014.

_____
**JESSIE C. SALAZAR, C.S.R.**
**Texas C.S.R. #4286**
**Official Court Reporter, 139th J.D.C.**
**Hidalgo County Courthouse**
**Edinburg, Texas, U.S.A.  78539**
**Telephone:  956.318.2260**
**C.S.R. Certification No. 4286**
**Expires:  December 31, A.D., 2015**

# Exhibit I

Affidavit of Rose Marie Palacios, May 19, 2014

STATE OF TEXAS )

                      )    Ex parte Humberto Garza III

County of Hidalgo )

## Affidavit of Rose Marie Palacios (formerly Rose Marie Vera)

BEFORE ME, the undersigned notary public, on this day personally appeared Rose Marie Palacios, formerly Rose Marie Vera, who, upon being duly sworn by me, states as follows:

1. I am Rose Marie Palacios, formerly known as Rose Marie Vera. The change in my name is because Vera was my married name. I am now divorced.

2. I was a juror at the 2005 death penalty trial of Humberto Garza. I gave an affidavit concerning that trial in 2007, which I have reviewed, and I confirm that the facts stated in that affidavit are true and correct to the best of my knowledge.

3. I have now been asked additional questions concerning Mr. Garza's trial. In my previous affidavit, I explained that the bailiff at the trial had told the jury members that the judge always carried a gun. That bailiff was a little woman whose name was "Licha." She took us to and from the jury room and generally escorted us. For example, when the judge bought us all lunch, which happened on a couple of occasions, Licha took us to the restaurant.

4. So far as I recall, Licha's comment about the judge always carrying a gun was made when all of the jury was together in the jury room behind the courtroom.

5. Some members of the jury were concerned about whether they were safe, given that we were sitting on a case involving a gang. There were jurors who were alarmed that there was a reporter who took a photograph in the courtroom, and who were concerned about people in the courtroom who might be gang members.

1

6.  Some jurors were worried about whether they were safe parking in the public lot at the front of the courthouse. For example, some, including me, were concerned that a relative or supporter of Mr. Garza might write down our license plate numbers out in that lot, and then follow us.

7.  I was concerned about my personal safety. When we heard from Licha that the judge carried a gun, I believed that to mean that he must have past experiences of being threatened. Licha's comment about the gun added to my fear.

8.  Some members of the jury told Licha we were concerned about the security situation, although I did not personally complain about it.

9.  There was a young man on the jury who sat next to me who seemed so scared that after the sentencing he literally ran from the room and let the door almost swing into my face.

10. In my previous affidavit, I mentioned that the judge had warned us that sometimes gang members come after members of the jury in a case. I was not previously asked to explain when that warning was given. It was when the jury was in the jury room. It was not in open court. So far as I recall, the attorneys representing the State and the defense were not present at that time, or at any time when the judge was with us in the jury room.

11. A couple of times at least the judge spoke to us in the jury room in response to a note we sent out. I can't remember precisely, but I think we sent out at least a couple of notes. At times Licha would respond if we had a question.

12. As stated in my previous affidavit, the judge reassured us that the reporter who took a photograph in court was legitimate. My recollection is that we were all back in that jury room when the judge gave that reassurance.

2

13. I think that the court reporter, who was a young man, came into the jury room a couple of times also, but I can't remember why he was there.

14. When I signed my previous affidavit, I had forgotten that part way through the trial we were allowed to start parking in the lot behind the courthouse, which was used by the judges and court staff. We were told by the deputies that the change was made because jurors had expressed fear about the gang members. I think that the change in parking arrangements only made me more scared that something might happen to me.

15. The Judge made it very clear that the case would definitely conclude by Easter. While I thought it was possible that we might continue longer than that if it was necessary, I thought that it was inappropriate to fix a finishing time in a case where a man's life was at stake.

16. In the end, the trial was not that long - just a couple of weeks at most - and the sentencing phase seemed very short.

17. The lead defense attorney looked professional, but he showed no passion: it was as though his heart was not in it.

18. This was not an attorney who even seemed to be trying very hard. He did not present much evidence. It made me sorry for the young man on trial, to be represented by an attorney like that.

19. When the lead defense counsel presented the character witnesses at sentencing, he did not draw much out of them. I could not even understand the point of his aunt's testimony. The religious witnesses did not really have any impact on me at all.

20. The lead defense attorney argued that Mr. Garza did not intend or expect the people who died in that house to be shot, but that was just not credible - it was going too far to expect us to believe that.

3

21. The lead defense attorney seemed to be thrown off course by the prosecution objections when defense evidence was being presented.

22. The junior defense attorney hardly spoke at all, and I was not sure what he was doing there. He seemed almost like an assistant or secretary.

23. The end of the sentencing was very emotional. I was actually worried that people might pass out. There were people in the jury room crying openly, even a younger man was just sobbing like a baby. For some reason we had to wait there until the judge came to talk to us. I can't even remember what he said then, but he did not try to console the people who were so upset.

24. It is my belief that the issue of security during the trial played a big role in my decision on the issue of deciding whether Mr. Garza was a future danger to society. I had my own security concerns very much in mind, and they were increased by Licha's comment about the judge carrying a gun, and by what the judge said about the gang following jurors.

I have read this affidavit and swear upon pain and penalty of perjury that it is true and correct.


_Rose Marie Palacios_
Signed

SIGNED AND SWORN before me this ___19th___ day of ___May___, 2014:


_Gwendolyn Boyzo_
NOTARY PUBLIC

GWENDOLYN BOYZO
My Commission Expires
May 27, 2017

4

# Exhibit J

Affidavit of Rose Marie Vera, July 14, 2007

STATE OF TEXAS }

COUNTY OF HIDALGO }

## <u>AFFIDAVIT OF ROSE MARIE VERA</u>

My name is Rose Marie Vera. I am a resident of Hidalgo County, Texas. I am over the age of eighteen and am competent to make this affidavit. All the facts stated here are within my personal knowledge.

1. I was a juror in the 2005 capital murder trial of Humberto Garza.

2. The death penalty was presented to us as if it was not our decision to make. We just answered the questions given to us and then it was the judge who gave death penalty. It is the judge's authority to give the death penalty.

3. The way it was explained to the jury, and the way I understood it, is that it was capital murder if you were involved in the crime any way.

4. The security guards and deputies would occasionally make sure we got to our car in the parking lot safely. Another night, when we went to the parking lot, only one car remained. Mr. Garza's mother was sitting in her car, alone, staring at us. I was worried she was writing down our license plate numbers. Another night during the trial, I thought a truck was following me home from the courthouse. I moved aside so it could pass me, but it didn't pass me. I drove past my driveway and circled the block and the car stopped following me.

5. During the trial, the male jurors noticed that a couple of Garza's friends in the audience were staring at us. There was a reporter in the audience who took a picture of us. We were scared and we took our fears to the judge. The judge assured us that the reporter was legitimate and trustworthy.

6. The judge warned us that sometimes gang members come after the jury. What made it scary for us is that you never know who is or is not a gang member in the Valley. I thought Garza's gang could work anywhere, even inside the courtroom.

7. The judge carried a gun. He always had one. We knew this because the bailiff told us that the judge carried one. Even the bailiff didn't carry a gun.

8. After the death verdict was read, there was one man who was so scared that he ran through the door to get out of the courtroom before everyone else. I remember he hit let the door hit me on his way out, he was so scared.

9. I was worried that Garza's lawyers would feel rushed because the judge said, "we are going to finish. There is no way we are going to come back after

Easter." I think he mentioned something about traveling or fishing with his son. We finished on Holy Thursday.

10. Garza's lawyer was professional, but not passionate. The lawyer just did not have a lot to work with.

11. I feel all of the defendants should be punished equally for their involvement in the crime. If I had known Marcial Bocanegra, one of the shooters in the murders, would receive a 35-year sentence for the actual shooting, I would have voted for a life sentence for Humberto Garza instead of a death sentence.

12. On June 29, 2007, Felicia Espinosa and Peter Walker, two student interns, showed me affidavits from Garza's mother and aunt. This evidence was not presented at trial. I did not know about Garza's sexual molestation. The affidavits show a very dysfunctional family. I did not see that at trial.

13. I do remember from trial that Garza's father was in prison and Garza had seen a neighbor killed as a kid. Garza's mother testified that Garza was working at the time. She thought he was doing well. She should have known he was meeting with his old friends. The testimony of Ms. Garza's mother was just not compelling.

I have read all 13 paragraphs of the above statement and swear, under the pain and penalty of perjury, that it is true and correct to the best of my knowledge. I give this statement of my own free will.

_Rose Marie Vera_
Rose Marie Vera

_07-14-07_
Date

Subscribed to and sworn before me by Rose Marie Vera on this _14_ day of July, 2007.

_Malic Cavg_
Notary Public

My Commission expires: _5-30-09_

MARIO CAVAZOS
MY COMMISSION EXPIRES
May 30, 2009

# Exhibit K

Affidavit of Melissa Guerrero, July 14, 2007

STATE OF TEXAS             }
                                  }

COUNTY OF HIDALGO     }

## AFFIDAVIT OF MELISSA GUERRERO

My name is Melissa Guerrero. I am a resident of Hidalgo County, Texas. I am over the age of eighteen and am competent to make this affidavit. All the facts stated here are within my personal knowledge.

1. I was a juror in the in Humberto Garza's 2005 Capital Murder trial.

2. As it was explained to us, the jurors were supposed to only answer the special issue questions during the sentencing phase of the trial. It was the judge who would ultimately decide Humberto Garza's sentence.

3. Even after the special issue questions had been answered, I still did not know what Humberto Garza's sentence would be. When the judge announced the death sentence I took it really hard.

4. If I had known Mr. Cantu, the other person accused of planning the robbery, would be acquitted of charges relating to the murders, it would have influenced me to vote for a life sentence rather than a death sentence.

5. If I had known that Mr. Bocanegra, one of the shooters in the murders, would receive a 35-year sentence for the murders, I would have voted for a life sentence instead of a death sentence.

6. Both Cantu's acquittal and Bocanegra's sentence would have influenced me sufficiently to vote for a life sentence.

7. During the sentencing phase, I remember looking at a list of Humberto Garza's prior convictions. One conviction for breaking into a house had the prefix "aggravated" before it. Arlett Lomeli, another juror, who had worked as a probation officer, explained to me and the other jurors that "aggravated" meant that someone had been at home in the house at the time of the break-in.

8. I relied upon and considered Arlett's explanation in determining that Humberto Garza would be a danger in the future. It definitely influenced me in determining Humberto Garza's future dangerousness.

9. During the trial, I feared for my safety as a juror. I was worried that I would be the victim of retaliation by a gang for my involvement with the trial.

10. I was the "holdout juror" during the sentencing phase. Eventually, I was the only one who did not want to give a death sentence. I argued that Humberto could change, that he could be rehabilitated. Eventually I gave in and agreed with everyone. If I had known that the jury's decision regarding the sentence was final, and that it would necessarily result in the judge giving a death sentence, I would have been influenced to vote for a life sentence rather than a death sentence.

I have read all 10 paragraphs of the above statement and swear, under the pain and penalty of perjury, that it is true and correct to the best of my knowledge. I give this statement of my own free will.

_____
Melissa Guerrero

7/14/07
_____
Date

Subscribed to and sworn before me by ~~Miguel Martinez II~~ Melissa Guerrero my
on this ____ day of July, 2007.

_____
Notary Public

My Commission expires: 5-11-2011

DENNIS A. FILIPPI SR.
Notary Public, State of Texas
My Commission Expires
May 11, 2011

# Exhibit L

July 7, 2014 Letter of Assistant District Attorney Theodore C. Hake to the Hon. Noe Gonzalez

July 7, 2014



Judge Noe Gonzalez
370th District Court
Hidalgo County, Texas
Hidalgo County Courthouse
100 North Closner
Edinburg, Texas  78539



RE:  Cause No. CR-3175-04-G (1),
     styled Ex parte Humberto Garza



Dear Judge Gonzalez:


     A courtroom hearing was set for June 9, 2014 in this habeas proceeding. However, said hearing had to be postponed because habeas counsel for Applicant filed a motion to recuse you from further involvement in this case; 139th District Court Judge J.R. "Bobby" Flores, who was assigned to hear said motion, held a hearing on June 16, 2014; and Judge Flores then took the matter under advisement and asked each side to submit a memorandum of law.

     On July 3, 2014, Judge Flores signed an order denying Applicant's motion to recuse you from further involvement in this case.

     Earlier today, I received an E-mail copy of a letter to you in which Ms. Sheard indicated that she will be filing a petition for writ of mandamus and a motion for a stay of proceedings in the trial court later today or tomorrow at the latest.

     *Despite this indication of Ms. Sheard's intentions, the State believes that you should still re-schedule the evidentiary hearing for the soonest available date, for several reasons.*

First of all, the Court of Criminal Appeals may or may not grant Applicant's request for a stay of proceedings, should he seek such a stay.

Secondly, given the fact that the hearing was previously set for June 9, 2014, and only delayed because of the intervening recusal proceedings, neither side should have any difficulty being ready to go forward with said hearing.

Third, setting this matter for a hearing as soon as possible will demonstrate that the you, as the trial judge, and the parties are attempting to move this case along toward ultimate disposition as expeditiously as possible, despite the delay caused by the inability to take any action while the recusal issue was pending. Clearly, demonstrating this point is a major concern given the deadline to resolve any outstanding issues in this case imposed by the Court of Criminal Appeals' April 7, 2014 order in this case.

In order to ensure her awareness of this communication, I have E-mailed a copy of this letter to Applicant's habeas counsel Hilary Sheard at Ms. Sheard's E-mail address of HilarySheard @Hotmail.com.  I have also mailed a follow-up copy of said item to Ms. Sheard addressed to Hilary Sheard, Attorney at Law, 7301 Burnet Road # 102-328, Austin, Texas  78757.

Thank you for your attention to this matter.


Respectfully,


THEODORE C. HAKE, Assistant
Criminal District Attorney
Hidalgo County, Texas


xc:  Hilary Sheard
     Attorney at Law
     7301 Burnet Road, #102-328
     Austin, Texas  78757